# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION



GEORGE D. ARNESEN
280 Tangelo Drive
Buras, LA 70041

JEFFREY RYAN BRADLEY
8033 Westwood Circle
Ocean Springs, MS 39564

> *Plaintiffs,*

*v.*

GINA RAIMONDO, U.S. Secretary of
Commerce
1401 Constitution Ave. NW
Washington, DC 20230

NATIONAL MARINE FISHERIES SERVICE
(NMFS)
1315 East-West Highway
14th Floor
Silver Spring, MD 20910

JANET COIT, NMFS Assistant Administrator
1315 East-West Highway
14th Floor
Silver Spring, MD 20910

SAMUEL D. RAUCH III, NMFS Deputy
Assistant Administrator for Regulatory
Programs
1315 East-West Highway
14th Floor
Silver Spring, MD 20910

Civil Action No. 1:23cv145 TBM-RPM

**PETITION FOR REVIEW AND
COMPLAINT**

GULF OF MEXICO FISHERY MANAGEMENT
COUNCIL
4107 West Spruce St.
Suite 200
Tampa, FL 33607

PHIL DYSKOW, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

THOMAS FRAZER, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

ROBERT GILL, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

GREG STUNZ, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

TROY WILLIAMSON, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

SUSAN BOGGS, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

BOB SHIPP, Council Member
4107 West Spruce St.

Suite 200
Tampa, FL 33607

BILLY BROUSSARD, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

JONATHAN DUGAS, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

MICHAEL MCDERMOTT, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

DALE DIAZ, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

SCOTT BANNON, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

KEVIN ANSON, Council Member designee
4107 West Spruce St.
Suite 200
Tampa, FL 33607

PATRICK BANKS, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

CHRIS SCHIEBLE, Council Member designee
4107 West Spruce St.
Suite 200
Tampa, FL 33607

JESSICA MCCAWLEY, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

CHRISTOPHER SWEETMAN, Council Member
designee
4107 West Spruce St.
Suite 200
Tampa, FL 33607

ROBIN RIECHERS, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

DAKUS GEESLIN, Council Member designee
4107 West Spruce St.
Suite 200
Tampa, FL 33607

GEN. JOE SPRAGGINS, Council Member
4107 West Spruce St.
Suite 200
Tampa, FL 33607

RICK BURRIS, Council Member designee
4107 West Spruce St.
Suite 200
Tampa, FL 33607

ANDY STRELCHECK, Council Member and
NMFS Regional Administrator

NMFS Southeast Regional Office
263 13th Ave. South
St. Petersburg, FL 33701

_Defendants._

## Introduction

1.    The United States is blessed with abundant natural resources, including teeming marine fisheries.  The Framers recognized that our fisheries are vital to the Nation, THE FEDERALIST No. 4 (John Jay), and the Government has an obligation to ensure these vital resources are harvested responsibly.  How to balance the competing interests in fishing—production versus conservation, commercial versus sport, fishing versus other uses of marine resources—is a complex question that turns on fundamental values and broad policy priorities.

2.    Despite the national importance of offshore fishing regulation, Congress has removed the issue from democratic control.  Rather than make these decisions itself or vest them in executive agencies accountable to the elected President, Congress has assigned control of the nation's fisheries to novel federal councils that violate the Constitution's structural protections in multiple respects.  This unconstitutional regime puts local fishermen like George Arnesen and Ryan Bradley at the mercy of

unaccountable bureaucrats who answer only to themselves. The Constitution's fundamental promise of representative government forbids that result.

3.     In 1976, Congress passed the Magnuson-Stevens Fishery Conservation and Management Act (Act). The Act was Congress's first comprehensive attempt to regulate fishing in federal territorial waters. At the time, Congress was concerned that foreign fleets were entering federal waters and pilfering a precious American resource. Congress also feared that new technologies could trigger unsustainable overfishing—threatening ecosystems and the Nation's long-term food security. These were noble aims, and ones that nobody understands better than Plaintiffs, for whom the long-term health of America's marine fisheries is a matter of deeply personal concern.

4.     In its zeal to regulate, however, Congress converted federal waters into Constitution-free zones, violating the Constitution in multiple respects—violations that are increasingly drawing judicial scrutiny. For example, the Fifth Circuit recently held that the National Marine Fishery Service (NMFS), which administers the Act, violates the Fourth Amendment rights of fishermen when it subjects their boats to round-the-clock GPS surveillance. *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956 (5th Cir. 2023). And fishermen are currently in the Supreme Court challenging NMFS's power under the Act to force government observers onto fishing boats while making fishermen fund that federal surveillance. *Loper Bright Enters. v. Raimondo*, No. 22-451, 2023 WL 3158352 (S. Ct. May 1, 2023). A well-intentioned attempt at rule by

enlightened experts has devolved, as usual, into a bureaucratic morass captured by narrow interests.

5.    That dynamic is clear in this case, which confronts the unconstitutional core of the Act's regulatory apparatus. At the heart of the Act are eight Regional Fishery Management Councils: federal entities charged by Congress with "exercis[ing] sound judgment in the stewardship of fishery resources" within multi-state zones. 16 U.S.C. § 1801(b)(5). This suit involves the Gulf of Mexico Fishery Management Council, upon which Congress has bestowed broad policymaking "authority over the fisheries in the Gulf of Mexico seaward of" Texas, Louisiana, Mississippi, Alabama, and western Florida. *Id.* § 1852(a)(1)(E).

6.    Congress "designated" the Councils as the "primary policy makers" for federal fisheries, "vest[ing] [them] with the authority to develop management plans" that "dictate the fundamental objectives and methods of managing a given fishery." William R. Rogalski, *The Unique Federalism of the Regional Councils Under the Fishery Conservation and Management Act of 1976*, 9 B.C. Env't Affs. L. Rev. 163, 177–78 (1980). This is clear from the Act's text, which enshrines the Councils as the first and last word on marine fishing policy. The Act provides that each Council "shall have authority" over, and "develop annual catch limits for," its fisheries. 16 U.S.C. § 1852(a)(1), (h)(6). And each Council "shall" craft all "measures … necessary and appropriate for the conservation and management" of those fisheries. *Id.* § 1853(a)(1)(A). Once a Council exercises that power, the Secretary of Commerce "may repeal or revoke" its policies

3

only if three-quarters of the Council approves of the Secretary's policy choice. *Id.* § 1854(h).

7.     Given this broad authority to set, monitor, adjust, and preserve federal policies—authority that trumps even the Commerce Secretary's power in certain respects—one would expect some degree of federal democratic control over the Councils.  But Congress provided just the opposite, immunizing Council Members from meaningful control by the President, his Commerce Secretary, and through them the American people.  It conferred the power to appoint Council Members on *state* rather than *federal* officials and it granted Members nearly impenetrable tenure protections.  Congress thus ensured that fishermen like Plaintiffs are regulated by officials insulated from democratic control and vulnerable to capture by narrow private interests.  More fundamentally, Congress broke the Constitution's promise of separated powers and executive accountability to the President.  This is clear in multiple respects.

8.     To start, the Act makes no effort to hew to the Appointments Clause.  *No federal official* is empowered to select and approve the vast majority of voting Council Members.  Five hold their federal office simply by virtue of holding particular state offices. *Id.* § 1852(b)(1).  Thus, a large bloc of each Council is composed of *state* officials who wield *federal* authority without having been approved by the President, the Secretary of Commerce, or anyone else with constitutionally sound appointment power.

9.     Another group of Council Members is likewise chosen by state officials, albeit in a more complicated fashion.  Governors of the states within each Council's

region assemble lists of three or more potential Council Members whom they deem "qualified" under statutory criteria. *Id.* § 1852(b)(2)(A), (C). Those lists are submitted to the Secretary, who may either approve an appointment or "notify" the governor that he must provide "an additional explanation" of a nominee's "qualifications." *Id.* § 1852(b)(2)(C). The Secretary is forbidden from going outside the governors' lists of approved nominees to make her own selection.

10.    Then there are Council Members' removal protections. Most incredibly, under no circumstances may anyone in the Executive Branch dismiss a Member who holds his seat by virtue of his role in a state government. *Id.* § 1852(b)(1)(A). The Members from the governor-curated lists, for their part, can be removed only "for cause," with "cause" defined as solely breaking specific conflict-of-interest rules. *Id.* § 1852(b)(6). For *anything else*, the Secretary is limited to asking the Council to remove one of its own by a two-thirds supermajority vote. *Id.*

11.    These appointment methods and removal restrictions are patently unconstitutional. Council Members are "officers of the United States" subject to the Appointment Clause. But they are not selected according to its rules. Moreover, due to their near-ironclad removal protections, the Councils exercise policymaking authority beyond presidential control. That insulation flouts the Constitution's vesting of executive power in the President and frustrates his obligation to faithfully execute the Nation's laws.

12.    The Act's operation demonstrates the shortsightedness of subordinating constitutional structure to novel innovation.  Councils have been captured by special interests, from foreign-funded seafood titans to well-connected recreational fishermen. The immediate casualties are working-class commercial fishermen like Plaintiffs, who face a campaign of exclusionary restrictions.  Without the deep pockets or personal connections necessary to penetrate and persuade an insulated Council, these small businessmen face economic extinction.

13.    The public also suffers under this regime.  By favoring recreational fishermen over the commercial sector, the Councils have harmed consumers hoping to find high-quality American seafood in grocery stores and restaurants.  The Councils have also failed to foster sustainability and undermined our domestic fishing fleet.  In particular, the Councils have implemented so-called "catch share" programs that divvy up fishing rights in a discriminatory manner and then allow them to be bought and sold. This policy has consolidated the commercial fishing industry, squeezing out local fishermen and forcing them to lease rights from mega-corporations.

