# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

GEORGE D. ARNESEN, *et al.*

       *Plaintiffs,*

  *v.*

GINA RAIMONDO, U.S. Secretary of Commerce, *et al.*

       *Defendants.*

No. 1:23-cv-00145-TBM-RPM

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
# OR ALTERNATIVELY FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................1

    A.    Regional Fisheries Management Councils ...........................................................2

    B.    The National Marine Fisheries Service ..............................................................5

    C.    Amendment 54 ...................................................................................................6

    D.    The Plaintiffs .....................................................................................................7

ARGUMENT ..........................................................................................................................8

I.    Plaintiffs are Likely to Prevail on the Merits of their Constitutional Claims............8

    A.    Council Members serve in violation of the Appointments Clause .....................9

        1.    Council Members are "Officers of the United States." ...........................9

            a.    Council Members hold continuing offices established by law.......... 10

            b.    Council Members exercise significant authority. ............................... 10

        2.    Council Members are illegally appointed as principal officers ..................... 14

        3.    Council Members are illegally appointed as inferior officers ...................... 16

            a.    State bureaucracy Members ..................................................... 16

            b.    Governor-nominated Members .............................................. 17

        4.    The challenged actions are invalid and unlawful ............................. 18

    B.    Council Members are unconstitutionally insulated from removal ........................ 18

        1.    Council Members do not fall within a *Seila Law* exception............................ 19

        2.    The Act's removal restrictions are unconstitutional regardless.................... 20

        3.    Plaintiffs are entitled to relief ............................................... 21

            a.    The Act's unconstitutional components are inseverable.................. 22

            b.    Prospective relief is warranted.......................................... 25

    C.    The Deputy Assistant Administrator at NMFS is unconstitutionally insulated
        from removal................................................................... 27

    D.    Plaintiffs have Article III standing............................................ 31

        1.    Plaintiffs are suffering concrete injuries ...................................... 31

        2.    Plaintiffs' injuries are traceable to Defendants ............................... 31

        3.    Plaintiffs' injuries can be redressed by this Court ............................ 34

II.    Plaintiffs Are Suffering Irreparable Harm ........................................... 34

III.    The Equities and the Public Interest Weigh in Favor of Preliminary Relief.......... 35

CONCLUSION......................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Airlines, Inc. v. Brock,*
480 U.S. 678 (1987) ................................................................................................ 22, 23

*Alfa Int'l Seafood v. Ross,*
264 F. Supp. 3d 23 (D.D.C. 2017) ............................................................................. 5, 29

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ....................................................................................................... 8

*Axon Enter., Inc. v. FTC,*
143 S. Ct. 890 (2023) ............................................................................................. *passim*

*Braidwood Mgmt. Inc. v. Becerra,*
___ F. Supp. 3d ___, 2022 WL 4091215 (N.D. Tex. Sept. 7, 2022) ............................. 10

*Buckley v. Valeo,*
424 U.S. 1 (1976) ............................................................................................. 9, 10, 14, 29

*C & W Fish Co. v. Fox, Jr.,*
931 F.2d 1556 (D.C. Cir. 1991) ..................................................................................... 5

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
51 F.4th 616 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) ............................. 26

*Cochran v. SEC,*
20 F.4th 194 (5th Cir. 2021) ......................................................................................... 26

*Collins v. Mnuchin,*
938 F.3d 553 (5th Cir. 2019) ......................................................................................... 18

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ........................................................................................... *passim*

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019) ................................................................................................. 32

*Edmond v. United States,*
520 U.S. 651 (1997) ........................................................................................... 9, 14, 15

*Esparraguera v. Dep't of the Army,*
981 F.3d 1328 (Fed. Cir. 2020) ............................................................................. 27, 28

*FEC v. Cruz,*
142 S. Ct. 1638 (2022) ........................................................................................... 32, 33

*FEC v. NRA Pol. Victory Fund,*
6 F.3d 821 (D.C. Cir. 1993) ......................................................................................... 18

*Feds for Med. Freedom v. Biden,*
    63 F.4th 366 (5th Cir. 2023) ................................................................ 20, 28

*Feinerman v. Bernardi,*
    558 F. Supp. 2d 36 (D.D.C. 2008) ........................................................... 35

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ...................................................................... *passim*

*Freytag v. Comm'r,*
    501 U.S. 868 (1991) ...................................................................... *passim*

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ............................................................................. 16

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ....................................................................... 19, 29

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
    684 F.3d 1332 (D.C. Cir. 2012) ........................................................ 14, 18

*Lucia v. SEC,*
    138 S. Ct. 2044 (2018) .................................................................. *passim*

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................. 34

*Masterpiece Cakeshop v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) ......................................................................... 18

*Morrison v. Olson,*
    487 U.S. 654 (1988) ............................................................................. 20

*Myers v. United States,*
    272 U.S. 52 (1926) ......................................................................... 17, 27

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ............................................................................. 22

*Nguyen v. United States,*
    539 U.S. 69 (2003) ............................................................................... 18

*Oceana, Inc. v. Ross,*
    No. 17-cv-05146, 2020 WL 5239197 (C.D. Cal. Jan. 8, 2020) .................... 3

*Seila Law, LLC v. CFPB,*
    140 S. Ct. 2183 (2020) .................................................................. *passim*

*Sierra Club v. Trump,*
    929 F.3d 670 (9th Cir. 2019) ................................................................... 8

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ................................................................. 31

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016)................................................................................. 31, 34

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ............................................................................................31

*Trottie v. Livingston,*
   766 F.3d 450 (5th Cir. 2014) (per curiam) ..................................................... 8, 34, 35

*United Cook Inlet Drift Ass'n v. NMFS,*
   Nos. 3:21-cv-00255, -00247, 2022 WL 2222879 (D. Alaska June 21, 2022) .............31, 32, 33, 34

*United States v. Arthrex, Inc.,*
   141 S. Ct. 1970 (2021) ......................................................................................*passim*

*United States v. Donziger,*
   38 F.4th 290 (2d Cir. 2022) ....................................................................................10

*United States v. Germaine,*
   99 U.S. 508 (1879)..................................................................................................10

*Valley v. Rapides Par. Sch. Bd.,*
   118 F.3d 1047 (5th Cir. 1997) .................................................................................35

*Wages & White Lion Invs., LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) .................................................................................34

*Williams v. Pennsylvania,*
   579 U.S. 1 (2016) ...................................................................................................18

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. Article II, § 1, cl. 1 ....................................................................................16

U.S. Const. Article II, § 2, cl. 2 ........................................................................... 9, 16, 17

5 U.S.C. § 702 ...........................................................................................................34

5 U.S.C. § 706(2) .......................................................................................................26

5 U.S.C. § 3132(a) ......................................................................................................27

5 U.S.C. § 3393(d) ........................................................................................................6

5 U.S.C. § 3592 .........................................................................................................5, 6

5 U.S.C. § 4311 ............................................................................................................6

5 U.S.C. § 4312 ............................................................................................................6

5 U.S.C. § 4313 ............................................................................................................6

5 U.S.C. § 4314 ............................................................................................................6

5 U.S.C. § 4315 ............................................................................................................6

5 U.S.C. § 7512 ..........................................................................................................28

5 U.S.C. § 7513 ..........................................................................................................28

5 U.S.C. § 7541 .................................................................................................................... 5

5 U.S.C. § 7542 ................................................................................................................. 5, 28

5 U.S.C. § 7543(a) ........................................................................................................ 5, 6, 28

5 U.S.C. § 7543(b) ............................................................................................................... 6

5 U.S.C. § 7543(d) ............................................................................................................... 6

16 U.S.C. § 1801(b) ...................................................................................................... 2, 11, 13

16 U.S.C. § 1851(b) ................................................................................................ 2, 11, 14, 15

16 U.S.C. § 1852(a) .............................................................................................. 2, 4, 10, 11

16 U.S.C. § 1852(b) ....................................................................................................... *passim*

16 U.S.C. § 1852(d) ...................................................................................................... 10, 15

16 U.S.C. § 1852(e) ............................................................................................................. 15

16 U.S.C. § 1852(f) ............................................................................................................. 15

16 U.S.C. § 1852(g) ....................................................................................................... 13, 15

16 U.S.C. § 1852(h) ....................................................................................................... *passim*

16 U.S.C. § 1852(i) ............................................................................................................. 15

16 U.S.C. § 1853(a) .................................................................................................. 10, 11, 13

16 U.S.C. § 1853(c) ....................................................................................................... 2, 11

16 U.S.C. § 1854(a) ....................................................................................................... *passim*

16 U.S.C. § 1854(b) ...................................................................................................... 3, 12, 14

16 U.S.C. § 1854(c) ....................................................................................................... 3, 12

16 U.S.C. § 1854(e) ............................................................................................................. 14

16 U.S.C. § 1854(h) ...................................................................................................... 3, 11, 12

16 U.S.C. § 1855(b) ............................................................................................................. 14

16 U.S.C. § 1855(c) ...................................................................................................... 3, 11, 16

16 U.S.C. § 1855(f) ....................................................................................................... 8, 18

16 U.S.C. § 1856(a) ....................................................................................................... 2, 24

16 U.S.C. § 1857 .................................................................................................................. 21

28 U.S.C. § 2201(a) ...................................................................................................... 26, 30

43 U.S.C. § 1312 .................................................................................................................. 2

## OTHER AUTHORITIES

1 ANNALS OF CONG. 515 (June 17, 1789) ........................................................................ 27

A. Bamzai & S. Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756 (2023) ............... 17, 19

5 C.F.R. § 317.501 ............................................................................................................... 5

5 C.F.R. § 317.502(a) ..................................................................................................... 5

5 C.F.R. § 752.604 ......................................................................................................... 6

5 C.F.R. § 752.605 ......................................................................................................... 6

Cong. Rsch. Serv., *Reauthorization Issues for the Magnuson Stevens Fishery Conservation and Management Act* 31 (May 22, 2014) .......................................................................... 2

Dep't of Commerce, *NOAA Organizational Handbook: Transmittal No. 61* (Feb. 24, 2015) ...................................................................................................... 5

85 Fed. Reg. 7246 (Feb. 7, 2020) ................................................................................. 3

88 Fed. Reg. 13077 (Mar. 2, 2023) .............................................................................. 6

88 Fed. Reg. 14964 (Mar. 10, 2023) ............................................................................ 6

88 Fed. Reg. 39193 (June 15, 2023) ............................................................................. 6

B. Feinstein & J. Nou, *Submerged Independent Agencies* (forthcoming U. Pa. L. Rev. 2023) ............................................................... 28, 29, 30

C. Flavelle & B. Bain, *Washington Bureaucrats are Quietly Working to Undermine Trump's Agenda*, Bloomberg (Dec. 18, 2017) ......................................................................... 29