14.    If this weren't enough, the Council's work is implemented by an agency official at NMFS who *himself* wields federal executive power in violation of the Constitution.  That position, the Deputy Assistant Administrator for Regulatory Programs, is currently filled by Defendant Samuel Rauch.  A career civil servant, Mr. Rauch is not subject to the at-will removal the Constitution requires for such senior executive officials.

15.    As a result of the illegitimate exercise of federal authority by the Council and NMFS, Plaintiffs face the prospect of their industry's demise.  George and Ryan operate small fishing businesses in fishing-dependent coastal communities.  Among other species, they target greater amberjack (pictured below), one of the few major Gulf reef species still free from catch-share regulation.  Amberjack falls within the Council's Reef Fish Fishery Management Plan (FMP), which sets catch limits and other rules.



Greater Amberjack (*Seriola dumerili*)

16.    The Council's latest policy initiative is Amendment 54, which slashes commercial amberjack catch limits by about 80%.[1]  Amendment 54 makes it all but impossible for Plaintiffs to profit from this fishery by restricting them to harvesting 250 lbs. of amberjack per trip—a few fish—once three-quarters of the overall catch limit is brought ashore.  Plaintiffs cannot justify the cost and risk of venturing into the Gulf to bring home just 250 lbs. of amberjack.  For fishermen like Plaintiffs, Amendment 54 threatens to end a generations-long history of amberjack fishing in the Gulf of Mexico.

---

[1] The Council's commercial amberjack catch limits took effect immediately upon NMFS's June 15, 2023 issuance of the Amendment 54 Final Rule.  *See* 88 Fed. Reg. 39193, 39201 (June 15, 2023).  As a result, on June 16, 2023, NMFS announced the closure of the 2023 commercial amberjack season effective June 18, 2023.

17.     Not only does Amendment 54 effectively shut Plaintiffs out of this fishery, it does so in part by redistributing rights from commercial fishermen to the recreational sector.  That is a significant and destructive shift.  The tiny recreational sector caters to wealthy hobbyists, not average Americans looking for fresh seafood; it cannot support struggling coastal communities; and it is more wasteful.  As Plaintiffs can attest, this is the latest example of insulation from accountability leading to agency capture, of which the recreational sector has taken full advantage.

18.     This Court should vacate, enjoin, and declare unlawful Amendment 54 and the Amendment 54 Final Rule.

## PARTIES

19.     Plaintiff George Arnesen is a second-generation commercial fisherman from Venice, Louisiana.  George has worked as a commercial fisherman for 40 years, and his dream is to fish the Gulf as long as he is able.  Since obtaining a Gulf of Mexico Reef Fish Permit in 1996, George has targeted multiple reef species, including greater amberjack.  George and his wife have fished together since 1999.  They operate a single commercial vessel: the *Ms. Aleena*, a 39-foot Key West named after their daughter.  The Arnesens built a profitable amberjack business by harvesting fish and driving them directly to wholesalers in New Orleans who then sell to seafood restaurants.



The *Ms. Aleena* after Hurricane Ida



The *Ms. Aleena*'s namesake with a
greater amberjack

20.    Plaintiff Ryan Bradley is a fifth-generation commercial fisherman from Ocean Springs, Mississippi and the Executive Director of Mississippi Commercial Fisheries United.  Ryan started fishing at age 7 with his grandfather, who worked the Gulf as a shrimper and oysterman for 50 years.  Ryan holds a Reef Fish Permit and operates a single commercial vessel: the *Fighting Chicken*, a 32-footer with a fish-hold capacity of 2,000 pounds.  Weather permitting, Ryan makes weekly trips into the Gulf. He primarily targets greater amberjack, red snapper, mangrove snapper, and grouper. Ryan has harvested amberjack commercially for the past 7 years.  In 2018, he founded Sea Alis Seafood Company, a federally licensed seafood dealer, and operates the business from Pass Christian, Mississippi.  Ryan's primary customers are restaurants across Mississippi.



Sea Alis amberjack and red snapper



Ryan on the docks in Pass Christian



Ryan's son with a greater amberjack

21.     Defendant Gina Raimondo is the Secretary of Commerce and the official charged by law with administering the Act. She is sued only in her official capacity.

22.     Defendant National Marine Fisheries Service (NMFS) is an agency within the Department of Commerce. The Secretary of Commerce has delegated to the National Oceanic and Atmospheric Administration (NOAA) the authority to administer the relevant portions of the Act; NOAA sub-delegated that authority to NMFS. *See infra* ¶¶ 58–59.

23.     Defendant Janet Coit is the Assistant Administrator for Fisheries at NMFS. She has been delegated the power to administer various portions of the Act by the Under Secretary for Oceans and Atmosphere. *See infra* ¶ 59. She is sued only in her official capacity.

24.     Defendant Samuel Rauch is the Deputy Assistant Administrator for Regulatory Programs at NMFS. The Assistant Administrator for Fisheries has

delegated the authority to sign materials for publication in the Federal Register and the Code of Federal Regulations to this official. Mr. Rauch executed the Amendment 54 Final Rule, finalizing the Amendment and accompanying regulations as legal and binding. 16 U.S.C. § 1854(a)(1)(A), (b)(1). He is sued only in his official capacity.

25.     Defendant Gulf of Mexico Fishery Management Council ("the Council") is the federal entity with "authority over the fisheries in the Gulf of Mexico seaward of" Texas, Louisiana, Mississippi, Alabama, and western Florida. *Id.* § 1852(a)(1)(E). The Council developed and issued Amendment 54 and accompanying regulations.

26.     Defendants Phil Dyskow, Thomas Frazer, Robert Gill, Greg Stunz, Troy Williamson, Susan Boggs, Bob Shipp, Billy Broussard, Jonathan Dugas, Michael McDermott, Dale Diaz, Andy Strelcheck, Scott Bannon (and his designee, Kevin Anson), Patrick Banks (and his designee, Chris Schieble), Jessica McCawley (and her designee, Christopher Sweetman), Robin Riechers (and his designee, Dakus Geeslin), and Gen. Joe Spraggins (and his designee, Rick Burris)—hereinafter the "Voting Members"—comprise the voting Members of the Council that developed Amendment 54 and will develop future annual amberjack catch limits as mandated by the Act. *See id.* § 1852(h)(6). They are sued only in their official capacities.

## JURISDICTION AND VENUE

27.     This is an action arising under the United States Constitution and the Magnuson-Stevens Fishery Management Act, 16 U.S.C. § 1801 *et seq.* The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

28.    The Act authorizes judicial review of NMFS rules and district-court jurisdiction over cases arising under the Act.  16 U.S.C. §§ 1855(f), 1861.

29.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as by Federal Rule of Civil Procedure 57.

30.    Equitable relief is authorized under this Court's equitable powers, *see, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and the Administrative Procedure Act as incorporated by the Act, 16 U.S.C. § 1855(f)(1); 5 U.S.C. §§ 703, 706.

31.    Venue is proper in this District under 28 U.S.C. § 1391(e).

32.    There is an actual controversy between the parties concerning the lawfulness of Amendment 54 and the Amendment 54 Final Rule.  Plaintiffs will suffer concrete, irreparable injuries traceable to Defendants and redressable by this Court.  *See infra* ¶¶ 128–36.

## FACTUAL ALLEGATIONS

### *Federal Fisheries Management*

33.    For much of its history, the United States claimed only a narrow strip of exclusive territorial waters.  *See* Congressional Research Service, R43565, *Reauthorization Issues for the Magnuson Stevens Fishery Conservation and Management Act* 31 (May 22, 2014) ("CRS Report").  Nearly all regulation of commercial fishing fell to state authorities, who still manage nearshore waters.  *See United Cook Inlet Drift Ass'n v. NMFS*, 837 F.3d 1055, 1058 (9th Cir. 2016).  But after the United States asserted jurisdiction up to 200 miles offshore, substantial waters lay beyond state regulation and open to exploitation.

34.     Congress grew concerned that foreign fleets were overfishing American stocks and, in 1976, passed the Fishery Conservation and Management Act—a comprehensive attempt to regulate fishery resources in federal waters. The statute has been reauthorized and amended multiple times.

35.     The Act establishes federal jurisdiction over all marine fishery resources located within 200 miles of any United States coastline and beyond state territorial waters. *See* 16 U.S.C. § 1811(a). To regulate this zone, the Act created "an entirely new[] regional management system." CRS Report at 34. And to operate it, the Act created eight Regional Fishery Management Councils. *See* 16 U.S.C. § 1852. Those "councils, composed of federal, state, and public representatives, are not modeled after any other authority; rather, they were shaped by the demands of compromise and necessity." Rogalski, *supra*, at 164–65. "[P]olitical pressures played an important role in placing the states in a dominant representative position on the councils," in part because the industry "would have been hostile towards a purely federal regime." *Id.* at 174.

36.     Among the Act's enacted purposes is to "promote domestic commercial and recreational fishing under sound conservation and management principles" by "provid[ing] for the preparation and implementation … of fishery management plans." 16 U.S.C. § 1801(b)(3)–(4). Congress "establish[ed] Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans." *Id.* § 1801(b)(5). These

Councils must consider the interests of "States, the fishing industry, consumer and environmental organizations, and other interested persons," and "take into account the social and economic needs of the States." *Id.*

37.    The Councils dominate the Act's regulatory regime, and Congress outlined their structure and functions in detail.  Each regional Council "shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority." *Id.* § 1852(a)(2).  Not every fishery falls within a Council's ambit:  The Secretary of Commerce has "authority over any highly migratory species fishery," because such species move among jurisdictions.  *Id.* § 1852(a)(3).