G. Frug, *Does the Constitution Prevent the Discharge of Civil Service Employees?*, 124 U. Pa. L. Rev. 942 (1976) .......................................................................... 28

Council Members, Gulf of Mexico Fishery Management Council ..................................... 4

*Hearings Before the Senate Committee on Commerce on S. 961*, 94th Cong., 1st Sess., 468 (1975) .............................................................................................................. 24

House Committee on Oversight and Reform, *U.S. Government Policy and Supporting Positions* (*Plum Book*) ...................................................................................... 5

LEGISLATIVE HISTORY OF THE FISHERY CONSERVATION AND MANAGEMENT ACT OF 1976 (1976) .......................................................................................... 24, 25

NOAA Fisheries, *Samuel D. Rauch III* ........................................................................... 5

William R. Rogalski, *The Unique Federalism of the Regional Councils Under the Fishery Conservation and Management Act of 1976*, 9 B.C. Env't Affs. L. Rev. 163 (1980) ...... 4, 9, 12, 25

R. Sando, *Rauch, Sam: Oral History Interview* (June 30, 2016) .......................... 12, 14, 29

U.S. Office of Personnel Management, *Guide to the Senior Executive Service* (Mar. 2017) .............. 27

D. Willett & A. Gordon, *Rights, Structure, and Remediation*, 131 Yale L.J. 2126 (2022) ............ 8

J. Yoo, *Unitary, Executive, or Both?*, 76 U. Chi. L. Rev. 1935 (2009) ............................ 29

**INTRODUCTION**

Plaintiffs George Arnesen and Jeffrey Ryan Bradley are commercial fishermen who harvest greater amberjack in the Gulf of Mexico. The amberjack fishery is subject to federal catch limits set by the Gulf of Mexico Fishery Management Council. The Magnuson-Stevens Fishery Conservation and Management Act (the Act) grants the Council broad authority to set and adjust fishery policies in the Gulf region. This year, the Council slashed the commercial amberjack catch limit by nearly 80% and the National Marine Fisheries Service (NMFS)—the agency that audits Council policies for legality and issues them as regulations—approved that plan wholesale. This new rule—which took effect on June 15, 2023—has triggered the immediate closure of the 2023 commercial amberjack fishing season.

The statutory regime that produced this rule is unconstitutional at every level. The regime is unconstitutional at the outset because the Council Members that crafted and issued the rule are unconstitutionally installed in office and then unconstitutionally shielded from removal by the President (and are thus free from presidential supervision). And the regime is unconstitutional at the endpoint because the agency official charged with promulgating the Council's rule as binding law is also unconstitutionally shielded from presidential removal and supervision.

The Supreme Court has made clear that the "legitimacy and accountability" of the federal bureaucracy requires "a clear and effective chain of command down from the President, on whom all the people vote," *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021), but the Act severs that chain many times over. In doing so, it subjects Plaintiffs—and many others—to rule by officials who are immune from democratic control. That insulation has, in turn, fostered an insular bureaucracy that favors monied interests at the expense of local fishermen—a bias evident in this latest policy.

The time has come to end this unconstitutional regime. The Court should vindicate "the Constitution's structural integrity," *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991), grant Plaintiffs a preliminary injunction, and enter final judgment in their favor.

## BACKGROUND

**A.     Regional Fishery Management Councils**

For much of its history, the United States claimed only a narrow strip of territorial waters, leaving fishing regulation to the States.  *See* Cong. Rsch. Serv., *Reauthorization Issues for the Magnuson Stevens Fishery Conservation and Management Act* 31 (May 22, 2014) (CRS Report).  Today, States govern out to three nautical miles, while federal authority extends from the edge of state waters to 200 miles offshore.  *See* 43 U.S.C. § 1312; 16 U.S.C. § 1856(a)(1).  To regulate those federal waters, Congress in 1976 passed the Magnuson-Stevens Fishery Conservation and Management Act.

The Act installed "an entirely new[] regional management system" for federal fisheries, CRS Report at 31, and established eight Regional Fishery Management Councils to operate it, 16 U.S.C. § 1852(a).  The Councils dominate the Act's policymaking structure.  Congress entrusted the Councils with "exercis[ing] sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of [fishery management] plans" (FMPs).  *Id.* § 1801(b)(5).  If a Council decides that a "fishery under its authority … requires conservation and management," it must "prepare and submit" to the Secretary of Commerce an FMP and amendments as "necessary from time to time."  *Id.* § 1852(h)(1).  In particular, Councils "develop annual catch limits" for their managed fisheries.  *Id.* § 1852(h)(6).  Councils craft regulations they "deem[] necessary or appropriate for … implementing a [FMP] or amendment."  *Id.* § 1853(c).  Moreover, Councils may "conduct any other activities … which are necessary and appropriate to [their] functions."  *Id.* § 1852(h)(9).

In contrast with its sweeping grant of policymaking power to the Councils, the Act gives the Commerce Department a limited role.  When it comes to Councils' core federal power—to develop FMPs and amendments—the Secretary merely "assist[s]" the Councils by "establish[ing] advisory guidelines" that lack "the force and effect of law."  *Id.* § 1851(b).  In addition, because Councils do not have legal staff, the Secretary "review[s]" Council FMPs and amendments "to determine whether

[they are] consistent with" the Act and "other applicable law." *Id.* § 1854(a)(1)(A).  Following public notice and comment, the Secretary must "approve, disapprove, or partially disapprove" the Council's work. *Id.* § 1854(a)(3).  If the Secretary disapproves all or part of it, she offers "recommendations … that could be taken by the Council to conform [its] plan or amendment to … applicable law." *Id.* § 1854(a)(3)(C).[1]  If the Secretary fails to "notify [the] Council" of her decision "within 30 days," then the Council's "plan or amendment shall take effect as if approved." *Id.* § 1854(a)(3)(C).

Once a Council's FMP or amendment takes effect, that Council can block its revocation on policy grounds *forever*:  "The Secretary may repeal or revoke a [FMP] for a fishery under the authority of a Council *only if* the Council approves the repeal or revocation by a three-quarters majority of the voting members." *Id.* § 1854(h) (emphasis added).  The Secretary may develop her own FMP or amendment only in very narrow circumstances—(1) where a Council fails to do so "after a reasonable period of time," (2) where it "fails to submit a revised or further revised [FMP] or amendment," or (3) where the fishery is not within a Council's jurisdiction. *Id.* § 1854(c)(1).

Under certain conditions, a Council can even *force* the Secretary to take immediate action:  "If a Council finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a [FMP] exists for such fishery," "the Secretary *shall* promulgate emergency regulations … to address the emergency or overfishing if the Council, by unanimous vote," demands "the taking of such action." *Id.* § 1855(c)(2)(A) (emphasis added).

---

[1] A similar process governs a Council's proposed implementing regulations.  When a Council "deems" regulations "necessary," the Secretary reviews them for legality and consistency with the Council's policies. 16 U.S.C. § 1854(b)(1).  The Secretary "shall promulgate final regulations" that she finds legal and must "consult with the Council before making any revisions." *Id.* § 1852(b)(2), (3).  But the Secretary cannot order a Council to "consult" with her, giving the Councils even more control. *See Oceana, Inc. v. Ross*, No. 17-cv-05146, 2020 WL 5239197, at *5 (C.D. Cal. Jan. 8, 2020) (ordering NMFS to consult with a Council); *but see id.*, Dkt. No. 124, at 8–9 (Nov. 18, 2019) (NMFS "repeatedly attempted to consult with" the Council but cannot "compel the independent … Council to place this item on its agenda"); *see also* 85 Fed. Reg. 7246, 7247 (Feb. 7, 2020) (NMFS issuing rules it wished to alter because the Council would not consult).

The Councils "are not modeled after any other authority; rather, they were shaped by the demands of compromise and necessity."  William R. Rogalski, *The Unique Federalism of the Regional Councils Under the Fishery Conservation and Management Act of 1976*, 9 B.C. Env't Affs. L. Rev. 163, 164–65 (1980).  The Council at issue here "ha[s] authority over the fisheries in the Gulf of Mexico seaward of" Texas, Louisiana, Mississippi, Alabama, and Florida.  16 U.S.C. § 1852(a)(1)(E).

The Act provides for three sets of Council Members.  *First*, it reserves Council seats for "[t]he principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State," "or the designee of such official."  16 U.S.C. § 1852(b)(1)(A).  Such "designee[s]" fill all five of these seats on the Gulf of Mexico Council.  Alabama's, for example, is filled by the head marine biologist at the State Department of Conservation and Natural Resources.  *See* Council Members, Gulf of Mexico Fishery Management Council (last accessed May 26, 2023), https://gulfcouncil.org/about/council-members/.  These Members serve on Councils "so long as" they occupy their predicate state positions.  16 U.S.C. § 1852(b)(1)(A).  No other provision governs their tenure on the Council.

*Second*, the Act provides seats for Members nominated by State governors, 11 of whom serve on the Gulf of Mexico Council.  "[T]he Governor of each … constituent State" must submit "not less than three individuals" he deems "qualified" based on statutory factors.  *Id.* § 1852(b)(2)(C).  The Secretary "review[s] each list … to ascertain if the individuals on [it] are qualified" under the Act.  *Id.* If they are, the Secretary must appoint one of them.  If the Secretary "determines that any individual" on a governor's list "is not qualified," her only option is to "notify" the governor, who may then "submit a revised list or resubmit the original list with an additional explanation of the [individual's] qualifications."  *Id.*  The Secretary cannot bypass a governor to make her own choice.  And the Secretary may only remove such a Member "for cause" in the exceedingly narrow event that the Member "is found … after notice and an opportunity for a hearing" to have violated the Act's conflict-

of-interest provision.  *Id.* § 1852(b)(6)(B).  For anything else, only the Council itself can initiate removal—requiring a two-thirds vote to proceed.  *Id.*

*Third*, each Council includes the NMFS "regional director … or his designee."  *Id.* § 1852(b)(1)(B).  Like the state officials, this Member is not independently appointed to (or removable from) the Council; he automatically fills a Council seat due to his NMFS position.  The Regional Administrator on the Gulf of Mexico Council is Andy Strelcheck, a Senior Executive Service (SES) career official who enjoys robust tenure protections.  *See* House Committee on Oversight and Reform, *U.S. Government Policy and Supporting Positions* 27 (*Plum Book*); *see also* 5 U.S.C. §§ 3592, 7541–43.