38.    The Gulf of Mexico Council, at issue here, "shall have authority over the fisheries in the Gulf of Mexico seaward of" Texas, Louisiana, Mississippi, Alabama, and Florida's west coast.  *Id.* § 1852(a)(1)(E).

39.    The Council has "17 voting members." *Id.*  They include "[t]he principal State official with marine fishery management responsibility and expertise in each constituent State … so long as the official continues to hold such position, or [his] designee." *Id.* § 1852(b)(1)(A).  In other words, each state government has a permanent representative on the federal Council.  And while the Act reserves seats for the head of each state fishery agency, those officials can designate others to fill them. *Id.*  Indeed, such designees fill all five of these seats on the Gulf Council.  Alabama, for example, is represented by Defendant Kevin Anson, the chief marine biologist for the State Department of Conservation and Natural Resources.

14

40.    No federal official plays any role in selecting these Members or their designees.  Nor can any federal official remove them, because their *federal* Council membership flows directly from their *state* position: they hold Council seats "so long as" they hold state office.

41.    Each Council also includes "[t]he regional director of the [NMFS] for the geographic area concerned, or his designee."  *Id.* § 1852(b)(1)(B).  For the Gulf of Mexico, that is Defendant Andy Strelcheck.  Mr. Strelcheck is part of the Senior Executive Service (SES) and holds a career-appointed position.  *See* House Committee on Oversight and Reform, 116th Cong., 2d Sess., *United States Government Policy and Supporting Positions* 27 (Comm. Print 2020) ("*Plum Book*").  He can be removed from office only for cause under civil-service statutes.  5 U.S.C. §§ 3592, 7541–43.

42.    The remaining 11 voting Members are chosen by the Secretary from "a list of individuals submitted by the Governor of each … constituent State."  16 U.S.C. § 1852(b)(1)(C).  When compiling these lists, a governor "determine[s] that each such individual is qualified" for the role under a statutory rubric.  *Id.* Each list "shall include the names and pertinent biographical data of not less than three individuals."  *Id.* The Secretary's job is to "review each list" and "ascertain if the individuals … are qualified" under the Act's terms.  *Id.* If the Secretary finds them unqualified, she cannot make her own selection.  Instead, she must "notify" the governor, who then "submit[s] a revised list or resubmit[s] the original list with an additional explanation of the qualifications of the individual."  *Id.*

15

43.    These 11 Members can be removed by the Secretary only "for cause," and in only one situation: where "the member is found by the Secretary, after notice and an opportunity for a hearing … to have committed an act prohibited by" the Act's conflict-of-interest provision.  *Id.* § 1852(b)(6)(B).  For *anything else*, only the Council, by a two-thirds vote, can initiate removal.  *Id.*

44.    Each Council conducts its statutory duties by majority vote, and a bare majority of voting Members present constitutes a quorum.  *Id.* § 1852(e)(1).

45.    A Council's core responsibility is the development of fishery management plans (FMPs) and amendments to FMPs.  Each Council must, "for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary" an FMP and "amendments to each such plan that are necessary from time to time."  *Id.* § 1852(h)(1).  Specifically, each Council must "develop annual catch limits for … its managed fisheries."  *Id.* § 1852(h)(6).

46.    Each Council may also develop any regulations it "deems necessary or appropriate for … implementing a [FMP] or plan amendment" and submit them to the Secretary before or after such FMP or amendment takes effect.  *Id.* § 1853(c).

47.    The Act empowers Councils to "develop … multi-year research priorities" for "areas of research that are necessary for management purposes," *id.* § 1852(h)(7), and to generally "conduct any other activities … which are necessary and appropriate to [their] functions," *id.* § 1852(h)(8).

48.    Each Council may "appoint[] and assign duties to" various administrative employees, "determine its organization, and prescribe its practices and procedures." *Id.* § 1852(f)(1), (6). And each Council "shall establish, maintain, and appoint ... a scientific and statistical committee to assist it in the ... development and amendment of any [FMP]." *Id.* § 1852(g)(1)(A). Indeed, each Council is empowered to "establish such advisory panels as are necessary or appropriate to assist it in carrying out its functions." *Id.* § 1852(g)(2).

49.    In contrast with its sweeping grant of policymaking authority to the Councils, the Act gives the Commerce Department only a limited role. The Secretary's role in the development of FMPs and amendments is purely advisory: She "establish[es] advisory guidelines (which shall not have the force and effect of law) ... to *assist in the development* of [FMPs]" by the Councils. *Id.* § 1851(b) (emphasis added).

50.    Once a Council develops a FMP or amendment, the Secretary "review[s]" its work "to determine whether it is consistent with" the Act and "other applicable law." *Id.* § 1854(a)(1)(A). The Secretary simultaneously publishes the FMP or amendment in the Federal Register and initiates a 60-day comment period. *Id.* § 1854(a)(1)(B).

51.    At the end of that period, the Secretary must "approve, disapprove, or partially approve" the FMP or amendment. *Id.* § 1854(a)(3). But a "disapprov[al]" or "partial[] approv[al]" does not end a Council's involvement. The Secretary's authority following disapproval is limited to offering "recommendations ... that could be taken by the Council to conform [its] plan or amendment to the requirements of applicable

law." *Id.* § 1854(a)(3)(C).   The Council "may" then "submit a revised plan or amendment." *Id.* § 1854(a)(4).

52.    If for any reason the Secretary fails to "notify [the] Council" of her decision "within 30 days of the end of the comment period," the Council's "plan or amendment *shall take effect* as if approved." *Id.* § 1854(a)(3) (emphasis added).

53.    A similar process governs a Council's proposed implementing regulations. When a Council "deems" such regulations necessary, *id.* § 1853(c), the Secretary reviews them over 15 days to determine their legality and consistency with the Council's FMP or amendment, *id.* § 1854(b)(1).   If the Secretary finds the rules illegal or inconsistent with the Council's work, she may "recommend[] … revisions." *Id.* § 1854(b)(1)(B).   The Council "may" then "revise the proposed regulations." *Id.* § 1854(b)(2).

54.    Following notice and comment, the Secretary "shall promulgate final regulations" and must "consult with the Council before making any revisions to the proposed regulations." *Id.* § 1852(b)(3).   The Secretary cannot bypass this consultation requirement—even as she has no authority to summon a Council to consult with her. *See Oceana, Inc. v. Ross*, No. 17-CV-05146, 2020 WL 5239197, at *5 (C.D. Cal. Jan. 8, 2020) (ordering NMFS to consult with a Council); *see also* Dkt. No. 124 at 8–9, *Oceana, Inc.*, No. 17-CV-05146 (C.D. Cal. Nov. 18, 2019) (NMFS "has repeatedly attempted to consult with" the Council but "lacks the authority to *compel* the independent … Council to place this item on its agenda").

55.     Once a FMP or amendment takes effect, the Council *must* approve its repeal or revocation: "The Secretary may repeal or revoke a [FMP] for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members." 16 U.S.C. § 1854(h).

56.     The Secretary has authority to promulgate her own FMP or amendment in only very narrow circumstances—(1) where a Council "fails to develop" a FMP or amendment "after a reasonable period of time," (2) where a Council "fails to submit a revised or further revised plan or amendment," or (3) where the fishery is not within any Council's jurisdiction. *Id.* § 1854(c)(1).  But even then, the Secretary must "submit [her] plan or amendment to the appropriate Council for consideration and comment," which she must then "tak[e] into account." *Id.* § 1854(c)(4)(A), (5).  The same is true of Secretary-generated regulations. *Id.* § 1854(c)(6).

57.     A Council can even force the Secretary to take immediate action.  If it "finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a [FMP] exists for such fishery," "the Secretary *shall promulgate* emergency regulations … if the Council, by unanimous vote … [so] requests." *Id.* § 1855(c)(2)(A) (emphasis added).

58.     Making matters worse, while the Act refers to "the Secretary," the reality is that the Secretary plays no role in this process.  She has instead delegated her authority under the Act to the Under Secretary for Oceans and Atmosphere (the head of NOAA).



59.    The Under Secretary has, in turn, redelegated that authority to the Assistant Administrator for Fisheries—currently Defendant Janet Coit—who heads NMFS.    *See* NOAA, *NOAA Organizational Handbook: Transmittal No. 61*, U.S. Department of Commerce, at 2–4 (Feb. 24, 2015) ("NOAA Handbook"); *see also* NOAA, *Transmittal 61 Clearance Memo*, U.S. Department of Commerce (Jan. 26, 2015).

60.    The Assistant Administrator for Fisheries has, in turn, redelegated the authority to sign material generated under the Act for publication in the Federal Register and Code of Federal Regulations to the Deputy Assistant Administrator for Regulatory Programs.    *See* NOAA Handbook at 5.    That role has been filled by Defendant Samuel Rauch for nearly twenty years.

61.     Mr. Rauch is a member of the SES appointed to a career position.  *See* *Plum Book* at 26.  As an SES career appointee, Mr. Rauch may be removed only for cause. *See* 5 U.S.C. §§ 3592, 7541–43.