## B.     The National Marine Fisheries Service

The Secretary of Commerce has delegated her duties under the Act to the Under Secretary for Oceans and Atmosphere at the National Oceanic and Atmospheric Administration (NOAA), "a sub-agency of the [Commerce] Department."  *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 37–38 (D.D.C. 2017).  "The Under Secretary, in turn, has delegated his authority to the Assistant Administrator for Fisheries"—*i.e.*, the NMFS Director, currently Janet Coit.  *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1558 (D.C. Cir. 1991); NOAA, U.S. Department of Commerce, *NOAA Organizational Handbook: Transmittal No. 61*, at 2–4 (Feb. 24, 2015) (NOAA Handbook).  Finally, the Assistant Administrator has subdelegated the power to issue rules for publication in the Federal Register and Code of Federal Regulations to the Deputy Assistant Administrator for Regulatory Programs.  NOAA Handbook at 5.  That role has been filled by Samuel Rauch for nearly twenty years.

Mr. Rauch "oversees" all NMFS "regulatory actions and programs."  NOAA Fisheries, *Samuel D. Rauch III*, https://www.fisheries.noaa.gov/contact/samuel-d-rauch-iii (last visited June 21, 2023).  He is a career-appointed SES civil servant hired by Office of Personnel Management and NMFS officials using the civil-service hiring process.  *See Plum Book* at 26; 5 C.F.R. §§ 317.501, 317.502(a).  Following a "1-year probationary period," SES career appointees are largely immune from removal.

5 U.S.C. § 3393(d).  They can be removed from the civil service or suspended more than 14 days "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer." *Id.* § 7543(a).  They can be stripped of SES status only for "less than fully successful executive performance," as determined by a merit-based evaluation system. *Id.* § 3592(a)(2); *see also id.* §§ 4311–15.  And they enjoy procedural protections and the right to a hearing before the Merits System Protection Board. *See id.* § 7543(b), (d); 5 C.F.R. §§ 752.604, 752.605.

## C.    Amendment 54

The Gulf of Mexico Council recently developed Amendment 54, an amendment to the Gulf Reef Fish FMP revising catch limits for greater amberjack.  On January 20, 2023, the Council finalized Amendment 54.  NMFS published Amendment 54 in the Federal Register for comment on March 2, 2023, and published implementing regulations on March 10, 2023.  *See* 88 Fed. Reg. 13077, 14964.  NMFS issued the Amendment 54 Final Rule on June 15, 2023.  *Id.* at 39193.  The agency dismissed Plaintiffs' constitutional objections, raised in their comment, as grounded in "misunderstand[ings]" of the Act. *Id.* at 39198.  Mr. Rauch executed the proposed and final rules. *See id.* at 14969, 39201.

Amendment 54 cuts the fleet-wide commercial acceptable catch limit (ACL) for greater amberjack from 484,380 pounds to 101,000 pounds—a reduction of roughly 80%.  Under the Amendment's buffer rules, that leaves an acceptable catch target (ACT) of 93,930 pounds.  And once 75% of that ACT has been caught—roughly 70,000 pounds across the entire fleet—fishermen are limited to 250 pounds of amberjack per trip.  Amendment 54 achieves this reduction in part by reserving a greater proportion of the species for the recreational sector.  Before Amendment 54, 27% of the amberjack harvest was reserved for commercial fishermen, with the remaining 73% to the recreational sector.  Under Amendment 54, the commercial sector enjoys just 20% of the overall catch.

Amendment 54's commercial amberjack restrictions took effect immediately on June 15, 2023. 88 Fed. Reg. at 39201.  Because the Gulf fleet had *already* surpassed Amendment 54's commercial ACL

as of that date, NMFS promptly announced the immediate closure of the 2023 amberjack harvest. *See* NOAA Fisheries (June 16, 2023) https://www.fisheries.noaa.gov/bulletin/commercial-harvest-greater-amberjack-federal-waters-gulf-mexico-will-close-june-18 (Exhibit C).

**D.     The Plaintiffs**

Plaintiff George Arnesen is a second-generation commercial fisherman from Venice, Louisiana, with 40 years of commercial fishing experience. Since obtaining a Gulf Reef Fish Permit in 1996, George has targeted multiple reef species, including greater amberjack. George and his wife have fished together since 1999 and operate the *Ms. Aleena*, a 39-foot Key West named after their daughter. The Arnesens built a successful amberjack business by harvesting fish and driving them directly to wholesalers in New Orleans who then sell to seafood restaurants.

Plaintiff Jeffrey Ryan Bradley is a fifth-generation commercial fisherman from Ocean Springs, Mississippi with 15 years of commercial fishing experience. Ryan started fishing at age 7 with his grandfather, who worked the Gulf as a shrimper and oysterman for 50 years. Ryan holds a Gulf Reef Fish Permit and captains the *Fighting Chicken*, a 32-foot vessel with a fish-hold capacity of 2,000 pounds. Weather permitting, Ryan makes weekly trips into the Gulf, often in search of greater amberjack, red snapper, mangrove snapper, or grouper. Ryan has harvested amberjack commercially for the past 7 years. In 2018, he founded Sea Alis Seafood Company, a licensed seafood dealer based in Pass Christian, Mississippi that supplies seafood to restaurants across the State.

George and Ryan intend to target and harvest greater amberjack under their federal permits whenever it is profitable. Even before Amendment 54, Plaintiffs and other amberjack fishermen operated on razor-thin margins. But the Amendment's dramatic cuts to the overall catch have erased what remains. As a direct result of Amendment 54, the 2023 commercial amberjack season has been cancelled; Plaintiffs will not be able to harvest this species *at all* until 2024. *See* Exhibit C. In short, Amendment 54's new burdens on commercial amberjack fishermen are harming Plaintiffs right now.

*See* Arnesen Decl. ¶¶ 23–31; Bradley Decl. ¶¶ 14–21.  In particular, Amendment 54 spells the end of George's once-lucrative amberjack sales to wholesalers in New Orleans.  Arnesen Decl. ¶ 30.  Ryan's seafood business will suffer, too, as will the restaurants who rely on his amberjack.  Bradley Decl. ¶¶ 19–20.  But none of this is a surprise to Plaintiffs, who have seen firsthand how the Council caters to the well-connected recreational sector over local businesses.  *See id.* ¶ 22; Arnesen Decl. ¶ 32.

## ARGUMENT

"To be entitled to a preliminary injunction, a movant must establish (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that … an injunction will not disserve the public interest."  *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) (per curiam).  Plaintiffs satisfy these requirements.  This Court should grant preliminary injunctive relief or, in the alternative, grant summary judgment on an expedited basis.[2]  *See* 16 U.S.C. § 1855(f)(4).

## I.   Plaintiffs are Likely to Prevail on the Merits of their Constitutional Claims.

Plaintiffs are likely to prevail on the merits for three reasons:  *First*, the voting Members of the Gulf of Mexico Fishery Management Council serve in violation of the Appointments Clause.  *Second*, those Members enjoy unconstitutional protections from removal from office.  *Third*, the Deputy Assistant Administrator who issued the Amendment 54 Final Rule is unconstitutionally insulated from removal.  Each claim provides an independent basis for preliminary injunctive relief.

---

[2] Plaintiffs possess "an implied private right of action directly under the Constitution to challenge governmental action under the Appointments Clause [and] separation-of-powers principles."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); Compl. ¶¶ 139, 151, 158 (raising independent causes of action).  The Supreme Court has "long held that federal courts" can "grant injunctive relief" to prevent "violations of federal law by federal officials."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *Sierra Club v. Trump*, 929 F.3d 670, 694–98 (9th Cir. 2019) (collecting cases).  And it recently permitted plaintiffs to proceed under this cause of action regardless of any statutory restraints on judicial review.  *See Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 906 (2023); D. Willett & A. Gordon, *Rights, Structure, and Remediation*, 131 Yale L.J. 2126, 2187 (2022) ("[C]ourts need no statutory basis to award *equitable* relief for constitutional violations.").

### A.      Council Members serve in violation of the Appointments Clause.

The Framers "viewed the principle of separation of powers as the central guarantee of a just government." *Freytag*, 501 U.S. at 870.  The Constitution delivers on that guarantee, in part, through the Appointments Clause, under which the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States."  U.S. Const. Art. II, § 2, cl. 2.  The only exception to that rule covers "inferior Officers," whose appointment "Congress may by Law vest … in the President alone, in the Courts of Law, or in the Heads of Departments."  *Id.*  In two ways, the Appointments Clause "ensure[s] that those who wield[]" the appointment power are "accountable to political force and the will of the people."  *Freytag*, 501 U.S. at 884.  It "divid[es] the power to appoint the principal federal officers … between the Executive and Legislative Branches" and "allows Congress only limited authority to devolve appointment power" for inferior officers.  *Id.*

The Appointments Clause is not a matter of "mere[] … etiquette or protocol," *Buckley v. Valeo*, 424 U.S. 1, 125 (1976), but rather serves as a "structural safeguard[] of the constitutional scheme," *Edmond v. United States*, 520 U.S. 651, 659 (1997).  By violating it, the Act fractures the "clear and effective chain of command down from the President" and thus forfeits the Councils' "legitimacy and accountability to the public."  *Arthrex*, 141 S. Ct. at 1979.  Council Members—the Act's "primary policy makers"—are quintessential officers.  Rogalski, *supra*, at 178.  Indeed, the Act is best read to create a class of principal officers.  But even if Council Members are considered inferior officers, the Act's unorthodox selection methods violate the Appointments Clause.

### 1.      Council Members are "Officers of the United States."

The Appointments Clause envisions three categories of federal officials: principal officers, inferior officers, and "lesser functionaries." *Buckley*, 424 U.S. at 126 n.162.  "Officers" are those who hold "continuing office[s] established by law," *Lucia v. SEC*, 138 S. Ct. 2044, 2053 (2018), and "exercis[e] significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126.

### a.      Council Members hold continuing offices established by law.

Those employed on a temporary basis to complete discrete, limited tasks are typically not officers.  For example, "civil surgeons" were not officers because their *ad hoc* medical duties were "occasional and temporary."  *United States v. Germaine*, 99 U.S. 508, 511–12 (1879).  By contrast, officers hold "positions" that are "established by law, and whose duties and functions are … delineated in a statute."  *Freytag*, 501 U.S. at 881.  "[T]o qualify as an office, the position must not depend on the identity of the person occupying it, and the duties should continue, though the person be changed."  *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (internal quotation marks omitted).