62.     In an interview posted to a NMFS website, Mr. Rauch described his role in detail.  *See* Ruth Sando, *Rauch, Sam ~ Oral History Interview*, Voices from the Fisheries (June 30, 2016) ("Rauch Interview").  Mr. Rauch "work[s] with the [C]ouncils … to put out fisheries regulations" and "sign[s] all of those" regulations, *id.* at 5, as his job is "to manage the regulations," *id.* at 9.  Asked whether fishery regulations "all kind of bubbl[e] up to" him, Mr. Rauch answered: "Yes.  Somebody has to[.]"  *Id.* at 5.

63.     Although Mr. Rauch acknowledged that he exercises these duties under the Act, he reiterated that the Councils "really drive the system" of "who, when, and where people get to fish," and described them as "mini legislative bod[ies]."  *Id.* at 15. Mr. Rauch explained that although he "ultimately issue[s] the regulations," he "do[es] that" only "because it resolves what [the Council] do[es] as legal."  *Id.*  In other words, he is "the auditor[]" of a Council-controlled "system."  *Id.*

### Consequences for Local Commercial Fishermen

64.     The unaccountable Councils have overseen massive—and damaging— changes to American commercial fishing.  An industry once characterized by small, family-run businesses has been transformed by relentless consolidation.  The voices of big business, environmental groups, and the recreational sector have drowned out those of local fishermen like Plaintiffs.  Captains and crew with the generational knowledge

needed to responsibly steward our marine resources have been reduced to hired hands for distant corporations. As a result, the domestic fishing fleet faces an uncertain future—a looming threat to American food security. But because the Act insulates the Councils from democratic accountability, Plaintiffs and others like them cannot effect change. Under the current regime, not even the elected President of the United States has the authority to steer federal fishery policy in a different direction.

65.    The Councils' approach is perhaps best illustrated by the implementation of so-called "catch share" programs. Under this approach, also called an "individual fishery quota" or "IFQ" system, a Council first determines how much of a given species can be harvested. It then divides up the catch such that "each [fishery] participant is allocated a fixed percentage (*i.e.*, an individual quota) of the total catch to harvest." *Coastal Conservation Ass'n v. Locke*, Nos. 09-CV-641, 10-CV-095, 2011 WL 4530631, at *1 (M.D. Fla. Aug. 16, 2011) ("*CCA*"). Initial rights allocations are based on past harvest levels—necessarily privileging large players. Those initial allocations can then be bought, sold, and leased in an open market—again privileging the deepest pockets.

66.    The Act gives Councils the authority to "initiate" a catch share program "on [their] own initiative." 16 U.S.C. § 1853a(c)(6)(A). If the Council wishes to take that step, it must first hold a referendum of "eligible" voters: those "who have substantially fished the species." *Id.* § 1853a(c)(6)(D). In 2010, the Gulf Council placed grouper and tilefish fisheries in a catch share program. It deemed those who had harvested at least 8,000 pounds of grouper and tilefish annually in recent years "eligible"

to vote. *CCA*, 2011 WL 4530631, at *5. "This criteria for participation in the referendum excluded approximately seventy percent … of all reef-fish permit holders." *Id.* at *4. The Council's handpicked electorate approved the program. *Id.* at *5. And that electorate had everything to gain: Their previous harvests entitled them to lucrative initial allocations. A similar process unfolded when the Council moved red snapper to catch shares.

67.    In the Gulf and nationwide, catch share regulation has triggered dramatic industry consolidation. Indeed, that was the goal: By concentrating rights in a few hands, the Council sought to end "overcapitalization" by squeezing out smaller, less profitable players. Ryan Bradley has written about the problem for years from his perspective as a fifth-generation fisherman. "[I]n the Gulf of Mexico, private equity firms and other large investors" have "gobbled up the rights to fish, driving up the cost of fishing access and making it prohibitively expensive." Ryan Bradley, *Op-ed: Catch Shares Enable Wealthy Landlords to Gobble Up Local Fisheries*, Civil Eats (Aug. 31, 2022). Red snapper, for example, was once a lucrative species for local commercial fishermen. But adding the expense of leasing fishing rights to fuel, crew, supplies, and other costs leaves fishermen like Plaintiffs "in the red before we even reach the dock." *Id.*

68.    In New England, a leading beneficiary of consolidation is Blue Harvest Fisheries, the subject of a 2022 exposé. Will Sennott, *How Foreign Private Equity Hooked New England's Fishing Industry*, ProPublica (July 6, 2022). Since catch shares arrived courtesy of the Council, Blue Harvest and other newcomers have dominated Atlantic

fisheries from haddock to flounder. After buying up as many shares as the law allows, these firms charge captains to lease those rights. After deducting lease charges and other expenses, fishermen take home pennies on the dollar. "You can no longer work your way up from the deck, become a captain and buy your own boat and permit," one fisherman explained. *Id.* "You'll never make enough. They made it unattainable to do anything but work for them." *Id.* Blue Harvest is owned by Bregal Partners, part of a wealthy Dutch family's financial empire.

69.    Researchers have long known that catch shares have these effects. "No matter what you do," one academic has observed, "there is a dynamic that is going to unfold in predictable ways, toward the concentration of wealth and away from public participation." Susanne Rust, *System turns US fishing rights into commodity, squeezes small fishermen*, Reveal (Mar. 12, 2013).

70.    A 2016 study supported by the Gulf Council revealed numerous problems driven by catch shares. *See* D. Griffith et al., *Private Fish, Public Resource: Socioeconomic Impacts of the Grouper-Tilefish Individual Fishery Quota (IFQ) Program on Gulf of Mexico Communities* (Sept. 2016). The authors reported that fleet consolidation "contradicts the history of Gulf fisheries, which tend to be diverse, multispecies, and multi-gear fisheries." *Id.* at 4. Fishermen told researchers that high barriers to entry and cuts to take-home pay have led to "an aging population of fishermen and a dearth of younger fishers." *Id.* at 6. The study concluded that allowing firms "with no direct physical participation in the fishery to purchase shares … should be reconsidered," and that

regulators "need to rethink the wisdom of putting every species under an IFQ program." *Id.* at 7. Unsurprisingly, the Council has not acted on that recommendation.

71.    Catch shares are not the only illustration of the Council's regulatory capture. Not every Gulf species is regulated by catch shares—including greater amberjack. But that has not saved local fishermen from bearing the brunt of the unaccountable Council's steady crackdown on commercial harvests.

72.    George Arnesen's fishing business was just beginning to recover from the 2010 Deepwater Horizon oil spill when the Council began imposing strict new limits on amberjack. In 2012, the Council lowered the species' annual acceptable catch limit (ACL) and imposed, for the first time, a commercial trip limit of 2,000 pounds. In 2016, the Council lowered the ACL and cut the commercial trip limit from 2,000 pounds whole weight to 1,500 pounds gutted weight. And in 2020, the Council cut the trip limit again—to 1,000 pounds with a step-down to just 250 pounds once three-quarters of the catch limit is harvested.

73.    These increasingly draconian restrictions have eroded Plaintiffs' ability to profit from the amberjack fishery. Along the way, the Council has transferred the amberjack harvest from commercial to recreational fishermen. But the recreational sector is more wasteful: Many charter boats seeking to stay under bag limits discard dead fish from their coolers when they catch a larger or more valuable fish later in the day. Due in part to this practice, data for the recreational sector is less reliable and skews the overall picture of fishery health. Most important, however, the recreational

sector is a small and exclusive market.  Marine resources are supposed to benefit *all* Americans.  But the recreational sector largely supports tourism for wealthy hobbyists.

74.    For years, Plaintiffs have seen the influence of large shareholders, environmentalists, and recreational fishermen over Council meetings and Council decisions.  As Plaintiffs can attest, the Council is uninterested in the concerns of local commercial fishermen.    In fact, the NMFS Deputy Assistant Administrator— Defendant Rauch—has spoken *favorably* of the Councils' capture.  For instance, Mr. Rauch explained that the Councils' approach is driven by "the environmental community":  "We've got the regulatory structure that we do now because the environmentalists are pushing us."  Rauch Interview at 19.  Unsurprisingly, activist groups have pivoted away from lawsuits and toward a strategy of influencing the Councils.  As Mr. Rauch explained, "the environmental community—they still use litigation, but they are also *making an enormous investment in the [C]ouncil process*, and that has moved the [C]ouncil[s] in their direction."  *Id.* (emphasis added).

75.    Mr. Rauch also discussed "the rise of recreational fishermen" as an outsized influence on Council policymaking.  *Id.* at 15.  "What we've really seen over time," he explained, is "the increase in the importance of the recreational community in [the Council] process."  *Id.*  He claimed that "[t]he amount of money added to the economy in any given year f[ro]m the recreational fisheries can rival what is coming from the commercial fisheries because the jobs, the travel, [and] the boats."  *Id.*  He noted that the Councils and NMFS have "encourage[d]" recreational fishermen to

"participat[e]" in the process because "they are important" and "have traditionally been underserved." *Id.* at 16, 18 ("So, the commercial people are fine. … It's the recreational people that are suffering."). This attitude comes as no surprise to Plaintiffs, who have seen time and again how the Council accommodates the well-heeled recreational sector while leaving small commercial fishermen high and dry.

76. If any doubt remained about the regulators' perspective, Mr. Rauch has dispelled it: If the Councils and NMFS "fail" to properly calibrate their regulatory efforts, he shrugged, "it's just less money for fishermen." *Id.* at 20. To NMFS and the Councils, those "consequences of failure" just aren't "significant." *Id.* But for Plaintiffs and others like them, "less money for fishermen" is not only "significant"—it could cripple their businesses and doom a centuries-old way of life on the Gulf.