Council Members officers hold "continuing office[s] established by law" and are entrusted with "continuing and permanent" duties.  *Lucia*, 138 S. Ct. at 2051, 2053.  Congress "created" permanent Council seats "by statute"—"down to [their] duties, salary, and means of appointment."  *Id.* at 2053 (internal quotation marks omitted); 16 U.S.C. § 1852(a)(1).  The Act spells out Members' duties in detail and provides for their pay.  *See, e.g.*, *id.* §§ 1852(d), (h), 1853(a).  And no Member serves on an "occasional or temporary" basis.  Most serve three-year terms, which can be extended by six years.  *See* 16 U.S.C. § 1852(b)(3); *cf. Braidwood Mgmt. Inc. v. Becerra*, ___ F.Supp.3d ___, ___, 2022 WL 4091215, at *10 (N.D. Tex. Sept. 7, 2022) (rejecting a "minimum-hours requirement for officers" and holding that officials with four-year terms were officers because their "positions are fixed by statute and will continue indefinitely").  Meanwhile, the state-bureaucracy Members hold their positions indefinitely, and the Act does not limit the Regional Director's tenure.  16 U.S.C. § 1852(b)(1)(A)–(B).

### b.      Council Members exercise significant authority.

Officers of the United States "exercis[e] significant authority pursuant to" federal law.  *Buckley*, 424 U.S. at 126.  They (and only they) may undertake important "administrative functions," including "rulemaking, [issuing] advisory opinions, and [making] determinations of [benefit] eligibility."  *Id.* at 140–41.  In other words, officers "perform more than ministerial tasks" and "exercise significant

discretion." *Freytag*, 501 U.S. at 881–82.  And if an official wields officer-level authority in exercising *any* of his duties, he qualifies as an "officer" under the Appointments Clause.  *Id.* at 882.

Council Members exercise significant authority and policymaking discretion over the Nation's fisheries.  The Councils are the centerpiece of the Act, and their Members are a far cry from the "broad swath of 'lesser functionaries' in the Government's workforce."  *Lucia*, 138 S. Ct. at 2051.  The Act vests Members with "authority over the[ir] fisheries" and charges them to "exercise sound judgment in the stewardship of fishery resources."  16 U.S.C. §§ 1801(b)(5), 1852(a)(1).

To fulfill this mandate, the Act empowers each Council to adopt and amend FMPs for its fisheries.  *Id.* §§ 1852(h)(1), 1853(a)(1)(A).  Relying on input from advisory committees that report only to it, a Council determines how much of a species can be harvested, how to divide the catch, and how it can be caught.  *See id.* § 1852(h)(6).  The Act leaves these policy decisions to Councils; the Secretary contributes only nonbinding guidance and can repeal an existing Council policy only if three-quarters of the Council agrees.  *Id.* §§ 1851(b), 1854(h).  In addition, each Council may draft implementing regulations as it "deems necessary or appropriate."  *Id.* § 1853(c).  Each Council makes crucial determinations regarding the health of its fisheries and "develop[s]" its own "multi-year research priorities."  *See id.* § 1852(h)(5), (7).  Congress also gave the Councils residual authority to "conduct any other activities" under the Act "or which are necessary and appropriate to the foregoing functions."  *Id.* § 1852(h)(9).  And it even empowered a unanimous Council to *compel* the Secretary's imposition of certain emergency or interim regulations.  *Id.* § 1855(c)(2)(A).

Consider this case, in which the Council exercised its power to "develop annual catch limits" for greater amberjack.  *Id.* § 1852(h)(6).  Throughout the Amendment 54 process, the Council relied on its chosen teams of scientists.  It weighed policy considerations and the competing interests of environmental groups, recreational fishermen, and the commercial sector.  *See id.* § 1801(b)(5).  In the end, it slashed commercial amberjack catch limits by about 80%.  And now that Amendment 54 has

taken effect, only the Council will have the power to lift its restrictions. *Id.* § 1854(h). If adjudicators who take evidence and propose opinions in *individual* disputes are officers, *Lucia*, 138 S. Ct. at 2054, Council Members vested with the *general* rulemaking authority exercised here are plainly officers too.

The Government will no doubt trumpet the Secretary's role in approving Council plans, but that step does not strip Council Members of officer status. To begin with, the Secretary does not review Council policies. That duty has been delegated (and re-delegated, and delegated again) to NMFS. And its circumscribed review does not evict the Councils from their policymaking role.

*First*, the Councils (and only the Councils) set the policy agenda for fisheries—a role NMFS cannot usurp. For Council-managed fisheries, NMFS typically has *no* policymaking power without Council cooperation; NMFS can act unilaterally *only* where a Council fails to do so. *See* 16 U.S.C. § 1854(c)(1)(A), (6). The Councils, not NMFS, decide when to *begin* the rulemaking process by "transmit[ing]" a policy or regulation. *Id.* § 1854(a)(1), (b)(1). And when a Council *does* choose to act, the agency's back-end review has *no* policy component—that review is statutorily limited to "consisten[cy] with … applicable law." *Id.* § 1854(a)(1), (b)(1). If a Council's policy is lawful, NMFS "shall" issue it. *Id.* § 1854(a)(3), (b)(3). And if NMFS identifies a legal error, it is limited to explaining that error to the Council and "recommend[ing]" revisions. *Id.* § 1854(a)(3)–(4), (b)(1)(B). Finally, if NMFS wants to "repeal or revoke" a Council's FMP, it cannot do so unless fully three-quarters of the Council agrees. *Id.* § 1854(h). As Mr. Rauch has explained, the "[C]ouncil process" is where "policy-level decisions" are made. R. Sando, *Rauch, Sam: Oral History Interview* at 19 (June 30, 2016), https://voices.nmfs.noaa.gov/sites/default/files/2018-09/rauch_samuel.pdf (Rauch Interview). NMFS plays a mere "auditor[]" role, "resolv[ing] what [the Councils] do as legal," *id.* at 15, while the Councils serve as "primary policy makers," Rogalski, *supra*, at 178.

*Second*, NMFS does not have to do *anything* for a Council policy to become law. In *Lucia*, the Supreme Court deemed Securities and Exchange Commission ALJs to be officers because the SEC

could "decline[] [to] review" an ALJ's ruling, thereby making it "final."  138 S. Ct. at 2054 (internal

quotation marks omitted).  So too here.  Although the Act states that the Secretary "shall" engage in

a limited review of Council policies, it further provides that such review is *not* required:  If the Secretary

fails for any reason to "notify a Council within 30 days … of the approval, disapproval, or partial

approval of a plan or amendment, then such plan or amendment shall take effect *as if approved*."  16

U.S.C. § 1854(a)(3)(C) (emphasis added).  That gives Councils even more authority than SEC ALJs

possessed in *Lucia*, where the SEC had to affirmatively "issue an opinion" specifically declining to

review a particular ALJ decision before that decision would take effect.  138 S. Ct. at 2054.  The

Councils' even greater "last-word capacity makes this an *a fortiori* case."  *Id.*

*Third*, Council Members wield significant authority by "prepar[ing] proposed findings," *Freytag*,

501 U.S. at 874, and "shap[ing] the administrative record" upon which their policy determinations and

NMFS approvals are based, *Lucia*, 138 S. Ct. at 2053.  The Act charges Councils with detailing the

factual basis for a FMP or amendment, *see* 16 U.S.C. § 1853(a), collecting public comments, *id.*

§ 1852(h)(3), and incorporating input from its advisory committees, *id.* § 1852(g).

The Government will likely urge this Court to pretend the Councils are powerless advisory

bodies.  But Congress (and fishermen nationwide) would be stunned to learn that those charged with

"exercis[ing] sound judgment in the stewardship" of America's fisheries, 16 U.S.C. § 1801(b)(5),

actually only perform "[in]significant" "ministerial tasks."  *Freytag*, 501 U.S. at 881–82.  Congress

knows how to create advisory bodies and it did so elsewhere in the Act—authorizing "scientific and

statistical committee[s]," various "advisory panels," and a "fishing industry advisory committee."  16

U.S.C. § 1852(g)(1)–(3).  These advisory groups "assist" the Councils "in carrying out [their]

functions."  *Id.* § 1852(g)(2).  Congress even made clear that the "[d]ecisions and recommendations"

of these "committees and panels … shall be considered to be advisory."  *Id.* § 1852(g)(5).  But the Act

never describes Councils or their policies in such terms.  To the contrary, it repeatedly directs the

*Secretary* to offer advisory recommendations *to the Councils*—not the other way around.[3]  The reason is obvious:  The Act establishes each Council as "a mini legislative body" that decides "who, when, and where people get to fish."  Rauch Interview, at 15, 19.  As such, Council Members wield the "significant authority" our Constitution reserves for officers.  *Buckley*, 424 U.S. at 126.

### 2.  Council Members are illegally appointed as principal officers.

The Appointments Clause establishes a default appointment method for officers: presidential nomination and Senate confirmation.  Congress may deviate from that method only for "inferior" officers—that is, those "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."  *Edmond*, 520 U.S. at 663, 664–65.  Any officer not so supervised is a "principal" officer, and so cannot be appointed using the Clause's alternative mechanisms.  *See Arthrex*, 141 S. Ct. at 1980.

Courts consider three factors to determine "how much power an officer exercises free from control by a superior."  *Id.* at 1982.  *First*, does a principal officer exercise sufficient "administrative oversight" of the officer in question?  *Id.* at 1980.  *Second*, may a principal officer freely remove him from office?  *Id. Third*, can a principal officer "review the [officer's] decisions"?  *Id.*; *see also Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1338 (D.C. Cir. 2012) (outlining factors).  All three considerations confirm that Council Members are principal officers.

*First*, no principal officer oversees the Councils.  This factor is met where a superior can "prescribe uniform rules of procedure" for, or "formulate policies and procedure in regard to," the subordinate officer's duties.  *Edmond*, 520 U.S. at 664.  It can also be met where a principal officer

---

[3] *See, e.g.*, 16 U.S.C. §§ 1851(b) (Secretary "establish[es] advisory guidelines … to assist" Councils), 1854(a)(3)(C) (Secretary makes "recommendations concerning the actions that could be taken by the Council to conform" its FMP or amendment "to … applicable law"); 1854(b)(1)(B) (same, for regulations); 1854(e) (Secretary "report[s] annually to … the Councils" on overfishing status, "request[s]" action if needed, and "recommend[s] … conservation and management measures"), 1855(b)(1) (Secretary creates "guidelines to assist the Councils in the description and identification of essential fish habitat" and "provide[s] each Council with recommendations … to assist it in the identification of … habitat").

"fixes the [officer's] rate of pay," "controls the decision whether to" initiate his work, or can "select[]" the subordinate officer to perform particular tasks. *Arthrex*, 141 S. Ct. at 1980.

The Councils are subject to only the most minimal NMFS oversight. Councils control their own procedural rules, policy priorities, research agendas, and staffing decisions. *See* 16 U.S.C. § 1852(e)–(i). No superior officer controls their pay. *See id.* § 1852(d). Nor, in general, does anyone other than a Council itself decide whether to initiate the Act's core policymaking process. *See id.* § 1854(a)(1). And the Act shields that process from real oversight. The agency's front-end input is limited to "advisory guidelines" without "force and effect of law," *id.* § 1851(b); its back-end legal review is likewise tightly limited.