### Amendment 54

77. The Gulf of Mexico Council recently developed Amendment 54, an amendment to the Gulf Reef Fish FMP revising catch limits for greater amberjack. On January 20, 2023, the Council announced that it had finalized Amendment 54. NMFS published Amendment 54 in the Federal Register for public comment on March 2, 2023 (*see* 88 Fed. Reg. 13077) and published implementing regulations for public comment on March 10, 2023 (*see* 88 Fed. Reg. 14964). NMFS issued the Amendment 54 Final Rule, which incorporates amendments to the Code of Federal Regulations, on June 15, 2023. *See* 88 Fed. Reg. 39193. NMFS dismissed Plaintiffs' constitutional objections, raised in their public comment, as grounded in "misunderstand[ings]" of the Act. *Id.* at

39198. Defendant Rauch executed both the proposed and final rules. *See* 88 Fed. Reg. 14969 (proposed rule); *id.* at 39201 (final rule). The relevant portions of Amendment 54 concerning commercial amberjack fishing took effect immediately on June 15, 2023. *Id.* at 39193, 39201.

78.     Effective immediately, Amendment 54 cuts the fleet-wide commercial acceptable catch limit (ACL) for greater amberjack by about 80%: from 484,380 pounds to 101,000 pounds. That leaves an acceptable catch target (ACT) of 93,930 pounds. Once 75% of the ACT has been caught—roughly 70,000 pounds—fishermen will be limited to 250 pounds of amberjack per trip. Amendment 54's dramatic reduction of overall limits means the step-down to a 250-pound trip limit will occur earlier in the season than ever before.

79.     Indeed, on June 16, 2023, NMFS announced that—due to Amendment 54's massive cut to the commercial catch limit—the commercial amberjack season will close on June 18, 2023, until the 2024 fishing season begins. This closure was triggered because, by the time of the Final Rule's issuance, the Gulf fleet's commercial amberjack harvest had *already* exceeded Amendment 54's annual catch limit of 101,000 pounds. As a result of the Amendment 54 catch limits, then, Plaintiffs will not be able to fish for amberjack until 2024.

80.     Amendment 54 achieves this reduction in the commercial harvest in part by reserving a greater proportion of the species quota for the recreational sector. Before Amendment 54, 27% of the amberjack harvest was reserved for commercial fishermen,

28

with the remaining 73% to the recreational sector.  Under Amendment 54, the commercial sector can receive just 20% of the overall catch limit.

81.    Even before Amendment 54, Plaintiffs and other amberjack fishermen operated on razor-thin margins.  But the Amendment's dramatic cuts to the overall catch limit will erase what remains.  Under its constraints, independent local fishermen operating day boats cannot make a profit harvesting Gulf amberjack; their overhead will not allow it.  In particular, the Council has pulled the rug from under the Arnesens' once-lucrative sales of fresh-caught amberjack to wholesalers in New Orleans.  For fishermen like George, it is never worth the investment in time, money, and personal risk to venture into the Gulf in pursuit of a mere handful of fish.  Ryan Bradley's business will suffer, too, as will the restaurants who rely on his amberjack.

82.    Every day Amendment 54 is in effect, Plaintiffs will lose the opportunity to harvest amberjack and bring that harvest to market.  That injury is irreparable and indefinite.  It is imposed by a Council that Plaintiffs attest is out of touch, unresponsive to commercial fishermen, and beholden to special interests.  And it is overseen by an equally unaccountable career bureaucrat at NMFS.

## CONSTITUTIONAL VIOLATIONS

### Council Members Serve in Violation of the Appointments Clause.

83.    The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  The Clause also allows Congress to

"vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

84.     Principal officers must be nominated by the President and confirmed by the Senate. The same rule presumptively applies for inferior officers, but Congress may authorize the President alone, the courts, or the "Heads of Departments" to appoint such officers. The Appointments Clause does not dictate the manner of appointment for "lesser functionaries" beyond these categories. *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979–80 (2021).

85.     The Council's voting Members wield vast authority on behalf of the United States, subject only to limited supervision by NMFS. Yet none of them are appointed by the President or anyone accountable to him. Whether viewed as principal or inferior officers, all Members serve in violation of the Appointments Clause.

## Council Members are Officers of the United States.

86.     Any official assigned "continuing and permanent" duties, *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018), and who "exercis[es] significant authority pursuant to the laws of the United States[,] is an 'Officer of the United States,'" *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

87.     Council Members—the "primary policy makers" for federal fisheries—are quintessential officers. *See* Rogalski, *supra*, at 178. They bear no resemblance to the "broad swath of 'lesser functionaries' in the [federal] workforce." *Lucia*, 138 S. Ct. at

2051.  Thus, Council Members must be appointed "in the manner prescribed by" the Appointments Clause.  *Buckley*, 424 U.S. at 126.

88.  *First*, Council Members "occupy a 'continuing' position established by law." *Lucia*, 138 S. Ct. at 2051 (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879)). Congress established Council seats by statute and spelled out Members' duties in detail. *See* 16 U.S.C. § 1852.  Eleven of the Council's 17 Members serve statutorily-defined three-year terms, which can be extended for a further six years.  *Id.* § 1852(b)(3).  The Members from state bureaucracies hold their positions indefinitely.  *See supra* ¶ 40.  No Members serve for merely "occasional or temporary" periods.  *Germaine*, 99 U.S. at 511–12.

89.  *Second*, Council Members exercise significant policymaking authority over federal fisheries, affecting every aspect of the commercial and recreational fishing industries.  Congress vested Councils with sweeping and ongoing "authority over the fisheries in" their regions, 16 U.S.C. § 1852(a)(1), and empowered them to "exercise sound judgment in the stewardship of fishery resources," *id.* § 1801(b)(5).

90.  To fulfill this mandate, each Council has the power to adopt and amend FMPs for all federal fisheries within its jurisdiction.  *Id.* §§ 1852(h)(6), 1853(a)(1)(A). Relying on data from advisory committees that report only to it, a Council determines how much of a particular species can be harvested, how to divide the catch, and the manner in which fish can be caught.  The Act leaves these decisions to a Council's policy judgment.  The Secretary contributes only nonbinding guidance.  *Id.* § 1851(b).

91.    Here, Council Members made important decisions that affect Plaintiffs' livelihoods.  First, the Council chose to slash the total number of amberjack that can be caught in a season.  Second, it chose to reallocate that catch toward politically connected recreational fishermen.  These policy judgments—made solely by the Council—make it unfeasible for commercial fishermen like Plaintiffs to harvest amberjack, preventing fresh seafood from reaching stores and restaurants.

92.    After a Council makes a policy decision, the Act requires it to submit its proposed edict to the Secretary of Commerce.  But that formal approval does not—and cannot—divest the Council from its control over federal policy.

93.    NMFS can block the Council's edicts only if it identifies a *legal* defect in the Council's proposal.  16 U.S.C. § 1854(a)(3).  It cannot block a proposal based on a mere *policy* disagreement.  And if the agency does happen to identify a legal defect, its only option is to remand the plan to the Council with "recommendations" on how to fix the legal problem—recommendations that the Council is not obliged to even *consider*, much less adopt.  *Id.* § 1854(a)(3)(C), (a)(4).

94.    If for any reason NMFS fails to act on a Council submission within 30 days, the FMP or amendment "shall take effect as if approved."  *Id.* § 1854(a)(3); *Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 431 (D.D.C. 2014).

95.    The Council's power is even greater, though, if the President or Secretary ever wishes to repeal or modify an existing FMP or amendment.  The Secretary may repeal or modify federal fishing policy "only if the Council approves" that repeal or

modification "by a three-quarters majority." 16 U.S.C. § 1854(h). Thus, once Amendment 54 takes effect, *only* the Council may lift it. Indeed, a bloc of unaccountably-appointed-and-insulated officials can preserve Amendment 54 *forever*.

96.    An official cannot serve as an "officer[] for purposes of some of [his] duties" but as a "mere employee[] with respect to other responsibilities." *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991). Thus, if Council Members wield officer-level authority in the exercise of *any* of their duties, they must be appointed under the terms of the Appointment Clause.

97.    In sum, each Council is "a mini legislative body" that decides "who, when, and where people get to fish." Rauch Interview at 15, 19. That is "significant authority" that can only be exercised by "Officers of the United States." *Buckley*, 424 U.S. at 126.

### Council Members are principal officers.

98.    Council Members are principal officers who must be appointed by the President and confirmed by the Senate. The Appointments Clause refers to certain "inferior" officers "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663, 664–65 (1997). Any officer who does *not* fit that description is a "principal" officer. *See Arthrex*, 141 S. Ct. at 1980. The key inquiry is "how much power an officer exercises free from control by a superior." *Id.* at 1982. Three factors guide that inquiry: *First*, does any principal officer exercise "administrative oversight" over the officer in question? *Id.* at 1980. *Second*, may a

33

principal officer remove the officer without cause? *Id.* *Third*, can a principal officer "review the [officer's] decisions"? *Id.*

99.    These factors all demonstrate that Council Members are principal officers. *First*, Council Members are subject only to minimal NMFS oversight. No principal officer controls the Council's policy priorities, research agenda, procedural rules, or staffing decisions. *See* 16 U.S.C. § 1852(e)–(i); *Arthrex*, 141 S. Ct. at 1980; *Edmond*, 520 U.S. at 664–65.