*Second*, no principal officer—nor even the President himself—may remove Council Members at will. Each Council Member enjoys nearly impenetrable removal protections that violate the Constitution in their own right. *See infra*, at 18–21. Even if those protections were constitutional, they clearly deny any principal officer the power to freely remove Members—"a powerful tool for control." *Edmond*, 520 U.S. at 664. Five are *completely* immune from removal. 16 U.S.C. § 1852(b)(1)(A). Eleven others can be removed only in extremely narrow circumstances. *Id.* § 1852(b)(6). The Regional Administrator enjoys tenure protections of his own. *See supra*, at 5–6.

*Third*, no principal officer can veto a Council's policy decisions. "Since the founding, principal officers have directed the decisions of inferior officers on matters of *law as well as policy*." *Arthrex*, 141 S. Ct. at 1983 (emphasis added). But while NMFS may return a FMP or amendment to a Council if it identifies a *legal* defect, that just means the Council has the final word when it comes to *lawful* policies. Nor is NMFS approval always essential, given that Council policies "shall take effect as if approved" if the agency fails to act. 16 U.S.C. § 1854(a)(3)(C). The finality of Council decisions is particularly apparent if the President wishes to revoke an existing plan—a step that just five Members can block. Generally, then, substantive changes to fishery policy *must* come through Council action. Moreover,

a unanimous Council can make the unreviewable final decision to force the Secretary to impose certain emergency and interim regulations. *Id.* § 1855(c)(2)(A).

### 3.   Council Members are illegally appointed as inferior officers.

Even if Members are inferior officers, though, they were still unlawfully appointed. Article II authorizes Congress to "vest the Appointment" of "inferior Officers" in "the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II, § 2, cl. 2. Neither the President nor any court selects Council Members. That leaves "the Heads of Departments"—typically cabinet-level officers. *See Freytag*, 501 U.S. at 886. But 16 of 17 Members are not appointed by such officials.

### a.   State bureaucracy Members

The Appointments Clause denies Congress power to delegate the *federal* appointment power to *state* officials—who are certainly not Heads of Departments. Indeed, the whole point of the Clause is to provide clear "lines of accountability," *Arthrex*, 141 S. Ct. at 1982, by "limit[ing] the universe of eligible recipients of the power to appoint," *Freytag*, 501 U.S. at 880. But *state* officials are accountable, if at all, only to *state* electorates. Such officials cannot wield *federal* power to appoint officers whose authority transcends state borders. Allowing them to do so would turn federalism on its head—undermining the values of representation and accountability that our system of dual sovereignty is built to advance. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).

Nevertheless, the Act reserves Council seats for "[t]he principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State," "or the designee of such official." 16 U.S.C. § 1852(b)(1)(A). In other words, the Act empowers state officials to appoint federal officers. Indeed, state bureaucrats enjoy plenary discretion to select designees to serve on the Council, and have done so. This is an extraordinary "diffusion of accountability." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010). Federal officers wield the "executive Power," U.S. Const. art. II, § 1, cl. 1, and that

power is vested in the President, who answers to a national electorate.  But Council Members purport to wield it despite having been appointed by governors or (more often) by obscure state bureaucrats. So if a Council issues a policy that harms fishermen in one state, those fishermen have *zero* political recourse against a significant portion of its Members.  That is unconstitutional.

### b.  Governor-nominated Members

Eleven Council Members are nominated by governors and selected from curated lists by the Commerce Secretary.  As noted above, *see supra*, at 4–5, this procedure does not allow the Secretary to choose whomever she (or the President) prefers.  Instead, the Secretary *must* pick from a closed set of candidates curated by a state official.  Governors are in control throughout the process:  The Act does not impose time restraints, limit the amount of back-and-forth, or otherwise empower the Secretary to bypass state governors.  For instance, a governor committed to elevating particular candidates has the power to keep a Council seat empty until the Secretary relents.

This convoluted appointment process unconstitutionally "limit[s] selection" and "trench[es] upon executive choice."  *Myers v. United States*, 272 U.S. 52, 128 (1926).  Generally, the Executive Branch must be able to exclude officials with "different views of policy."  *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021).  But the Act assigns an essential role in officer selection to *separate sovereigns*—a wanton "diffusion of the appointment power" that assaults "the Constitution's structural integrity." *Freytag*, 501 U.S. at 878.  Moreover, the Appointments Clause's text confirms that the appointment power is not divided into nomination and selection phases:  The President, court, or department head must have the power to appoint an inferior officer "*alone*."  U.S. Const. Art. II, § 2, cl. 2 (emphasis added).  And "although the Senate must consent to" a principal officer's appointment, "the Constitution gives the power to appoint to the President alone."  A. Bamzai & S. Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1775 (2023).

### 4.   The challenged actions are invalid and unlawful.

Because the Council's Members were appointed in violation of the Appointments Clause, the Council lacked authority to develop Amendment 54 or its implementing regulation. "[I]ndividuals who were not properly appointed under the Constitution … were vested with authority that was never properly theirs to exercise." *Collins v. Mnuchin*, 938 F.3d 553, 593 (5th Cir. 2019), *aff'd in part, vacated in part, rev'd in part sub nom. Collins*, 141 S. Ct. 1761.  The Council can no more wield "power that it … d[oes] not lawfully possess" than could 17 members of the general public.  *Collins*, 141 S. Ct. at 1788. Amendment 54 is thus "void *ab initio*," as are the rules implementing it, which embody the policy judgments of an unconstitutionally appointed Council.  *Id.* at 1787.  Moreover, because Amendment 54 was void, NMFS should have rejected it as illegal under 16 U.S.C. § 1854(a)(1)(A).  Instead, NMFS adopted the Council's policies wholesale.  For both of these reasons, the challenged actions must be vacated and their enforcement enjoined.[4]  *See id.* § 1855(f)(1)(B); *Lucia*, 138 S. Ct. at 2055 (requiring a new proceeding); *Intercollegiate Broad. Sys.*, 684 F.3d at 1342 (vacating action).

### B.   Council Members are unconstitutionally insulated from removal.

"Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'"  *Seila Law, LLC* v. *CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1, cl. 1, and § 3).  Thus, although the President may delegate his power to subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield."  *Id.* at 2197.  He must retain "the ability to remove executive officials, for it is only the authority that can remove such officials that they must fear and, in the performance of their

---

[4] No Council Member was constitutionally appointed.  But the challenged actions would still be void if even just *one* Member served in violation of Article II.  Here as elsewhere, one unconstitutional decisionmaker is one too many.  *See Free Enter. Fund*, 561 U.S. at 511–12 & n. 12; *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993); *see also, e.g.*, *Nguyen v. United States*, 539 U.S. 69, 82 (2003) (vacating a conviction affirmed by a panel that unlawfully included an Article IV judge despite two Article III judges voting to affirm); *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016) (one compromised judge on a multi-judge court violated due process); *cf. Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1725 (2018).

functions, obey." *Id.*; *see also* Bamzai & Prakash, *supra*, at 1763 ("The Vesting Clause's grant of power has several components, one of which is the power to remove executive officers."). Otherwise, the President "could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514.

Accordingly, the Constitution's default rule is that the President must be able to remove officials at will. *Seila Law*, 140 S. Ct. at 2191–92. There are two narrow exceptions to this general rule—for (1) multimember agencies that lack "executive power" and (2) certain inferior officers. *Id.* at 2199–2200. But even *within* those categories, Congress cannot abrogate all presidential control. For instance, in limited circumstances, Article II may tolerate classic for-cause provisions. *See Humphrey's Executor v. United States*, 295 U.S. 602, 619 (1935). But when Congress imposes an *additional* layer of such protection, it impermissibly interferes with presidential control over the Executive Branch. *See Free Enter. Fund.*, 561 U.S. at 495–96. In short, certain tenure-protection schemes are inherently "inappropriate" for any official who is "wielding the executive power of the United States." *Id.* at 503.

### 1.   Council Members do not fall within a *Seila Law* exception.

"[T]he President's removal power is the rule" and Council Members enjoy no "exception." *Seila Law*, 140 S. Ct. at 2206. The first exception was recognized in *Humphrey's Executor*, where the Court "permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was not said to exercise any executive power." *Id.* at 2199. Rulemaking is not a "legislative" function but an executive one; "legislative function[s]" consist of "making investigations and reports … for the information of Congress." *Humphrey's Executor*, 295 U.S. at 628; *Seila Law*, 140 S. Ct. at 2200.

The Court has restricted the *Humphrey's Executor* exception to "officers of the kind … under consideration" there, and Council Members fall far beyond it. *Id.* at 2198. The Act lacks partisan-

balance requirements, and Council Members exercise the *executive* function of rulemaking—not the legislative function of advising Congress nor any adjudicatory role.

The remaining exception reaches "certain *inferior* officers with narrowly defined duties." *Id.* at 2192. The touchstone for this exception is *Morrison v. Olson*, where the Court upheld protections for the independent counsel—a prosecutor "appointed … to accomplish a single" criminal investigation. 487 U.S. 654, 672 (1988). The independent counsel "lacked policymaking or administrative authority" because her power "was trained inward to high-ranking Governmental actors identified by others, and was confined to a specified matter." *Seila Law*, 140 S. Ct. at 2200.

Council Members do not fit this exception. To start, they are *principal* officers. *See supra*, at 14–15. And regardless, they bear no resemblance to the time-limited, narrow-in-scope independent counsel. Unlike a special prosecutor with solely "inward"-facing power, Members' "policymaking … authority" affects "private citizens and businesses" across the country. *Seila Law*, 140 S. Ct. at 2200. Their extensive "duties" under the Act "are far from limited." *Id.*; *see supra*, at 10–14.

Because neither exception applies, the President must be free to remove Members at will— but he is not. The Act's removal protections for most of the Council are essentially absolute. *See infra*, at 20–21. And Member Strelcheck enjoys robust tenure protections as a career SES official. *See supra*, at 5–6; *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 391 (5th Cir. 2023) (Ho, J., concurring) (civil servants "enjoy a *de facto* form of life tenure"). That violates the Constitution. *See infra*, at 27–30.

### 2. The Act's removal restrictions are unconstitutional regardless.

Even if Council Members could somehow fit within a *Seila Law* exception, though, the Act's extraordinary and unprecedented removal protections would still be unconstitutional.