100.    The Act shields the Council's core responsibility—developing FMPs and amendments—from administrative or policy oversight. The Secretary's input consists of mere "advisory guidelines." 16 U.S.C. § 1851(b). Once the Council completes a FMP or amendment, NMFS merely checks it for legality. Indeed, a Council Member—the Regional Administrator—is involved in this process. *See NOAA* Handbook at 7. And as Mr. Rauch explained, although he "ultimately issue[s] the regulations," he "do[es] that" only "because it resolves what [the Council] do[es] as legal." Rauch Interview at 15. None of this circumscribed review involves a principal officer.

101.    *Second*, Council Members enjoy extraordinarily strong protection from removal. The Supreme Court has recognized that the "power to remove officers … is a powerful tool for control." *Edmond*, 520 U.S. at 664. But not even the President can freely remove Council Members. Much of the Council is immune from removal by *any* federal official, and the remaining Members enjoy some of the most robust tenure protections in federal law. *See supra* ¶¶ 40–43; *infra* ¶¶ 111–20.

102.    *Third*, given the Council's dominant role in developing FMPs and amendments, it issues "final decision[s]." *Arthrex*, 141 S. Ct. at 1981. Although NMFS may block a plan or amendment if it identifies a *legal* defect, the Council has the final word when it comes to fishery *policy*. "Since the founding, principal officers have directed the decisions of inferior officers on matters of law *as well as policy*." *Id.* at 1983 (emphasis added). The Act also provides that the Council's policies "shall take effect" if NMFS fails to act. 16 U.S.C. § 1854(a)(3). And the finality of the Council's decisionmaking is most stark whenever the President wishes to revoke or change the existing limits—a step that just five Council Members can thwart.

103.    In sum, Council Members hold primary responsibility for federal fisheries policy and answer to no principal officer in the course of their duties. Councils operate independently, free of administrative oversight. They cannot be removed at will, if they are removable at all. And their policy judgments cannot be overturned by any federal official that answers to the President—or even by the President himself.

### Even as inferior officers, 16 Council Members were appointed in violation of the Appointments Clause.

104.    Because no Council Member was nominated by the President and confirmed by the Senate, each serves unlawfully as a principal officer.

105.    Even if Members are *inferior* officers, though, 16 of them were still unlawfully appointed. Congress may "vest the Appointment" of "inferior Officers" in three (and only three) places—"in the President alone, in the Courts of Law, or in the

Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Neither the President nor any court is involved in the selection of Council Members. That leaves "Heads of Departments"—Cabinet-level officers and certain independent agencies. *Freytag*, 501 U.S. at 886; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511–12 (2010). But Heads of Departments do not appoint 16 of 17 Council Members either.

106.    To start, five Members hold their seats by virtue of their positions in state governments within the Council's region. *See supra* ¶¶ 39–40. These Members were thus "appointed" by state officials. The Appointments Clause does not allow Congress to outsource the power to fill *federal* offices to *state* officials. The Clause "ensure[s] that those who wield[]" the appointment power are "accountable to political force and the will of the people." *Freytag*, 501 U.S. at 884. But state officials are accountable, if at all, only to state electorates. Allowing those officials to choose federal officers with authority over multiple states is a clear Appointments Clause violation.

107.    Meanwhile, 11 other Members were improperly appointed because they were nominated by governors. For inferior officers, the Constitution permits Congress to "vest" the "Appointment" power in the Secretary of Commerce. U.S. Const. art. II, § 2, cl. 2. But the Act violates that instruction by giving the Secretary only a limited, subordinate role in selecting these Members. *See supra* ¶ 42.

108.    These Members are deemed "qualified" not by the Secretary's (or the President's) judgment, but through a set of statutory criteria evaluated by State governors wholly outside the Executive Branch. *See* 16 U.S.C. § 1852(b)(2)(A), (C).

The Secretary may disagree with a governor's conclusion that a candidate is "qualified," but that does not empower the Secretary to exercise independent judgment. *Id.* § 1852(b)(2)(C). Instead, she can only "notify" the governor of her view. *Id.* That governor may then resubmit the candidate "with an additional explanation of [his] qualifications," or nominate someone else. *Id.* The Act does not limit the amount of back-and-forth or empower any federal official to bypass state stonewalling.

109. Under this scheme, the Secretary is never permitted to choose whom she (or the President) would like to appoint; she must always pick from a closed set dictated by a state official.

110. This scheme unconstitutionally "limit[s] selection and ... trench[es] upon executive choice." *Myers v. United States*, 272 U.S. 52, 128 (1926). The President must be able to exclude those with "different views of policy," those "from a competing political party," and those he thinks "not intelligent or wise." *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) (internal quotation marks and alterations omitted). The Act flouts that principle by delegating Member selection to state officials accountable only to state voters. This "diffusion of the appointment power" to separate sovereigns assaults "the Constitution's structural integrity." *Freytag*, 501 U.S. at 878.

### Council Members are Unconstitutionally Insulated from Removal.

111. "[T]he 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1, cl. 1, & § 3). Although the President

can delegate to subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Id.* at 2197. A President powerless to fire such officials "could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514.

112.   Thus, the default rule is that the President must be able to remove Executive Branch officials at will. *Seila Law*, 140 S. Ct. at 2191–92. There are only two exceptions. The first covers "multimember bod[ies] of experts, balanced along partisan lines, that performed legislative and judicial functions" and do not "exercise any executive power." *Id.* at 2199. The second covers certain "inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 2199–2200.

113.   Even within those categories, Congress does not have free rein to insulate subordinate executive officials. The Constitution permits only certain forms of modest tenure protection.  *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 619 (1935) (President may remove FTC commissioners for "inefficiency, neglect of duty, or malfeasance in office"); *but see Free Enter. Fund.*, 561 U.S. at 495–96 (two layers of such for-cause removal protection are unconstitutional). Some protections are simply "inappropriate for officers wielding the executive power of the United States." *Free Enter. Fund*, 561 U.S. at 503.

114.   The Act unconstitutionally insulates every Council Member from removal. *First*, regardless of the *Seila Law* exceptions, 16 of the Council's 17 Members enjoy removal protections stronger than any removal protection the Supreme Court has

ever approved in any context. These restrictions impose far greater restrictions on presidential control and democratic accountability than the two-layer for-cause regime the Court invalidated in *Free Enterprise Fund*, and exponentially greater burdens than those the Court blessed in *Humphreys Executor*.

115. The President is powerless to remove five of the Council's Members— those seats appointed and filled by state bureaucrats—who hold Council seats "so long as" they occupy state offices. *See supra* ¶ 40. Indeed, the only officials empowered to remove these Members are employed by separate sovereigns. It is hard to imagine a more "inappropriate" form of tenure protection "for officers wielding the executive power of the United States," *Free Enter. Fund*, 561 U.S. at 503, than absolute protection at the grace of a separate sovereign.

116. The 11 governor-nominated Members also enjoy unconstitutional protections. The President—through the Secretary—may remove these Members only "for cause." 16 U.S.C. § 1852(b)(6). And the Act provides just *one* scenario that could supply the requisite "cause"—when a formal hearing reveals the Member violated 16 U.S.C. § 1857(1)(O), a conflict-of-interest provision. *Id.* § 1852(b)(6)(B). The President cannot unilaterally remove a Member for anything else. If the President wishes to remove a Member outside that extraordinary narrow circumstance, he must persuade the Member's colleagues on the Council to "first recommend[] removal" by a two-thirds vote. *Id.* § 1852(b)(6)(A). This scheme clearly "impede[s] the President's ability to perform his constitutional duty." *Seila Law*, 140 S. Ct. at 2199.

117.    *Second*, the Council and its Members do not fit either *Seila Law* exception and thus *any* removal restriction violates the Constitution.  To start, the Council is not the sort of "multimember body of experts, balanced along partisan lines," that *Humphrey's Executor* found "not to exercise any executive power."  *Id.*  Such independent agencies lack "the authority to promulgate binding rules" and serve as "mere legislative or judicial aid[es]."  *Id.* at 2200.  The Council is a "body of experts" but bears none of the exception's other hallmarks:  It lacks partisan balance; it is not a "legislative agency," *Humphrey's*, 295 U.S. at 628; and it exercises executive functions by, among other things, developing rules.

118.    Nor do Council Members fit the second *Seila Law* exception for inferior officers akin to the independent counsel in *Morrison v. Olson*, 487 U.S. 654 (1988).  Members are *principal* officers.  *See supra* ¶¶ 98–103.  And even if they were inferior officers, they bear no resemblance to a prosecutor with no "policymaking or administrative authority," *Seila Law*, 140 S. Ct. at 2200, who was "appointed … to accomplish a single task," *Morrison*, 487 U.S. at 672.

119.    Thus, Council Members lie beyond both *Seila Law* exceptions.  Their tenure protections are thus unconstitutional.  This includes Regional Administrator Andy Strelcheck, who serves on the Council in his capacity as a career SES official in NMFS.  Although his tenure protections are more familiar, they likewise transgress Article II by improperly insulating an official who exercises substantial executive authority.  *See supra* ¶¶ 86–97, 112, 117; *infra* ¶¶ 121–27, 156–61.

40

120.    The Constitution's Executive Vesting and Take Care Clauses protect democracy by ensuring that only those accountable to the President—and thus, the American people—wield executive power.  The Act violates that principle.

### The Deputy Assistant Administrator is Likewise Unconstitutionally Insulated from Removal.

121.    Article II of the Constitution mandates that the President possess the power to freely remove any officer who exercises "the executive power."