The President is utterly powerless to remove five Council Members: the state bureaucrats appointed by other state officials. These Members serve "so long as" they occupy predicate state positions. 16 U.S.C. § 1852(b)(1)(A). As a result, their tenure in federal office is limited only by the

vagaries of state law and (potentially) their superiors within a state bureaucracy. *No federal official* can remove such a Member. It is difficult to imagine a more "inappropriate" form of insulation "for officers wielding the executive power of the United States," *Free Enter. Fund*, 561 U.S. at 503, than one that vests all removal power in the government of a *separate sovereign*.

The governor-nominated Members likewise enjoy unconstitutional removal protections. The Secretary may remove these Members only "for cause." 16 U.S.C. § 1852(b)(6). But that overstates the Secretary's actual authority, because the Act provides just *one* scenario in which the Secretary can remove a Member unilaterally: after a formal hearing finds the Member violated a specific conflict-of-interest provision. *Id.* § 1852(b)(6)(B). That provision requires Members to disclose financial interests and sets recusal rules, but it does not reach other abuses. *See id.* § 1857(1)(O). The Secretary cannot dismiss a Member for inefficiency, neglect, criminality, nepotism, embarrassing conduct, undermining the President's policies, or anything else. *But see Collins*, 141 S. Ct. at 1787 (the President "must be able to remove" officers for these reasons). If the President wishes to remove a Member for something *other* than violating § 1857(1)(O), he must rely on the Member's own colleagues to "first recommend[] removal" by a two-thirds vote. 16 U.S.C. § 1852(b)(6)(A).

A Council's discretionary power to *allow* the President to remove its Members plainly "impedes the President's ability to perform his constitutional duty." *Seila Law*, 140 S. Ct. at 2199 (cleaned up). Again, *Free Enterprise Fund* rejected two layers of traditional for-cause requirements. 561 U.S. at 495–96. That limit on presidential control pales in comparison to the Act's scheme, under which a shifting coalition of a few Members can thwart a colleague's removal indefinitely and with impunity.

### 3. Plaintiffs are entitled to relief.

The Council exercised executive power free from presidential control when it developed and adopted Amendment 54. Plaintiffs are entitled to relief for two reasons. *First*, the Act's rulemaking system cannot be severed from the Councils' unconstitutional removal protections, meaning the

21

challenged actions must be vacated and their enforcement enjoined. *Second*, Plaintiffs are entitled to prospective relief even if this Court could somehow re-write the Act to create a compliant Council.

### a.     The Act's unconstitutional components are inseverable.

If an officer's unconstitutional tenure protection cannot be severed from Congress's grant of authority, that authority cannot be lawfully exercised. For instance, the challengers in *Free Enterprise Fund* sued on the theory that the Public Company Accounting Oversight Board's "'freedom from Presidential oversight' rendered unconstitutional 'all power and authority [it] exercised.'" *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 902 (2023) (quoting *Free Enter. Fund*, 561 U.S. at 508). And that theory would have prevailed but for severability: "Only the Court's ability to sever the relevant statute's for-cause removal provision enabled the Board to keep running." *Id.*

Here, unlike there, the Act's unconstitutional Council structure cannot be severed from its policymaking system. Severance of an unconstitutional provision is appropriate "unless the statute created in its absence is legislation that Congress would not have enacted." *Seila Law*, 140 S. Ct. at 2209 (internal quotation marks omitted). This inquiry has two steps. The court first considers whether the law's "surviving provisions [are] capable of 'functioning independently.'" *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 509). If the statute, or the relevant portion of it, cannot "remain[] fully operative as a law with [an officer's] tenure restrictions excised," it cannot be enforced. *Free Enter. Fund*, 561 U.S. at 509 (internal quotation marks omitted). The question is not whether the "remaining provisions will operate in some coherent way," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 692 (2012) (dissent), but "whether the statute will function in a *manner* consistent with the intent of Congress," *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). Second, if the law *can* survive, the court examines its "text [and] historical context" to determine whether Congress would have passed it without its "invalid" components. *Free Enter. Fund*, 561 U.S. at 509. On both steps, it is clear the Act's

unconstitutional Council structure is inseverable from its policymaking system.  Amendment 54 and its implementing regulations must therefore be vacated and enjoined.

*First*, Council Members' tenure protections are so intertwined with the broader Council system that the system would not be "fully operative" without them.  *Id.*  Indeed, it is unclear *how* a court could excise these protections.  The Act contains *no* removal provisions for Members appointed from state bureaucracies, who "shall be" Members by virtue of their state employment.  16 U.S.C. § 1852(b)(1)(A).  Likewise, the Regional Administrator serves on the Council due to his appointment to a career NMFS position; *his* tenure protections arise from statutes *outside* the Act.  There is thus no provision in the Act this Court could excise to cure the defect; the only remedy would be to erase these Council Members from the Act entirely.  But the Act's Council-based policymaking system cannot function in the "manner" Congress "inten[ded]" if more than a third of Congress's carefully chosen Members are excised.  *Alaska Airlines, Inc.*, 480 U.S. at 685.

Only the governor-nominated Members are removable from the Council at all.  *See* 16 U.S.C. § 1852(b)(2).  But for them, too, Congress's scheme defies the judicial "scalpel."  *Seila Law*, 140 S. Ct. at 2210.  *Which* aspects of the Act's removal mechanism should a court toss out?  Its restriction to conflict-of-interest violations, the formal hearing rule, the supermajority requirement, the Council's prerogative to "recommend[] removal," or all of the above?  *See* 16 U.S.C. § 1852(b)(6).  There is simply too much guesswork to ensure the revised Act will "remain[] fully operative" in the manner Congress intended.  *Free Enter. Fund.*, 561 U.S. at 509; *Alaska Airlines, Inc.*, 480 U.S. at 685.

These features of the Act distinguish *Free Enterprise Fund* and *Seila Law*.  In those cases, the Court severed discrete for-cause provisions, rendering officials freely removable by their appointing officers.  *Seila Law*, 140 S. Ct. at 2210; *Free Enter. Fund*, 561 U.S. at 509.  Because the statutes required minimal "blue-pencil[ing]," their operative provisions were unscathed.  *Id.*  The Act here is more complex:  Members' tenure protections are often bound inextricably to their mandatory Council

service and there are no simple or standalone removal limits to sever.  Curing the constitutional defect would require a "bulldozer" not a scalpel, usurping "editorial freedom" that "belongs to the Legislature." *Seila Law*, 140 S. Ct. at 2211 (internal quotation marks omitted).

*Second*, even if this Court could rewrite the Act to create Councils accountable to the President rather than State officials, the Act's text and history reveal that Congress would not have enacted that law.  *See Free Enter. Fund.*, 561 U.S. at 509.  Prior to the Act, fishery policy was largely left to the States—and still is, absent a FMP.  *See* 16 U.S.C. § 1856(a)(3)(A).  State governments and the fishing industry staunchly opposed federal control, and Congress secured their support *precisely by* putting States in charge of the Council system (and thus fishing regulation generally).

The Act's legislative history bears that out:  The Senate's original proposal called for Members to be appointed by the President in consultation with Governors, then confirmed by the Senate.[5]  The House's plan featured three federal officials, a gubernatorial appointee from each state, and at-large seats filled by the Commerce Secretary from lists prepared by the other Members.[6]  And the record is replete with expressions of concern that the Federal Government would dictate Council selection and operation—along with corresponding reassurances that it would not.  *See, e.g.*, *Hearings Before the Senate Committee on Commerce on S. 961*, 94th Cong., 1st Sess., 468 (1975) (Sen. Stevens) ("We have set up a … council which is composed of people from the area—not from Washington.  They are selected by the Governors."), 279 ("It is vital that the state fishery management agency be a member.").[7]

---

[5] S. Rep. No. 961, 94th Cong., 1st Sess. (1975), *reprinted in* Committee on Commerce, 94th Cong., 2nd Sess., Legislative History of the Fishery Conservation and Management Act of 1976, at 737 (1976) ("Legislative History").

[6] H.R. Rep. No. 94-445, 94th Cong., 1st Sess. (1975), *reprinted in* Legislative History, at 1115.

[7] *See also, e.g.*, *id.* at 169 (Sen. Stevens) (expressing "reluctan[ce] to establish categories which the States must recognize in making [Council] appointments, because" that "is a matter of State concern"); *id.* at 266 (statement of J. Mehos) ("[m]ost if not all" industry members "are apprehensive about any legislation that gives the Federal Government the power to adopt any fisheries management plan without the concurrence or approval of the regional council" staffed with state representatives); *House Debates and Passage of H.R. 200*, 94th Cong., 1st Sess. (1975), *reprinted in* Legislative History, at 834 (Rep. Leggett) (concerns "raised [about] States' rights" are misplaced "because the … councils … are heavily dominated by State interests"); *id.* at 915

Unsurprisingly, the final Council roster that emerged from Conference Committee was more State-centric than either chamber's opening bid: The Senate's standard appointment procedure was tossed out; the House saw its three federal agency officials whittled to one.[8]

It is thus clear that "political pressures"—and political compromise—"played an important role in placing the states in a dominant representative position on the councils."  Rogalski, *supra*, at 174.  The Act, "shaped by the demands of compromise and necessity," reassured an industry "hostile towards a purely federal regime" and States accustomed to steering fishery policy.  *Id.* at 165, 174.  This history confirms that Congress would never have enacted a federally controlled regulatory regime.  Indeed, we know Congress would not have created Councils accountable to the President because it rejected the Senate's plan to do *precisely that*.  No Court can overturn this quintessential legislative compromise and create fully federal Councils that Congress would never have established.

### b. Prospective relief is warranted.

Even if the Act's removal protections were somehow severable from its policymaking system, though, Plaintiffs would still be entitled to prospective relief.  The Council's amberjack policies—embodied in Amendment 54 and the Final Rule—represent exercises of federal power insulated from presidential control.  And a successful plaintiff is generally entitled to relief from the imposition of such power.  In *Seila Law*, for example, the Supreme Court concluded that subjecting a business to an unconstitutionally structured agency's subpoena power would "inflict[] a 'here-and-now' injury … that can be remedied by a court."  140 S. Ct. at 2196 (quoting *Bowsher v. Synar*, 478 U.S. 714, 728 n.5 (1986)).  And the obvious remedy (assuming the Government could not prevail on some other ground on

---

(Rep. Rogers) (Council membership "achieves the intent of leaving State jurisdiction unimpaired to the maximum extent possible"); *id.* at 940 (Rep. Leggett) ("[W]e do not intend to usurp State jurisdictions. … We give the Governors of the States the opportunity to appoint members."); *id.* at 993 (Rep. Lott) (it is "absolutely essential to the success of the" Act that "the head of each State's fisheries … agency" be a Member).