122.    Neither the President nor any of his deputies may freely remove Mr. Rauch from office.  As a member of the SES appointed to a career position, Mr. Rauch may be removed only for cause.  5 U.S.C. §§ 3592, 7541–43.  This removal protection is "a *de facto* form of life tenure."  *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 391 (5th Cir. 2023) (Ho, J., concurring).

123.    Mr. Rauch is an "Officer of the United States."  *First*, he holds a continuing office created by federal regulations, which can establish officer positions. *See United States v. Mouat*, 124 U.S. 303, 307–08 (1888).  Mr. Rauch has held this position for years, and the civil-service laws protect his continued tenure.  *Second*, he "exercis[es] significant authority pursuant to the laws of the United States."  *Buckley*, 424 U.S. at 126.  Mr. Rauch issues legally binding regulations on behalf of the Federal Government. The power to issue final rules is one of the most consequential actions an agency can take—one that can be exercised only by "Officers of the United States."  *See id.* at 140– 41.  More broadly, Mr. Rauch "oversees" all NMFS "regulatory actions and

programs"—for instance, he "[c]oordinat[es]" the agency's "National Environmental Policy Act programs." NOAA Fisheries, *Samuel D. Rauch III, Deputy Assistant Administrator for Regulatory Programs*, https://www.fisheries.noaa.gov/contact/samuel-d-rauch-iii (last visited June 5, 2023). As the "auditor[]" of the federal fisheries "system," Mr. Rauch is an officer of the United States. Rauch Interview at 15.

124.   As noted above at paragraph 111, *Seila Law* recognized "two exceptions" to the rule that the President must be able to freely remove Executive Branch officials from office. 140 S. Ct. at 2191–92. The Court identified exceptions "for multimember expert agencies that do not wield substantial executive power" and "inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 2199–2200.

125.   Mr. Rauch is not part of an expert board, nor is he analogous to the independent counsel in *Morrison*. Most relevant here, Mr. Rauch issues binding regulations that embody the Council's policy judgments and his own agency's legal review. That alone ranks Mr. Rauch above mere employees in the constitutional hierarchy. Mr. Rauch's rulemaking authority and oversight of all NMFS "regulatory actions and programs," *see supra* ¶ 123, entail substantial exercises of discretionary executive power.

126.   Mr. Rauch's protection from at-will removal "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Free Enter. Fund*, 561 U.S. at 498. His exercise of federal authority is "incompatible with the Constitution's separation of powers." *Id.*

127.    Mr. Rauch has, indeed, bragged about his substantial-and-unaccountable executive authority.    Specifically, he has told the story of his "most proud" accomplishment—implementing a rule regulating ship speeds—over the objections of the elected Vice President of the United States.    Rauch Interview at 30–31.    He described the White House as an "evil empire" against which he "fought" and "won." *Id.* at 31.    And he recounted "find[ing] every friend we … have in the government" to assist his effort to resist the very President whose executive power Mr. Rauch wields. *Id.*    It is difficult to imagine a starker violation of Article II.

**STANDING**

128.    Plaintiffs have Article III standing to challenge Amendment 54 and the Amendment 54 Final Rule, which incorporates implementing regulations.    A plaintiff has standing if he (1) suffers a concrete "injury in fact" that was (2) "likely caused by the defendant" and (3) "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).    A court must "assume, for purposes of the standing analysis," that a plaintiff is "correct on the merits of [his] claim[s]." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).

129.    Plaintiffs will suffer concrete, irreparable injuries as a result of Amendment 54's commercial amberjack regulations—which took effect immediately upon the Final Rule's June 15, 2023 publication.    By effectively shutting Plaintiffs out of the amberjack fishery, Amendment 54 strips them of revenue, profits, business relationships, and other opportunities derived from that fishery.    By cutting the

commercial quota by nearly 80%, Amendment 54 harms Plaintiffs. *First*, the dramatically lower catch limit will shorten the season and reduce opportunities to harvest amberjack. *Second*, the already-onerous trip limit of 1000 lbs. will plummet to 250 lbs. earlier in the season than ever. Indeed, on June 16, 2023, NMFS announced that—due to Amendment 54's cut to the commercial catch limit—the commercial amberjack season will close on June 18, 2023, until the 2024 fishing season begins. This closure was triggered because, by the time of the Final Rule's issuance, the Gulf fleet's commercial amberjack harvest had *already* exceeded Amendment 54's annual catch limit of 101,000 pounds. As a result of the Amendment 54 catch limits, then, Plaintiffs will not be able to fish for amberjack until 2024.

130.    Moreover, being subjected to regulations developed, approved, and issued by unconstitutionally appointed and insulated officers is an independently cognizable "here-and-now" injury. *Seila Law*, 140 S. Ct. at 2196; *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 903 (2023) ("The harm [plaintiffs] allege is being subjected to unconstitutional agency authority …. That harm may sound a bit abstract; but this Court has made clear that it is a here-and-now injury." (quotation marks omitted)).

131.    Plaintiffs' injuries are "fairly traceable" to Defendants. *Collins*, 141 S. Ct. at 1779. *First*, the Council exercised its power to "develop annual catch limits" when it "prepare[d] and submit[ted]" Amendment 54. 16 U.S.C. § 1852(h)(1), (6). By doing so, the Council set amberjack policy for the foreseeable future and initiated the rulemaking process that ended with NMFS issuing the Council's amberjack rule.

132.    Plaintiffs' injuries are traceable to the Council regardless of NMFS's role. "Article III requires no more than *de facto* causality," and the Council's action was a legal and factual prerequisite to the new, injurious catch limits. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (quotation marks omitted). Nor is traceability confined to the final step in a regulatory process. *FEC v. Cruz*, 142 S. Ct. 1638, 1649–50 (2022).

133.    *Second*, Plaintiffs' injuries are traceable to NMFS, which issued the Final Rule. As the product of an unconstitutional Council, Amendment 54 is invalid and unlawful, and NMFS should have exercised its authority to reject it. *See* 16 U.S.C. § 1854(a)(1)(A). Because it did not, Plaintiffs face irreparable harm.

134.    *Third*, Plaintiffs' injuries are traceable to Defendant Rauch, who executed the Amendment 54 Final Rule subjecting Plaintiffs to the Council's amberjack policy. Regardless of the *Council's* constitutional defects, Mr. Rauch's *own* tenure protections divest him of lawful authority to issue the Final Rule or accompanying regulations.

135.    Plaintiffs' standing does not require proof that a properly appointed or removable Council Member or agency official would have acted differently. *Seila Law*, 140 S. Ct. at 2196. First, because Plaintiffs are already being "harmed by … action that was taken by" illegally appointed and insulated officials, they have "establish[ed] standing." *Collins*, 141 S. Ct. at 1788 n.24. Moreover, like the challengers in *Axon* and *Cochran*, Plaintiffs "protest the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process." *Axon Enter.*, 143 S. Ct. at 904.

136.    This Court can redress Plaintiffs' injuries.  When a party "challenging the legality of government action ... is himself an object of the action[,] ... there is ordinarily little question" that a "judgment preventing" that action will redress his harm. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).  That is true here.  If the Court vacates or enjoins the challenged actions, Plaintiffs will be able to harvest more amberjack.  The same is true of Plaintiffs' requested injunctive relief against the Council's further development of amberjack catch limits.  And if the Court grants preliminary relief, Plaintiffs will not be "subjected to unconstitutional agency authority," remedying that injury. *Axon Enter.*, 143 S. Ct. at 903 (quotation marks omitted).

## CLAIMS FOR RELIEF

## Count I:  Council Members Serve in Violation of the Appointments Clause

137.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

138.    The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  The Clause allows Congress to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  *Id.*

139.    Plaintiffs have two causes of action to enforce this requirement:  The first arises under the U.S. Constitution and this Court's traditional equitable authority to enjoin unconstitutional executive action.  *See supra* ¶ 30; *Free Enter. Fund*, 561 U.S. at 491

n.2; *Armstrong*, 575 U.S. at 326–27; *Axon Enter.*, 143 S. Ct. at 906 (allowing plaintiffs to proceed on this equitable cause of action regardless of statutory restraints on judicial review). The second cause of action arises under the Act's provisions authorizing judicial review of the Amendment 54 Final Rule, which incorporate the relevant sections of the APA. *See* 16 U.S.C. § 1855(f).

140.    All 17 Council Members are "Officers of the United States" because they wield substantial authority on behalf of the Federal Government.

141.    All 17 Members are principal officers because they are not adequately supervised by or accountable to principal officers. Therefore, all 17 must be nominated by the President and confirmed by the Senate. None were.

142.    Even if Members are inferior officers, 16 out of 17 were unconstitutionally appointed. Congress may vest the appointment of inferior officers in the President, the courts, or the "Heads of Departments." Sixteen Members were appointed by someone else. Five hold office by virtue of their appointments within State governments; eleven were selected by governors and approved by the Assistant Administrator for Fisheries.

143.    The Council cannot lawfully act if *any* of its Members were unlawfully appointed. *See Nguyen v. United States*, 539 U.S. 69, 82 (2003) (vacating a conviction affirmed by a circuit panel that unlawfully included an Article IV judge despite two Article III judges voting to affirm); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1725 (2018); *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016). One unconstitutional official is one too many. *See Free Enter. Fund*, 561 U.S. at 511–12 &

n.12.  Alternatively, Plaintiffs are entitled to relief if the Court concludes that 9 or more of the Members were improperly appointed, because that would deprive the Council of a quorum for its vote on Amendment 54.  *See supra* ¶ 44.