[8] S. Rep. No. 94-711, 94th Cong., 2nd Sess., Conference Report (1975), *reprinted in* LEGISLATIVE HISTORY, at 56–57, 75–76, 86–87.

remand) would be to dismiss the agency's action—essentially, to vacate it. *Id.* at 2208. Likewise, in *Free Enterprise Fund*, the Court held that the challengers were "entitled to declaratory relief sufficient to ensure that the [regulations] to which they are subject will be enforced only by a constitutional agency accountable to the Executive." 561 U.S. at 513.

Plaintiffs here are likewise entitled to vacatur and a declaratory judgment. Plaintiffs are subject to the ongoing authority of the Council—and because the Council operates unrestrained by mandatory presidential control, its exercise of executive power is "illegitimate," "cannot be undone," and requires "meaningful" judicial relief. *See Axon Enter.*, 143 S. Ct. at 903–04. Vacatur is the appropriate remedy. *See* 5 U.S.C. § 706(2)(B). And at a minimum, Plaintiffs' standing (*see infra*, at 31–34) entitles them to a declaration that the Act's removal restrictions are unconstitutional and Amendment 54 is unlawful. The Declaratory Judgment Act, which authorizes relief where "appropriate" to "declare the rights" of a party, 28 U.S.C. § 2201(a), exists for this scenario. Because the parties have an "actual controversy" over the validity of Amendment 54 and the Act, declaratory relief is "appropriate." *See id.*

The Supreme Court has indicated that a plaintiff seeking monetary "retrospective relief" must show "compensable harm" stemming from the officer's insulation from removal. *See Collins*, 141 S. Ct. at 1787, 1789. But nothing in *Collins* casts doubt on the availability of a prospective injunction, vacatur, or declaratory relief. Not only that, by clarifying that a party has standing if he is impacted by the *conduct* of an unconstitutionally insulated official—"not [by] the provision of law that is challenged"—*Collins* confirms that declaratory relief is appropriate. *See id.* at 1779, 1788 n. 24.[9]

---

[9] A recent Fifth Circuit decision interpreting *Collins* did not—and could not—disturb that implication. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 631–32 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) (not addressing declaratory relief). Instead, as six Fifth Circuit judges recently explained, declaratory judgments "provide a meaningful avenue of relief for" claims that Congress has unconstitutionally insulated federal officers. *Cochran v. SEC*, 20 F.4th 194, 233 (5th Cir. 2021) (Oldham, J., concurring).

C.     **The Deputy Assistant Administrator at NMFS is unconstitutionally insulated from removal.**

The Framers understood that a great "danger to liberty" lay in "the difficulty of displacing" entrenched Executive Branch officials.  1 ANNALS OF CONG. 515 (June 17, 1789) (remarks of Rep. Madison).  The Constitution thus ensures that "[e]very individual, in the long chain which extends from the highest to the lowest link of the Executive Magistracy," is subject to democratic control through presidential removal—a power inherent in "that great principle of unity and responsibility in the executive department." *Id.* at 515–16, 518.  The Supreme Court has thus held that the Constitution guarantees to the President the power to remove his subordinates at will.  *See, e.g.*, *Collins*, 141 S. Ct. at 1787; *Seila Law*, 140 S. Ct. at 2191–92; *Myers*, 272 U.S. at 122 ("the exclusive power of removal" is "includ[ed] within the executive power").  Executive officials "who exercise significant authority" must be "subject to" that democratic "control."  *Free Enter. Fund*, 561 U.S. at 506.  Even "modest" protections, *Collins*, 141 S. Ct. at 1787, are tolerable only for minor functionaries with "limited duties" and "no policymaking or administrative authority," *Seila Law*, 140 S. Ct. at 2200.

Nevertheless, Congress has created an insulated cadre of "Senior Executive Service" officers who *by definition* "exercise[] important policy-making, policy-determining, or other executive functions." 5 U.S.C. § 3132(a)(2)(E).  These "high-level federal employees … exercise significant responsibility—including directing organizational units, supervising work, and determining policy." *Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1330 (Fed. Cir. 2020).  "Occupying significant positions of trust, senior executives are selected, in no small part, for their leadership abilities." *Id.*  In short, the "SES is comprised of the men and women charged with leading the Federal Government." U.S. Office of Personnel Management, *Guide to the Senior Executive Service* at 2 (Mar. 2017).  They are "the major link between [presidential] appointees and the rest of the Federal workforce," and they "operate and oversee nearly every Government activity in approximately 75 Federal agencies." *Id.*  And many

27

wield delegated authority to issue rules that bind individuals and businesses nationwide. *See, e.g.*, B. Feinstein & J. Nou, *Submerged Independent Agencies*, at 49 (forthcoming U. Pa. L. Rev. 2023).

Despite their substantial executive power, SES officials can be suspended or terminated only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function"—and only with robust procedural protections and appellate rights. *See* 5 U.S.C. §§ 7542–43, 7512–13. And they can be expelled from the SES only "under another set of procedures for 'unsatisfactory' or 'less than fully successful' performance"— with a guarantee of continued (non-SES) federal employment at the same salary. *Esparraguera*, 981 F.3d at 1330–31 (citing 5 U.S.C. §§ 3592(a), 3954, 4314(a)(3)).

These removal protections for powerful Executive Branch officials are wholly "incompatible with the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 498. They impede the President's prerogative to remove those "who disobey his commands, … those he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those … from a competing political party[,] … and those in whom he has simply lost confidence." *Collins*, 141 S. Ct. at 1787 (quotation marks and alterations omitted). Indeed, under the SES regime, "countless Executive Branch employees [with] the ability to influence or implement federal policy … enjoy a *de facto* form of life tenure." *Feds for Med. Freedom*, 63 F.4th at 390– 91 (Ho, J., concurring). And while some in the SES are relatively low on agency organizational charts, "the unchecked exercise of executive power by an officer buried many layers beneath the President poses more, not less, of a constitutional problem." *Arthrex*, 141 S. Ct. at 1983.

As a result, "the President actually controls surprisingly little of the Executive Branch." *Feds for Med. Freedom*, 63 F.4th at 390 (Ho, J., concurring). The consequences are predictable and familiar. Insulated bureaucrats "are rarely discharged from government for inadequately doing their jobs." G. Frug, *Does the Constitution Prevent the Discharge of Civil Service Employees?*, 124 U. Pa. L. Rev. 942, 945

(1976). More important, "tenure-like protections for the civil service have sharply reduced the president's ability to change the direction of the permanent bureaucracy." J. Yoo, *Unitary, Executive, or Both?*, 76 U. Chi. L. Rev. 1935, 1956 (2009). This is not academic conjecture, but the stuff of national headlines. *See, e.g.*, C. Flavelle & B. Bain, *Washington Bureaucrats are Quietly Working to Undermine Trump's Agenda*, Bloomberg (Dec. 18, 2017). None of it accords with our constitutional order.

Defendant Rauch is the Deputy Assistant Administrator for Regulatory Programs at NMFS and a career SES official. Because his one-year probationary period long ago elapsed, he enjoys the powerful removal protections that follow SES status. *See supra*, at 5–6. But the Constitution forbids that insulation, because—as an SES official—Mr. Rauch wields substantial executive power. Indeed, he "oversees" all NMFS "regulatory actions and programs." *See supra*, at 5.

Consider Mr. Rauch's authority to issue rules. "The Supreme Court has held that, under the Constitution, only 'Officers' … have [that] power," *Alfa Int'l Seafood*, 264 F. Supp. 3d at 41, because "rulemaking … represents the performance of a significant governmental duty," *Buckley*, 424 U.S. at 140–41. Mr. Rauch issues regulations by executing and publishing Council FMPs, amendments, and regulations in the Federal Register as final rules that amend the CFR—as he did here. *See supra*, at 6; *see also* Feinstein & Nou, *supra*, at 48–49. As Mr. Rauch explained in an interview posted to a NMFS website, he "work[s] with the [C]ouncils" to "put out fisheries regulations" and "signs all of those" regulations. Rauch Interview at 5. Fishery regulations "all … bubbl[e] up to" him. *Id.* He "ultimately *issue[s] the regulations*" and serves as "the auditor[]" of the Councils' policies. *Id.* at 15 (emphasis added). How Mr. Rauch wields his issuance authority is crucial for fishermen nationwide. Moreover, Mr. Rauch exercises his power across *all* federal fisheries—those under Councils and those under NMFS.

Mr. Rauch does not fit either exception to the Constitution's rule of at-will removal. While those "wholly disconnected from the executive department" may enjoy modest protections, *see Humphrey's Executor*, 295 U.S. at 630, purely executive officials like Mr. Rauch must be freely removable

unless they possess "*no* policymaking or administrative authority," *Seila Law*, 140 S. Ct. at 2200 (emphasis added).  The ongoing power to issue rules that bind "private citizens and businesses" and that embody executive policy judgments fully distinguishes his position from those that have been approved before.  *See id.*

The Constitution accordingly subjects the Deputy Assistant Administrator to "the President's unrestricted removal power."  *Seila Law*, 140 S. Ct at 2192.  Because Mr. Rauch has thus far operated free from presidential control, those exercises of executive authority are "illegitimate."  *Axon Enter.*, 143 S. Ct. at 903.  Thus, if Mr. Rauch's unconstitutional removal protections cannot be severed, the rules he signed are void.  *See id.* at 902; *supra*, at 22.  And severance is all but impossible.  This Court cannot re-write the entire web of SES statutes to render Mr. Rauch freely removable.  And the whole point of the SES regime is to create tenured civil servants:  Congress would not have enacted a self-defeating scheme.  *See Seila Law*, 140 S. Ct. at 2209; Feinstein & Nou, *supra*, at 53 (severance is inappropriate because "the purpose of the civil service laws was to insulate civil servants").  This Court should thus declare that Mr. Rauch's issuance of the Amendment 54 Final Rule was unlawful, vacate it, and enjoin its enforcement.[10]

Finally, as discussed above, severing Mr. Rauch's tenure protections would not preclude relief.  *See supra*, at 25–26.  At a minimum, this Court should declare that Mr. Rauch's exercise of officer-level executive authority free from the President's "removal power" was unconstitutional.  *Seila Law*, 140 S. Ct. at 2192.  Such a judgment is "appropriate" given Plaintiffs' standing and the parties' adversity on the challenged actions' legality and Mr. Rauch's tenure protections.  *See* 28 U.S.C. § 2201(a).

---

[10] The same result would obtain even if this Court somehow "severed" the delegation of rulemaking authority to Mr. Rauch from the Assistant Administrator for Fisheries.