144.    The Council's Members were appointed in violation of the Appointments Clause and thus never received lawful federal authority.  As a result, Amendment 54 is unlawful and void.  Because the Council's structure "was unconstitutional at the time [the rule was] issued," vacatur of Amendment 54 and the Amendment 54 Final Rule is warranted.  *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012); *see also Lucia*, 138 S. Ct. at 2055.

145.    The Amendment 54 Final Rule and accompanying regulations—formulated by an unconstitutionally appointed Council—are "contrary to constitutional right, power, privilege, or immunity" and must be vacated.  5 U.S.C. § 706(2)(B).

146.    Given the Council's lack of authority, NMFS was obligated to reject Amendment 54 under 16 U.S.C. § 1854(a)(1)(A).  Because it did not, the Amendment 54 Final Rule and all accompanying regulations are also "not in accordance with law," are "in excess of statutory … authority," and must be vacated.  5 U.S.C. § 706(A), (C).

147.    Injunctive relief is warranted.  Plaintiffs have no adequate remedy at law. And "subjection to an unconstitutionally constituted decision[-]maker" is "in itself a constitutional injury sufficient to warrant injunctive relief."  *See United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982); *see also Axon Enter.*, 143 S. Ct.

at 899, 903–04.  The Court should enjoin the enforcement of Amendment 54 and the Amendment 54 Final Rule, and all accompanying regulations.

148.  Declaratory relief is also "appropriate" to "declare [Plaintiffs'] rights."  28 U.S.C. § 2201.  The Court should declare that Council Members are unlawfully appointed and that Amendment 54, the Amendment 54 Final Rule, and all accompanying regulations are therefore void.

## Count II:  Council Members are Unconstitutionally Insulated from Removal

149.  Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

150.  Article II of the Constitution provides that "[t]he executive power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1, & § 3.  Although the President can delegate tasks to subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield."  *Seila Law*, 140 S. Ct. at 2197.  In order to hold officials accountable, the President must normally have "the ability to remove executive officials, for it is only the authority that can remove such officials that they must fear and, in the performance of their functions, obey."  *Id.* (cleaned up).

151.  Plaintiffs have two causes of action to enforce this requirement:  The first arises under the U.S. Constitution and this Court's traditional equitable authority to enjoin unconstitutional executive action.  *See supra* ¶ 30; *Free Enter. Fund*, 561 U.S. at 491 n.2; *Armstrong*, 575 U.S. at 326–27; *Axon Enter.*, 143 S. Ct. at 906 (allowing plaintiffs to

proceed on this equitable cause of action regardless of statutory restraints on judicial review). The second cause of action arises under the Act's provisions authorizing judicial review of the Amendment 54 Final Rule, which incorporate the relevant sections of the APA. *See* 16 U.S.C. § 1855(f).

152. The President cannot hold Council Members accountable because he cannot freely remove any of them. He cannot remove the five Members who hold federal office by virtue of their State offices under any circumstances. The 11 governor-nominated Members can be removed only if a supermajority of the Council consents or if they violate certain financial conflict-of-interest provisions. And Council Member Strelcheck may only be removed for cause. These restrictions unlawfully interfere with the President's supervision of the Executive Branch.

153. The Council's removal protections cannot be severed from the Act's provisions granting the Council policymaking authority over federal fisheries. Because the Council exercised that authority here, Amendment 54, the Amendment 54 Final Rule, and all accompanying regulations were issued without lawful authority and must accordingly be vacated. *See Axon Enter.*, 143 S. Ct. at 902 ("Only the … ability to sever the relevant statute's for-cause removal provision enable[s]" an agency "to keep running.").

154. "[T]he 'traditional' rule is that 'the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.'" *Seila Law*, 140 S. Ct. at 2209 (quoting *Alaska Airlines, Inc. v. Brock*, 480

U.S. 678, 685 (1987)).  Given the unambiguous intent of Congress to enshrine *state*-controlled Councils as its primary policymakers, Congress would never have passed the Act if its Councils were directly accountable only to federal officials.  Congress ensured that 16 of the Council's 17 Members would be accountable to state officials.  Indeed, "political pressures played an important role in placing the states in a dominant … position," in part because the industry would have rejected "a purely federal regime." Rogalski, *supra*, at 174.  "Thus, the composition of each council shows a strong state representation among those voting … and a strong federal representation among those advising though not voting." *Id.* at 173.  No court can undo that choice.

155.    Declaratory relief is also "appropriate" to "declare [Plaintiffs'] rights."  28 U.S.C. § 2201.  The Court should declare that Council Members are unconstitutionally insulated from removal; and declare that Amendment 54, the Amendment 54 Final Rule, and all accompanying regulations are therefore the unlawful products of an unconstitutionally constituted Council.

## Count III:  The Deputy Assistant Administrator at NMFS is Unconstitutionally Insulated from Removal

156.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

157.    Article II of the Constitution provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1, & § 3.  Although the President can delegate tasks to

subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Seila Law*, 140 S. Ct. at 2197.

158.   Plaintiffs have two causes of action to enforce this requirement:  The first arises under the U.S. Constitution and this Court's traditional equitable authority to enjoin unconstitutional executive action. *See supra* ¶ 30; *Free Enter. Fund*, 561 U.S. at 491 n.2; *Armstrong*, 575 U.S. at 326–27; *Axon Enter.*, 143 S. Ct. at 906 (allowing plaintiffs to proceed on this equitable cause of action regardless of statutory restraints on judicial review).  The second cause of action arises under the Act's provisions authorizing judicial review of the Amendment 54 Final Rule, which incorporate the relevant sections of the APA. *See* 16 U.S.C. § 1855(f).

159.   The President cannot hold the Deputy Assistant Administrator accountable because he cannot freely remove him.  As a career-appointed SES civil servant, the Deputy Assistant Administrator may be fired only for cause, under a scheme that effectively bestows "life tenure." *Feds for Med. Freedom*, 63 F.4th at 391 (Ho, J., concurring).  That is unconstitutional:  The Deputy Assistant Administrator exercises the core executive function of unilaterally issuing final binding regulations and thus fits into neither *Seila Law* exception.

160.   This Court cannot rewrite the SES regime to render the Deputy Assistant Administrator terminable at will.  The whole point of a Senior Executive Service with career appointees is to create an insulated class of civil servants.  Congress would not have enacted a self-defeating scheme that permitted such employees to be fired at will.

*See Seila Law*, 140 S. Ct. at 2209. Because the Court cannot revise the web of statutes and regulations that resulted in Mr. Rauch's unconstitutional service, this Court should declare that his issuance of the Final Rule and accompanying regulations was unlawful, vacate those actions, and grant injunctive relief. *See Axon Enter.*, 143 S. Ct. at 902.

161. Declaratory relief is "appropriate" to "declare [Plaintiffs'] rights." 28 U.S.C. § 2201. The Court should declare that the Deputy Assistant Administrator is unconstitutionally insulated from removal; and declare that the Amendment 54 Final Rule and all accompanying regulations are the unlawful products of an unconstitutionally insulated official.

**PRAYER FOR RELIEF**

**Now, therefore,** Plaintiffs request a judgment in their favor against Defendants as follows:

A. Declaring that the Voting Members of the Gulf of Mexico Regional Fishery Management Council were appointed in violation of the Appointments Clause.

B. Declaring that the Voting Members of the Gulf of Mexico Regional Fishery Management Council are unconstitutionally insulated from removal.

C. Declaring Amendment 54, the Amendment 54 Final Rule, and accompanying regulations unlawful, unenforceable, and void as the products of unconstitutionally appointed Council Members.

D.    Declaring Amendment 54, the Amendment 54 Final Rule, and accompanying regulations unlawful, unenforceable, and void as the products of Council Members with unconstitutional removal protections.

E.    Declaring that the Deputy Assistant Administrator for Regulatory Programs at NMFS is unconstitutionally insulated from removal.

F.    Declaring the Amendment 54 Final Rule and accompanying regulations unlawful, unenforceable, and void as the products of a Deputy Assistant Administrator for Regulatory Programs with unconstitutional removal protections.

G.    Vacating Amendment 54, the Amendment 54 Final Rule, and accompanying regulations as "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and/or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C); 16 U.S.C. § 1855(f)(1).

H.    Permanently enjoining Defendants from enforcing Amendment 54, the Amendment 54 Final Rule, or accompanying regulations against Plaintiffs.

I.    Permanently enjoining the Voting Members from developing further annual catch limits for the greater amberjack fishery.

J.    Awarding reasonable attorneys' fees and costs, plus interest accruing thereon, under 28 U.S.C. § 2412; and

K.    Granting such other and further relief as the Court may deem appropriate.

Dated:  June 16, 2023

Respectfully submitted,

Robert W. Wilkinson (MS Bar No. 7215)
A. Kelly Sessoms, III (MS Bar No. 9466)
Wilkinson, Williams, Bosio & Sessoms, PLLC
734 Delmas Ave. (39567)
P.O. Box 1618
Pascagoula, MS 39568-1618
(228) 762-2272 phone
(228) 762-3223 fax
rwilkinson@wwbslaw.com
ksessoms@wwbslaw.com

James M. Burnham (*lead counsel*)*
Brett Shumate*
John Henry Thompson*
Louis J. Capozzi III*
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-5429
jburnham@jonesday.com

*Counsel for Plaintiffs*

* *pro hac vice application forthcoming.*