**D.      Plaintiffs have Article III standing.**

A plaintiff has Article III standing if he (1) suffers a concrete "injury in fact" that was (2) "likely caused by the defendant" and (3) "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). A court must "assume, for purposes of the standing analysis," that a plaintiff is "correct on the merits of [his] claim[s]." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019). Plaintiffs have standing to challenge Amendment 54 and the Amendment 54 Final Rule. In one recent challenge to the Act, a district court accepted the Government's argument that plaintiffs lacked standing, but that is plainly wrong. *See United Cook Inlet Drift Ass'n v. NMFS*, Nos. 3:21-cv-00255, -00247, 2022 WL 2222879, at *17–20 (D. Alaska June 21, 2022) ("*UCIDA*").

**1.      Plaintiffs are suffering concrete injuries.**

Plaintiffs' injuries are concrete: Before the Council and NMFS imposed Amendment 54 through the Final Rule, Plaintiffs could catch and sell amberjack. By cutting the commercial amberjack quota by nearly 80%, Amendment 54 decimates harvest opportunities. Indeed, as a direct result of Amendment 54's catch-limit reductions, the 2023 commercial amberjack season has been *shut down*; Plaintiffs may not harvest this species *at all* until the 2024 season. *See* Exhibit C. Amendment 54 is therefore denying Plaintiffs earnings, business relationships, and other opportunities derived from the amberjack fishery. Such unrecoverable losses represent concrete and irreparable injuries. *See Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). Finally, "subjection to" rules developed and issued by unconstitutionally appointed and insulated officers is an independently cognizable "here-and-now injury." *See Axon Enter.*, 143 S. Ct. at 903–04; *Seila Law*, 140 S. Ct. at 2196.

**2.      Plaintiffs' injuries are traceable to Defendants.**

Plaintiffs' injuries are "fairly traceable" to all Defendants. *Collins*, 141 S. Ct. at 1779. Article III causation does *not* require evidence that "the Government's … conduct would have been different in a counterfactual world in which [it] had acted with constitutional authority." *Seila Law*, 140 S. Ct. at

2196. Instead, "for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." *Collins*, 141 S. Ct. at 1779 (internal quotation marks omitted). Thus, "a plaintiff that challenges a statutory restriction on the President's power to remove an executive officer can establish standing by showing that it was harmed by an action that was taken by such an officer." *Id.* at 1788 n.24. The same is true for Appointment Clause violations, which render federal action "void *ab initio*." *Id.* at 1787. In an obvious legal error, the *UCIDA* court demanded precisely what *Collins* and *Seila Law* rejected—faulting plaintiffs for failing to "allege that a differently structured Council would have voted against" the challenged policy. *See* 2022 WL 2222879 at *19. This Court should not repeat that error.

Plaintiffs are plainly "aggrieved by an official's exercise of executive power," and can therefore "challenge the official's authority to wield that power while insulated from removal by the President" and without a lawful appointment. *See Seila Law*, 140 S. Ct. at 2196. Start with the Council, which exercised its power to "develop annual catch limits" when it "prepare[d] and submit[ted]" Amendment 54. *See* 16 U.S.C. § 1852(h)(1), (6). By doing so, the Council initiated the rulemaking process that culminated in NMFS issuing the Council's policy prescriptions as law. Thus, the Final Rule embodies, and is a product of, the Council's exercise of federal power over federal fisheries. Article III causation requires nothing more.

Plaintiffs' injuries are traceable to the Council's conduct even though NMFS ultimately issued the Final Rule. "Article III requires no more than *de facto* causality," and the Council is plainly a "*de facto* caus[e]" of Plaintiffs' imminent harm. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). The Council's development and submission of Amendment 54 were legal and factual prerequisites to the Final Rule's catch limits. Nor is traceability confined to the final step in a regulatory process: When an agency "promulgates a rule to implement" a statute, a plaintiff may challenge the *statute's* constitutionality even if the *rule* causes his injury. *FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022). Rules

implementing an "invalid and unenforceable" statute are void, and a plaintiff harmed by such a rule may "raise constitutional claims against" the underlying "statutory provision." *Id.* at 1650. Plaintiffs' injuries, "even if brought about by" the Final Rule, are "traceable to the operation of" Amendment 54 and the Act itself—which is ripe for constitutional challenge. *Id.* at 1649–50.

Here too, the *UCIDA* court erred. It reasoned that plaintiffs cannot raise Appointments Clause or removal challenges to the Act because Council policies have "no legal effect" until "the agency first promulgat[es] implementing regulations." 2022 WL 2222879 at *18. That is wrong— agency action is *not* a prerequisite to Council policy "tak[ing] effect," 16 U.S.C. § 1854(a)(3)—and obscures the statutory limits on NMFS review. Beyond that, *UCIDA* did not grapple with *Department of Commerce* or *Cruz*, which establish that injuries may be traced to their underlying legal and factual causes. And most fundamentally, *UCIDA* glossed over the fact that Councils "develop" policies, while NMFS simply "approves" and publishes them. *See* 16 U.S.C. §§ 1852(h)(6), 1854(a)(3). Once a Council acts, the agency decides whether to adopt *the Council's* policies. NMFS approved Amendment 54, but its unaltered substance was *necessarily* developed by the Council.

For overlapping reasons, Plaintiffs' injuries are traceable to NMFS and Mr. Rauch, which approved and issued Amendment 54 in the Final Rule. Those actions ensured that Plaintiffs would be subjected to the Council's injurious policies. And the approval and issuance of Amendment 54 were unlawful actions: As the product of an unconstitutional Council, Amendment 54 is invalid and thus "[in]consistent with ... applicable law." 16 U.S.C. § 1854(a)(1)(A). Accordingly, the Constitution compelled NMFS and Mr. Rauch to "disapprove" Amendment 54, and not to issue it. *Id.* Their failure to do so will harm—and is currently harming—Plaintiffs. Finally, regardless of the Council's constitutional defects, Plaintiffs may challenge Mr. Rauch's tenure protections.

### 3.     Plaintiffs' injuries can be redressed by this Court.

When a party "challenging the legality of government action … is himself an object of the action[,] there is ordinarily little question" that a "judgment preventing" that action will redress his harm. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).  Plaintiffs seek a preliminary injunction barring Defendants from enforcing Amendment 54.  That would effectively restore preexisting catch limits, allowing Plaintiffs to harvest and sell amberjack during the 2023 season.  Ultimately, Plaintiffs seek vacatur of the challenged actions, injunctive relief, and a declaratory judgment.  Such relief would redress Plaintiffs' injuries by enabling them to fish as if the Amendment 54 process had not occurred.

Erring once more, the *UCIDA* court opined that even if it vacated the rule, "the constitutional issues [plaintiffs] raise regarding the makeup of the Council would not be redressed."  2022 WL 2222879 at *20.  But courts redress *injuries*, not "*issues*."  Defendants imposed regulations pursuant to the Act's unconstitutional terms—subjecting Plaintiffs to rule by illegitimate federal officers and harming Plaintiffs' businesses.  Those harms are entirely redressable.

## II.     Plaintiffs Are Suffering Irreparable Harm.

Plaintiffs are suffering "irreparable injur[ies]."  *Trottie*, 766 F.3d at 452; Arnesen Decl. ¶¶ 23–31; Bradley Decl. ¶¶ 14–21.  Effective immediately, Amendment 54 closed off the amberjack fishery to Plaintiffs.  As a result of its massive catch-limit reductions, Amendment 54 triggered the immediate *closure* of the 2023 commercial amberjack season—denying Plaintiffs *any* opportunity to harvest this species until 2024.  *See* Exhibit C.  That closure is devastating to Plaintiffs' businesses.  And Plaintiffs cannot recover their resulting losses "because federal agencies … enjoy sovereign immunity [from] monetary damages," and federal law waives immunity only in suits seeking relief *other* than damages. *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); *see also* 5 U.S.C. § 702. Thus, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."  *See Texas*, 829 F. 3d at 433 (internal quotation marks omitted);

*Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (where immunity bars damages, "any loss of income" is "irreparable *per se*").

In addition, Plaintiffs are now "subject[] to an unconstitutionally structured [policymaking] process" orchestrated by unconstitutionally appointed and insulated officers. *See Axon Enter.*, 143 S. Ct. at 904. And "being subjected to unconstitutional agency authority" represents "a here-and-now injury" for which equitable relief is necessary. *Id.* at 903 (quotation marks omitted); *Seila Law*, 140 S. Ct. at 2196. That harm is irreparable: No less than an adjudication before an "illegitimate" officer, subjection to rules developed and issued by "illegitimate" officers "cannot be undone." *Axon Enter.*, 143 S. Ct. at 903–04.

## III.   The Equities and the Public Interest Weigh in Favor of Preliminary Relief.

Plaintiffs' "injury if the injunction is denied outweighs any harm that will result if the injunction is granted." *Trottie*, 766 F.3d at 452. The injuries attested to in Plaintiffs' declarations clearly outweigh the Government's only injury—namely, the inability to enforce these catch limits against Plaintiffs as this suit proceeds to final judgment. Allowing two fishermen operating day boats to fish for amberjack under last season's rules will impose no appreciable hardship on regulators or the ecosystem.

For similar reasons, a preliminary injunction would "not disserve the public interest." *Id.* The public can only benefit from an injunction that allows more fresh seafood to come to market through Plaintiffs' efforts, and allowing those efforts will in no way endanger the amberjack fishery. More fundamentally, the public interest is always served by preventing constitutional violations—here, Plaintiffs' "subject[ion] to unconstitutional agency authority." *Axon Enter.*, 143 S. Ct. at 903; *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997).

## <u>CONCLUSION</u>

This Court should grant Plaintiffs' motion for a preliminary injunction and grant their requested relief.

Dated:  June 21, 2023

Respectfully submitted,

*/s/ Robert W. Wilkinson*
Robert W. Wilkinson (MS Bar No. 7215)
A. Kelly Sessoms, III (MS Bar No. 9466)
Wilkinson, Williams, Bosio & Sessoms, PLLC
734 Delmas Ave. (39567)
P.O. Box 1618
Pascagoula, MS 39568-1618
(228) 762-2272 phone
(228) 762-3223 fax
rwilkinson@wwbslaw.com
ksessoms@wwbslaw.com

James M. Burnham (*lead counsel*)
Brett Shumate
John Henry Thompson
Louis J. Capozzi III*
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-5429
jburnham@jonesday.com

*Counsel for Plaintiffs*

* *pro hac vice application forthcoming.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system.

I hereby certify that I have mailed by United States Postal Service the foregoing to all Defendants.

I hereby certify that I served the foregoing by electronic mail on the following non-ECF participants:  Todd Kim (Assistant Attorney General, U.S. Department of Justice, Environment and Natural Resources Division), S. Jay Govindan (Section Chief, Environment and Natural Resources Division), Meredith Flax (Assistant Chief, Environment and Natural Resources Division), and Allison Finnegan (Trial Attorney, Environment and Natural Resources Division).

*/s/ Robert W. Wilkinson*
Robert W. Wilkinson