IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

GEORGE D. ARNESEN; JEFFREY                          PLAINTIFFS
RYAN BRADLEY; KAREN BELL;
A.P. BELL FISH COMPANY, INC.;
*and* WILLIAM COPELAND

                                                    CIVIL ACTION NO. 1:23-cv-145-TBM-RPM
v.                                                  *consolidated with*
                                                    CIVIL ACTION NO. 1:23-cv-160-TBM-RPM

GINA RAIMONDO, *U.S. Secretary of
Commerce*; NATIONAL MARINE
FISHERIES SERVICE, *(NMFS)*;
JANET COIT, *NMFS Assistant
Administrator*; SAMUEL D. RAUCH,
III, *NMFS Deputy Assistant
Administrator for Regulatory Programs*;
GULF OF MEXICO FISHERY
MANAGEMENT COUNCIL; *et. al.*                       DEFENDANTS

## MEMORANDUM OPINION AND ORDER

The Secretary of Commerce is empowered through statute to regulate the nation's

fisheries. The way the Secretary does so is through eight Regional Fishery Management Councils

set up by the Magnuson-Stevens Act. Under the Act, these councils develop and pass fishery plans

that regulate the fisheries within their jurisdiction. These plans are then approved—either directly

or implicitly—by the Secretary. This case involves a challenge to the Magnuson-Stevens Act—

specifically the structure and composition it created for these councils.

In October 2022, the Gulf of Mexico Council passed Amendment 54, proposing a quota-

reduction on greater amberjack catch limits of around 80% for the commercial sector and 74% for

the recreational sector. In June 2023, after approval by the Secretary's Designee, the Assistant

Administrator for Fisheries, the Final Rule adopting Amendment 54 was promulgated. As a result,

the commercial greater amberjack season closed just three days after Amendment 54's promulgation.

With their livelihood at stake, a group of greater amberjack commercial fishers then sued to enjoin the enforcement of Amendment 54 via its Final Rule. The Commercial Fishers assert that the councils established under the Magnuson-Stevens Act, and particularly the Gulf of Mexico Council, consist of members serving in violation of the Appointments Clause of the United States Constitution. And because of that constitutional violation, they assert that the fishery plans developed by the councils and enforced by the Secretary are void.

The Appointments Clause requires that inferior officers of the United States be appointed by the President, a Court of Law, or the Head of a Department. In the case of the Gulf of Mexico Council, six of the 17 Council Members are not. Still, in helping create fishery plans, those six Council Members exercise the authority of officers of the United States. Yet the Council's passage of Amendment 54 was not the proximate cause of the Commercial Fishers' injuries. Instead, the cause was the decision by the Secretary—through her designee—to fully adopt and implement Amendment 54, as opposed to sending it back for further consideration or remaining silent and allowing for final passage through silence. The remaining 11 Council Members were properly appointed and exercised valid authority related to Amendment 54, while still constituting a quorum of the Council. For these reasons, the Final Rule adopting Amendment 54 is not void.

Also, while some of the Council Members are subject to unconstitutional removal restrictions, the Commercial Fishers have not shown that they were harmed by those removal restrictions in line with *Community Financial Services Association of America, Limited v. Consumer Financial Protection Bureau*, 51 F.4th 616, 632 (5th Cir. 2022). Injunctive relief is thus unnecessary.

The Commercial Fishers' Motions for Preliminary Injunction *or alternatively* Summary Judgment [6], [70] are denied. And the Government's Cross Motions for Summary Judgment [65] and [77] are granted. Finally, the potential Intervenor Defendants' [84] Motion for Review of Magistrate Judge Order [79] is denied. This case is dismissed.

## BACKGROUND AND PROCEDURAL HISTORY

### I.    The Magnuson-Stevens Act

The Magnuson-Stevens Act aims to protect the "valuable and renewable natural resources" that are this nation's "fish." 16 U.S.C.§ 1801(a)(1). The Act was passed after Congress found that "[c]ertain stocks of fish have declined to the point where their survival is threatened[.]" 16 U.S.C. § 1801(a)(2). Thus, "to take immediate action to conserve and manage" our nation's "fishery resources," Congress established "Regional Fishery Management Councils" under the Act. 16 U.S.C. §§ 1801(b)(1), (5).

These Councils are designed "to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revisions" of "fishery management plans[.]" 16 U.S.C. §§ 1801(b)(4), (5). Those plans in turn are to "achieve and maintain, on a continuing basis, the optimum yield from each fishery[,]" and do so with advice and participation from "the States, the fishing industry, consumer and environmental organizations, and other interested persons[.]" 16 U.S.C. §§ 1801(b)(4), (5). Plans are mandated "for each fishery . . . that requires conservation and management[.]" 16 U.S.C. § 1852(h)(1). They must, among other things, "contain a description of the fishery," "assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery," and

include "conservation and management measures that are consistent with the national standards."[1] 16 U.S.C. §§ 1853(a)(2), (3), (1) .

Once developed, the plans are submitted to the Secretary of Commerce. 16 U.S.C. § 1852(h). The Secretary must then "immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards . . . and any other applicable law." 16 U.S.C. § 1854(a)(1)(A). Within ninety days of publishing notice of the plan to the public, the Secretary must "approve, disapprove, or partially approve a plan . . . by written notice to the

---

[1] The national standards are referenced many times in this opinion. For ease of reference, they are set forth in full below:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851.

4

Council." 16 U.S.C. § 1854(a)(3). A disapproval must specify the law or standards the plan conflicts with and offer recommendations regarding fixing the plan. *Id.* If the Secretary does not notify the Council within that time frame, "then such plan or amendment shall take effect as if approved." *Id.* If a plan is disapproved, the Council can submit a revised plan and begin the cycle anew. 16 U.S.C. § 1854(a)(4).

The Council also must draft any regulations which it "deems necessary or appropriate" to implement a plan or modify a plan. 16 U.S.C. § 1853(c). Just like the plans, regulations are submitted to the Secretary for review. 16 U.S.C. §§ 1853(c), 1854(b)(1). The Secretary reviews them to "determine whether they are consistent with the fishery management plan, plan amendment, this chapter, and other applicable law." 16 U.S.C. § 1854(b)(1). If the Secretary approves of the regulations, they enter a notice-and-comment period. 16 U.S.C. § 1854(b)(1)(A). If the regulations are not approved, the Secretary must notify the Council and give recommendations on bringing the regulations in line with the plan or the law. 16 U.S.C. § 1854(b)(1)(B). The Council can then resubmit the regulations for approval. 16 U.S.C. § 1854(b)(2). The Secretary must promulgate any final regulations within thirty days of the notice-and-comment period concluding. 16 U.S.C. § 1854(b)(3). Before making any revisions to the regulations, the Secretary must consult the Council. *Id.*

If the Council does not develop a plan within "a reasonable period of time" or does not "submit a revised or further revised plan or amendment" after the Secretary disapproves of a plan, then the Secretary may develop her own plan. 16 U.S.C. § 1854(c)(1). Once the plan is complete the Secretary must submit it to the Council for notice and comment and open a general notice-and-comment period for sixty days. 16 U.S.C. § 1854(c)(4). After those notice periods, the Secretary

can adopt her plan. 16 U.S.C. § 1854(c)(5). Likewise, if the Secretary develops her own plan, she may also develop her own regulations. 16 U.S.C. § 1854(c)(6). Those regulations too must be submitted to the Council and the public for notice and comment. *Id.* Within thirty days after that period, the Secretary must promulgate final regulations. 16 U.S.C. § 1854(c)(7).

The Secretary—given that she runs a vast Cabinet-level agency—has delegated much of her authority under the Magnuson-Stevens Act to the Under Secretary of Commerce for Oceans and Atmosphere. DEP'T OF COM., DOO 10-15, UNDER SECRETARY OF COMMERCE FOR OCEANS AND ATMOSPHERE AND ADMINISTRATOR OF THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, § 3.01aa (2011); [14]-12, p. 3-6. The Under Secretary has in turn delegated a portion of his authority under the Magnuson-Stevens Act to the Assistant Administrator for Fisheries, currently Janet Coit, who oversees the National Marine Fisheries Service. *Id.* § 3.05 (2011). [14]-12, p. 3-6. Generally, the National Marine Fisheries Service is tasked with fulfilling the Secretary's responsibilities under the Magnuson-Stevens Act. Along those lines, Coit, as Assistant Administrator and acting Assistant Secretary of Commerce for Oceans and Atmosphere,[2] serves as the Secretary's Designee in interactions with the Council, including approval of the Council's plans and regulations.[3] [14]-12, p. 3-6. The Deputy Assistant Administrator is then tasked with

---

[2] Coit oversees "a governmental agency that employs 4,800 people in five regional offices, six science centers, and more than 20 laboratories in 15 states and U.S. territories." Steve Bittenbender, *Janet Coit named to lead NOAA Fisheries; Rick Spinrad confirmed as NOAA administrator*, SEAFOODSOURCE (Jan. 25, 2024, 3:29 PM), https://www.seafoodsource.com/news/supply-trade/janet-coit-named-to-lead-noaa-fisheries-rick-spinrad-confirmed-as-noaa-administrator.

[3] While the complete oversight structure of Assistant Administrator Coit's delegated authority to approve or disapprove plan amendments is documented in the record, the crux of all of the parties' briefed arguments center on the constitutionality of the Council's structure and its removal provisions, and not on Coit as Assistant Administrator or on her officer status and ability to bind the Executive Branch. Yet what can be gleaned from the record is that the Secretary has voluntarily chosen to delegate her authority over the National Marine Fisheries Service via internal regulation to the Under Secretary. DEP'T OF COM., DOO 10-15, UNDER SECRETARY OF COMMERCE FOR OCEANS AND ATMOSPHERE AND ADMINISTRATOR OF THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, § 3.01aa (2011). And the Under Secretary has in turn delegated that authority to the Assistant Administrator for Fisheries. [14]-

publishing the approved plans and regulations in the Federal Register and Code of Federal Regulations. [14]-12, p. 6. The National Oceanic and Atmospheric Administration has produced the following organizational chart:



12, p. 3-6. This freely-delegated authority to make decisions on the Secretary's behalf—in which a clear chain of command down from the President is in place—is very different from, for instance, *congressional* mandates restricting the Secretary's ability to review the decisions of her own subordinates. *See, e.g. United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1981, 210 L. Ed. 2d 268 (2021). Regardless, the Commercial Fishers are not challenging Coit's authority—just the Council's.

## II.     The Gulf of Mexico Council

The Gulf of Mexico Fishery Management Council covers Texas, Louisiana, Mississippi, Alabama, and the Gulf of Mexico-side of Florida. 16 U.S.C. § 1852(a)(1)(E). It exists outside the National Oceanic and Atmospheric Administration hierarchy laid out above. It has 17 Council Members drawn from the five states. *Id.* Of those 17 Council Members, five are "[t]he principal State official with marine fishery management responsibility . . . who is designated as such by the Governor of the State, so long as the official continues to hold such position." 16 U.S.C. § 1852(b)(1)(A). One Council Member is "[t]he regional director of the National Marine Fisheries Service" for the Gulf of Mexico. 16 U.S.C. § 1852(b)(1)(B).[4] The final 11 Council Members are "appointed by the Secretary" from "a list of individuals submitted by the Governor of each . . . State."[5] 16 U.S.C. §§ 1852(a)(1)(E), (b)(1)(C). Those 11 appointees "shall serve for a term of 3 years[.]" 16 U.S.C. § 1852(b)(3). Those same 11 may be removed for cause under two conditions. 16 U.S.C. § 1852(b)(6). First, if "the Council . . . recommends removal by not less than two-thirds of the . . . voting members" and second, if "the member is found by the Secretary . . . to

---

[4] At a hearing on some of the Commercial Fishers' Motion for Summary Judgment [6], the parties initially agreed that while the regional director is a senior civil servant, he is appointed to that role by the Secretary. [63], p. 31-32. In later filings, however, some newly joined Commercial Fishers challenged the appointment of the regional director. [71], p. 37.

[5] Each Governor must submit a list of "not less than three individuals" and must provide "a statement . . . explaining how each such individual" is "by reason of their occupational or other experience, scientific expertise, or training, . . . knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the" Gulf of Mexico. 16 U.S.C. §§ 1852(b)(1)(C), (2)(A). "If the Secretary determines that any individual is not qualified, the Secretary shall notify the appropriate Governor . . . . The Governor shall then submit a revised list or resubmit the original list with an additional explanation of the qualifications of the individual in question." 16 U.S.C. § 1852(b)(1)(C).

have committed an act prohibited by section 1857(1)(O) of this title."[6] *Id.* Below is a chart laying

out the three buckets of Council Members and how they arrive on the Council:



### III.    This Litigation

At its meeting conducted on October 24 through October 27, 2022, the Council voted 16-

1 to approve Draft Amendment 54: Modifications to the Greater Amberjack Catch Limits and

Sector Allocations, and other Rebuilding Plan Modifications. GULF OF MEX. FISHERY MGMT.

COUNCIL, GULF COUNCIL MOTIONS REPORT OCTOBER 24-27, 2022, p. 4-5. Amendment 54

revised the overfishing limit, acceptable biological catch, stock annual catch limit, annual catch

target, and the allocation between commercial and recreational fishers for the Greater Amberjack

fishery plan. Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of

---

[6] That section prohibits violating the Council's financial and voting conflict-of-interest provisions. 16 U.S.C.
§ 1857(1)(O).

the Gulf of Mexico; Amendment 54, 88 Fed. Reg. 13,077, 13,079 (Mar. 2, 2023) (to be codified at 50 C.F.R. pt. 622).

Each of these metrics restricts the total weight of Greater Amberjack that the commercial and recreational fishing sectors can bring ashore in each season. By computing the overfishing limit, acceptable biological catch, stock annual catch limit, and annual catch target, the Council can reach a quota for Greater Amberjack. 50 C.F.R. § 622.8. Once a quota is "reached or is projected to be reached," a notice is filed in the Federal Register and "for the remainder of the fishing year, the applicable closure restrictions for such a quota . . . apply." *Id.* This includes closing the relevant sector "for the remainder of the fishing year." 50 C.F.R. § 622.41(a)(i). And if the quotas were exceeded the prior year, then the next year's quota is reduced by the amount of that overage. 50 C.F.R. § 622.41(a)(ii).

Before Amendment 54's approval, the Greater Amberjack quota was around 485,000 pounds for the commercial sector and around 1,300,000 pounds for the recreational sector. Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico; Amendment 54, 88 Fed. Reg. 39,193, 39,195 (June 15, 2023) (to be codified at 50 C.F.R. pt. 622). After Amendment 54's approval, those quotas were reduced to around 94,000 pounds for the commercial sector and around 335,000 pounds for the recreational sector—a quota-reduction of about 80 percent and 74 percent for the commercial and recreational sectors respectfully. *Id.*

Notification of Amendment 54 was published on March 2, 2023. 88 Fed. Reg. at 13,077. Regulations implementing Amendment 54 were then published on March 10, 2023. Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico;

Amendment 54, 88 Fed. Reg. 14,964 (Mar. 10, 2023) (to be codified at 50 C.F.R. pt. 622). The Final Rule implementing Amendment 54 was promulgated on June 15, 2023. 88 Fed. Reg. at 13,193. As a result of the severe quota reduction, the commercial season which opened on January 1 was closed on June 18, 2023—three days after the promulgation of Amendment 54. Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; 2023 Commercial Closure for Gulf of Mexico Greater Amberjack, 88 Fed. Reg. 40,121 (June 21, 2023).

The Commercial Fishers filed this suit on June 16, 2023.[7] George Arnesen, Jeffrey Ryan Bradley, Karen Bell, William Copeland, and A.P. Bell Fish Company are all either Greater Amberjack commercial fishers or wholesalers. Arnesen is a Louisiana fisherman of 40 years who, over that time, has targeted Greater Amberjack. [1], p. 12. Bradley is a Mississippian who, in addition to fishing commercially for Amberjack, also operates a business selling seafood to restaurants across Mississippi. [1], p. 13. Karen Bell is a Floridian who owns and is the President of A.P. Bell Fish Company. [70]-1, p. 1. A.P. Bell Fish Company is a commercial fishing, fish processing, and wholesale and retail fish distribution business located in Florida. *Id.* at p. 2. The Company actively catches Greater Amberjack when they are in season. *Id.* The Company also purchases Greater Amberjack from other fishers and resells them as part of its wholesale business. *Id.* at p. 5. Finally, William Copeland is a Florida fisherman who pursues Greater Amberjack. [70]-2, p. 1-2.

The Commercial Fishers have sued to enjoin the enforcement of Amendment 54 and its regulations. [1], p. 58; [71], p. 9. Between the two consolidated cases, the Commercial Fishers have

---

[7] Karen Bell, William Copeland, and A.P. Bell Fish Company filed a separate suit in the Southern District of Mississippi against the many of the same defendants. *See Bell v. Raimondo*, No. 1:23-cv-160-HSO. The two cases were ultimately consolidated. [49].

named the Secretary of Commerce, the National Marine Fisheries Service, National Marine Fisheries Service Assistant Administrator Janet Coit, National Marine Fisheries Service Deputy Assistant Administrator Samuel Rauch, the Gulf of Mexico Fishery Management Council, and its Council Members as defendants. The Commercial Fishers assert that the Council Members serve in violation of the Appointments Clause of the Constitution, and therefore they cannot exercise any authority under the Magnuson-Stevens Act.

## ANALYSIS

### I.    The Preliminary Injunction and the Motion for Summary Judgment

This case has been expedited,[8] and the analysis will turn on the competing requests for summary judgment. Therefore, addressing the request for a preliminary injunction is unnecessary.[9] To be clear, no one is claiming there is a genuine dispute of material fact that is unresolved. For purposes of this opinion, the Court is implementing the usual standard: summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

---

[8] The Court has moved with haste by prioritizing this case while also continuing to conduct trials and many other criminal and civil matters that required a speedy resolution. For example, summary judgment briefing closed toward the end of October 2023. Also, a [84] Motion for Review of the Magistrate Judge Order [79] was filed in November that related to whether certain other fishery stakeholders could join the suit as Intervenor Defendants. That Motion has now been fully briefed. And today's opinion is being handed down before the decision in a similar case filed in a different district in December 2022 that the parties have referenced.

[9] Some of the Commercial Fishers moved for a preliminary injunction and some did not. [71], p. 1. It was also disputed by the parties whether district courts have the authority to issue preliminary injunctions for equitable claims traveling under the Magnuson-Stevens Act. [63], p. 6-7; *see also* 16 U.S.C. § 1855(f). Because this case has been expedited, the motion for preliminary injunction is moot. Of note, the parties acknowledged during the hearing on the request for a preliminary injunction that there were two avenues to achieve a quick resolution: (1) ruling on the request for a preliminary injunction or (2) expediting the case.

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## II.   Standing

The parties first contest standing. "The doctrine of standing asks 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (abrogated on other grounds by *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014))). "The Supreme Court has described standing as 'contain[ing] two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement; and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction.'" *Id.* The parties have only litigated Article III standing, so only Article III standing will be addressed.

### A.  The Requirements Under Article III

"To establish Article III standing, a plaintiff must show that it has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" *Collins v. Yellen*, 141 S. Ct. 1761, 1779, 210 L. Ed. 2d 432 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). "An injury-in-fact constitutes 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, (5th Cir. 2016) (quoting *Lujan*, 504 U.S. at 560). In a constitutional challenge, "for purposes of traceability, the relevant inquiry is whether the [Commercial Fishers'] injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law

that is challenged." *Collins*, 141 S. Ct. at 1779 (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)). Finally, for redressability, "a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.' The relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (internal citations omitted) (first quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000); and then citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)).

For standing purposes, the merits of the Commercial Fishers' claims are accepted as valid. *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647-48, 212 L. Ed. 2d 654 (2022) (assuming that, for standing purposes in a First Amendment challenge, the challenged regulation unconstitutionally burdened speech). Accordingly, for standing purposes, the Council Members' appointments will be assumed to be unconstitutional.

## B. The Commercial Fishers Have Standing

The Government does not really dispute that the Commercial Fishers have standing to sue the Secretary and Coit, seemingly admitting in its briefing that the Commercial Fishers have alleged an injury traceable to actions taken by both and redressable in this forum. [15], p. 20-25. Thus, the standing analysis will focus on the Government's standing challenges to sue the Council and Rauch.

### 1. Injury

First, the Commercial Fishers have alleged an injury. In *Selia Law v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 207 L. Ed. 2d 494 (2020), the Supreme Court found that when

a statutory provision "violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court." *Id.* at 2196 (citing *Bowsher v. Synar*, 478 U.S. 714, 727 n.5, 106 S. Ct. 3181, 92 L. Ed. 2d 583 (1986)). Yet even without that pronouncement, the Commercial Fishers have alleged a financial injury—a classic form of "particularized" and "concrete" injury. *See Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693 (5th Cir. 2011); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (finding that "tangible" injuries are necessarily concrete); and *Collins*, 141 S. Ct. at 1779 (stating that a "pocketbook injury is a prototypical form of injury in fact."). As amberjack fishers and wholesalers, the Commercial Fishers claim lost "revenue, profits, business relationships, and other opportunities" because of Amendment 54. [1], p. 47-48. They also allege ongoing harms related to the reduction of the commercial amberjack quota "by nearly 80%[.]" [1], p. 48, 32-33. The Government does not particularly contest these personal injuries, conceding that it does "not contend that [the Commercial Fishers'] concern about financial losses is not genuine and credible." [15], p. 42. The Commercial Fishers have alleged an injury-in-fact.

### 2. Traceability

Next, the Commercial Fishers can trace their alleged injury to the Council, but not to Rauch. To start, the Commercial Fishers have a traceable injury to the Council. The Government asserts that because the Commercial Fishers must prove causation, "they can only claim to have been injured by the Amendment 54 Final Rule promulgated by the Fisheries Service[,]" and not Amendment 54, passed by the Council. [15], p. 29. Yet traceability "does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable' to the defendant." *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 431 (5th

Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997)). Traceability only mandates that the Commercial Fishers' injury be causally connected to the Council's alleged conduct—the passage of Amendment 54. *See Tenth St. Residential Ass'n v. City of Dallas, Texas*, 968 F.3d 492, 502 (5th Cir. 2020).

The Supreme Court, in *Cruz*, describes this difference between proximate causation and fairly traceable causation. There, the plaintiff challenged the constitutionality of a statutory provision and a regulation promulgated under that statute by the Federal Election Commission before the Supreme Court. *Cruz*, 142 S. Ct. at 1648-50. The statute prohibited "the use of post-election funds to repay a candidate's personal loans" while the regulation stated, "that neither pre-election nor post-election funds [could] be used to repay candidate loans above $250,000[.]" *Id.* at 1648. Given the state of the plaintiff's campaign funds, only the regulation's ban on using pre-election funds to repay a loan above $250,000 harmed the plaintiff. *Id.* at 1649. And yet the Supreme Court still found that the injury was traceable to the statute as well. *Id.* This was because agencies "literally ha[ve] no power to act . . . unless and until Congress authorizes it do so by statute." *Id.* (quoting *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986)). So, despite the regulation being the "cause that directly produce[d]" the injury "and without which" the injury "would not have occurred," the statute was still traceable to the injury because the regulation could not have been enacted but for the statute. *Cause*, BLACK'S LAW DICTIONARY (11th ed. 2019).

In the Commercial Fishers' case, while Amendment 54 itself is not the proximate cause of their injury, it is a de facto cause, without which the injury would not have occurred. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566, 204 L. Ed. 2d 978 (2019) ("Article III 'requires no more

than *de facto* causality[.]'" (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.))); *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (finding traceability does not "require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'"). Said differently, without the Council creating Amendment 54, the Secretary would have been left with nothing to injure the Commercial Fishers. The intricate process for regulating our nation's fisheries illustrates why.

As discussed above, the Council first develops a plan, or plan amendments, to regulate a fishery. 16 U.S.C. § 1852(h). The Council submits that plan, along with regulations to implement that plan, to the Secretary's Designee, Assistant Administrator Janet Coit. 16 U.S.C. § 1853(c). Coit then considers the Council's submissions. 16 U.S.C. §§ 1854(a), (b). This is not a *de novo*-style of review. Under the Magnuson-Stevens Act's structure, Coit takes the Council's plan and determines whether it aligns with "the national standards" and "other applicable law" and examines the regulations to determine whether "they are consistent with the fishery management plan" and "other applicable law." *Id.* At this point, Coit can either allow a plan and regulations to pass through or return them to the Council for further consideration. *Id.* Coit cannot develop her own plan or regulations until the Council has submitted a plan to her, she has rejected it, and the Council has refused to revisit the prior plan. 16 U.S.C. § 1854(c).

Ultimately, when Coit reviews a fisheries plan, she is not making a purely voluntary choice. The Council has laid out a comprehensive regulatory plan and put it to her to decide whether the plan violates the law or the national standards. Once the Council transmits the plan to Coit, she initially faces a closed universe of options: (1) approve the plan or (2) determine that the plan falls askew of the national standards or the law. 16 U.S.C. §§ 1854(a), (b). And even then, Coit cannot

17

create her own plan; a rejection merely extends the process by returning the plan to the Council for further consideration. *Id.* Only after the Council *refuses* to revisit a rejected plan within a reasonable time may Coit pick option (3)—creating her own plan. 16 U.S.C. § 1854(c). In any case, she is not writing on a blank slate but is operating within the confines of a regulatory system laid out by the Council. She must initially either approve the Council's plan or ask for changes; at that stage there is no other option. Structurally, Coit is largely bound to the work of the Council. The Magnuson-Stevens Act specifically constructed the regulation of our nation's fisheries this way—so that the Council is the body who determines the scope and content of the regulations. It is a closed universe that Coit cannot escape—unless the Council consciously allows her to leave.

Yet standing is not considered in the abstract—courts must consider whether these specific Commercial Fishers can trace their harms to the Council's actions, not whether every potential plaintiff could. Acting as the Secretary's designee, Coit affirmatively approved Amendment 54. Based on the emails provided by the Government, Coit received Amendment 54 on Thursday, February 23, 2023 at 3:15 p.m., [14]-3, p. 2, and sent an email approving the Amendment at 3:22 p.m., [14]-4, p. 2. Then, after the notice and comment period ended, Coit reviewed and approved the regulations implementing Amendment 54. [14]-10, p. 2. This final approval does not change the reality: the Council's decision to submit Amendment 54 was a "fairly traceable" cause of the Commercial Fishers' injury.

The Government provides four cases arguing against the Commercial Fishers' standing, but each misses the mark. First, the District of Columbia Circuit once considered a challenge to the composition of the Federal Reserve's Federal Open Market Committee. *Comm. for Monetary Reform v. Bd. of Governors of the Fed. Rsrv. System*, 766 F.2d 538 (D.C. Cir. 1985). There the

plaintiffs asserted that the Federal Reserve and the Committee interfered with the economy leading to "devastatingly high interest rates[,]" and challenged the method of appointment of the Committee members. *Id.* at 540. The D.C. Circuit found that the plaintiffs lacked standing based on two points. First, the D.C. Circuit held that "[i]t is entirely speculative whether the influence of the Reserve Bank members" was responsible for the harm because of the other members of the Committee and because of "the complexity of the modern economy, it was also highly uncertain whether and to what extent such policies were responsible for the adverse economic conditions that allegedly resulted in harm" to the plaintiffs. *Id.* at 542. Second, the D.C. Circuit determined that the plaintiffs lacked standing because they did "not allege they are directly subject to the government authority they seek to challenge, but merely assert that they are substantially affected by the exercise of that authority." *Id.* at 543. But unlike in *Committee for Monetary Reform*, the Council's plan directly prompted the regulations that issued, and harm is obvious. And it is undisputed that the Commercial Fishers are subject to the plan and the regulations.

The next case concerned the "validity of federal fishing regulations setting harvest limits for Oregon coastal coho salmon." *Nw. Env't Def. Center v. Brennan*, 958 F.2d 930, 932 (9th Cir. 1992). Among other challenges, the Northwest Environmental Defense Center also claimed that the four state-appointed members of the fishery council served in violation of the Appointments Clause under the Magnuson-Stevens Act. *Nw. Env't Def. Center* at 932, 937. The Ninth Circuit found a lack of standing for two reasons. First, the Ninth Circuit held that the regulations were the proximate cause of the Center's alleged injury, not anything the Council itself did. *Id.* at 937. Second, the Ninth Circuit recognized that the Center did "not allege that plans proposed by a Council that did not include state-appointed members" would provide a different outcome. *Id.*

Because of that missing allegation, the Ninth Circuit found that even if the Council were a cause of the Center's injury, that "injury [could not] be fairly traced" to the alleged constitutional violations. *Id.* The Commercial Fishers, though, have challenged all 17 Council Members—not just the five state officials. Moreover, the Supreme Court has more recently spoken against these type of counterfactuals. *Selia Law*, 140 S. Ct. at 2196 (holding that "litigant[s] challenging governmental action as void on the basis of the separation of powers [are] not required to prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority.").

Third, the Government suggests that when independent decisionmakers exercise their judgment, "the chain of causation is broken[.]" [15], p. 33 (citing *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566, 204 L. Ed. 2d 978 (2019)). But that case supports the Commercial Fishers, not the Government. *Department of Commerce* involved a challenge to the citizenship question on the 2020 Census. The Supreme Court ultimately found standing because the plaintiffs' "theory of standing . . . [did] not rest on mere speculation about the decisions of third parties" instead relying "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 139 S. Ct. at 2566. Here, however, there are no third parties present—like the individuals responding to the census in *Department of Commerce*. Every decision was made by a government actor, and the actions of government actors working under a mandatory statutory structure are certainly predictable. *See Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries Serv.*, 730 F. Supp. 2d 157, 174 (D.D.C. 2010) ("Adoption of implementing regulations is mandatory[.]"). And, as explained above, the Secretary does not have independent decision-making authority to create her own fishery plan and go her own way.

20

Finally, the District of Alaska recently addressed many points considered here: a challenge to the composition of the fishery councils under the "Constitution's Appointments, Take Care, and Executive Vesting Clauses[.]" *United Cook Inlet Drift Association v. Nat'l Marine Fisheries Serv.*, Nos. 3:21-cv-255, 3:21-cv-247, 2022 WL 2222879, at *5 (D. Ala. Jun. 21, 2022). There, the District of Alaska found the plaintiffs lacked standing by relying on *Northwest Environmental Defense Center*—the above mentioned Ninth Circuit precedent to which it was bound. *United Cook Inlet Drift Ass'n* at *19. It also concluded that the Councils were "simply advisory bodies and ha[d]no legal authority." *Id.* That said, *Northwest Environmental Defense Center* does not bar the Commercial Fishers from raising structural constitutional claims in this Circuit. Also, in this Court's view, and as explained throughout this opinion, the Councils are not mere advisory bodies with no legal authority. Therefore, the Commercial Fishers' injury is traceable to the Council, and this element of standing is met for that claim.

Yet the Commercial Fishers cannot trace their alleged injury to Rauch. First, while Rauch signed the final regulation, the evidence suggests that the signature attached was a mere formality. *See* 1 C.F.R. §§ 16.1, 16.3, 18.5, 18.6, 18.7 (regulations requiring an agency's "certifying officer" to certify an original and various copies by signature for anything published in the Federal Register). The Government agrees, maintaining that this act of signing was a ministerial action, not substantive. [15], p. 37. Moreover, the Commercial Fishers, beyond pointing to Rauch's signature, have not explained how that signature involved Rauch in the Amendment 54 process. Without more, the Commercial Fishers' injury is not "fairly traceable" to Rauch. *See Texas v. United States*, 787 F.3d 733, 752 (5th Cir. 2015) (noting that the Supreme Court "has found that an injury is not

fairly traceable" when "the challenged action has played a minor role."). Because the Commercial Fishers' injury is not traceable to Rauch, the redressability analysis will focus solely on the Council.

### 3. Redressability

Finally, the Government does not contest redressability. The regulation which caused the harm to the Commercial Fishers depends fully on Amendment 54. The Government itself refers to the regulation as the Amendment 54 Final Rule. [15], p. 29. As the regulation provides, the Fisheries Service, "issues regulations to implement management measures described in Amendment 54 to the Fishery Management Plan . . . as prepared by the Gulf of Mexico Fishery Management Council[.]" Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico; Amendment 54, 88 Fed. Reg. 39,193 (June 15, 2023) (to be codified at 50 C.F.R. pt. 622). Moreover, within the description of the measures implemented in the regulation, it provides "[a]pplying the allocation selected by the Council in Amendment 54 results in a revised commercial ACL of 101,000 lb (45,813 kg) and a revised recreational ACL of 404,000 lb (183,251 kg)." *Id.* at 39,195. Without the Council's Amendment 54, there is no basis for the regulation. With "no other basis to authorize" the regulation, "the regulation . . . would cease to be enforceable." *Cruz*, 142 S. Ct. at 1649. Redressability is met, and the Commercial Fishers have standing to bring their suit.

## III.   The Appointments Clause

Next, the Commercial Fishers contend the 17 Council Members serve in violation of the Appointments Clause of the Constitution. Because of this violation, they then assert that those 17 Council Members cannot exercise any authority under the Magnuson-Stevens Act. Consequently, an analysis of the Appointments Clause is required.

## A. An Overview

The Framers went to great lengths to carefully calibrate the text of the Appointments Clause to function in a way that prevents overreach and abuse. *See Edmond v. United States*, 520 U.S. 651, 659, 117 S. Ct. 1573, 1579, 137 L. Ed. 2d 917 (1997) (finding that "the Appointments Clause of Article II is more than a matter of etiquette or protocol; it is among the significant structural safeguards of the constitutional scheme."). So in this analysis, the text of the Clause itself is critical. The Appointments Clause reads as follows:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint, Ambassadors, other public Ministers, and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II. § 2, cl. 2.

The Appointments Clause serves at least three functions: (1) "[b]y vesting the President with the exclusive power to select the principal (noninferior) officers of the United States, the Appointments Clause prevents congressional encroachment upon the Executive and Judicial Branches;" (2) "[t]he Framers anticipated that the President would be less vulnerable to interest-group pressure and personal favoritism than would a collective body;" and (3) "[b]y requiring the joint participation of the President and the Senate, the Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one." *Edmond*, 520 U.S. at 659-60.

The first and third considerations contain what could be called the "separation of powers" and "accountability" principles; "[t]he Appointments Clause not only guards

against . . . encroachment but also preserves another aspect of the Constitution's structural integrity by preventing diffusion of the appointment power." *Freytag v. Comm'r*, 501 U.S. 868, 879, 111 S. Ct. 2631, 2641, 115 L. Ed. 2d 764 (1991). This anti-diffusion principle "prevents Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to appoint." *Id.* at 880. The Framers understood that by limiting the number of executive branch members who could exert the authority of the United States, "they could ensure that those who wielded it were accountable to . . . the will of the people." *Id.* at 884. As Alexander Hamilton observed, the "people do not vote for the 'Officers of the United States.' They instead look to the President to guide the 'assistants or deputies . . . subject to his superintendence.' Without a clear and effective chain of command, the public cannot 'determine on whom the blame . . . ought to really fall.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498, 130 S. Ct. 3138, 3155, 177 L. Ed. 2d 706 (2010) (internal citations omitted) (quoting THE FEDERALIST NOS. 70, 72 (A. Hamilton)).

Ultimately, the Appointments Clause is part of the structure that ensures that the "President chosen by the entire Nation [who] oversee[s] the execution of the laws" can oversee the Executive Branch. *Id.* at 499. Thus, an Appointments Clause violation disrupts "the basic principle that the President 'cannot delegate ultimate responsibility or the active obligation to supervise that goes with it,' because Article II 'makes a single President responsible for the actions of the Executive Branch.'" *Id.* at 496-97.

### B.  The Appointments Clause Test

When evaluating an Appointments Clause challenge, three questions are asked: (1) are the public officials employees or officers; if they are officers, (2) what authority are those officers

exercising, and (3) who appointed those officers. *See Freytag*, 501 U.S. at 880-81; *Edmond*, 520 U.S. at 660-61; *Lucia v. Sec. & Exch. Comm'n*, 138 S. Ct. 2044, 2051-52, 201 L. Ed. 2d 464 (2018). "The Appointments Clause prescribes the exclusive means of appointing 'Officers.'" *Lucia*, 138 S. Ct. at 2051. But employees, or "lesser functionaries" need not comply with the strict requirements of Article II. *Id.* For employees, "the Appointments Clause cares not a whit about who named them." *Id.* (citing *United States v. Germaine,* 99 U.S. 508, 510, 25 L.Ed. 482 (1879)).

### 1.   Officers or Employees

A public official is an officer and not an employee if he occupies "a 'continuing' position established by law" and "exercise[s] significant authority pursuant to the laws of the United States." *Lucia*, 138 S. Ct. at 2047. Generally, even if an official acts as an employee some of the time, that official is still an officer. *Freytag*, 501 U.S. at 881. Practically, an officer tends to manifest as someone who has a career or term appointment to a statutory position where the statute specifies duties, salary, and appointment means. *Lucia*, 138 S. Ct. at 2052. Duties will often help determine the authority that an official has—significant authority can include enforcement powers, "rulemaking, advisory opinions, and determinations of eligibility[.]" *Buckley v. Valeo*, 424 U.S. 1, 140-41, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). As an example, "doctors hired to perform various physical exams" by the federal government were "mere employees because their duties were 'occasional or temporary' rather than continuing and permanent." *Lucia*, 138 S. Ct. at 2051 (quoting *Germaine*, 99 U.S. at 511-12). Meanwhile, district court clerks, election supervisors, vice consuls, United States commissioners in district court proceedings, and independent counsels have all been held to be inferior officers. *See Edmond*, 520 U.S. at 661 (internal citations omitted).

The Council Members fall into three buckets: state officials, the regional director, and governor-recommended Secretary appointees. 16 U.S.C. § 1852(b)(1). Each state official is a member "so long as the official continues to hold such position" but the Secretary appointees "serve for a term of 3 years." 16 U.S.C. §§ 1852(b)(1), (3). The compensation for Council Members is also specified—daily compensation at GS-15, step 7 (at least $67.57/hr) for Secretary appointees and reimbursement "for actual expenses incurred in the performance of duties" for the state officials. 16 U.S.C. § 1852(d). Also provided are the functions and duties of the Council. 16 U.S.C. § 1852(h). All of the above requirements tend to support Council Members being officers and not employees—they have specific terms, statutory duties, statutory compensation, and statutory appointment requirements. *Lucia*, 138 S. Ct. at 2052.

Moreover, the Council Members can bind the Executive Branch and have some "last-word" authority. *Id.* at 2054 (noting that SEC Administrative Law Judges' "last-word capacity" when the SEC declines review of their decisions demonstrated officer status). Here, after developing their fishery management plans, the Council must transmit those plans to the Secretary's Designee, Assistant Administrator Janet Coit, for approval. That transmission triggers the opening of a 60-day comment period. 16 U.S.C. § 1854(a)(1)(B). And if Coit does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then the plan takes effect. 16 U.S.C. § 1854(a)(3)(C). This structure resembles the one that the Supreme Court reviewed in *Lucia*. There, the Securities and Exchange Commission could decline reviewing an administrative law judge decision. *Lucia*, 138 S. Ct. at 2054. And when the Commission did decline review, "(and issue[d] an order saying so), the [judge's] decision itself '[became] final[.]'" *Id.* That "last-word capacity" made *Lucia* a

straightforward case for the Supreme Court—the administrative law judges were officers. *Id.*[10]
Here, like in *Lucia*, Coit can decline review, or (unlike in *Lucia*) simply allow time to run, and the
Council's plans or amendments take effect with no further action of an Executive Branch official.
Accordingly, the Council Members are officers, not employees. The next question is whether the
Council Members sit as principal or inferior officers.

### 2. Principal or Inferior Officers

The Appointments Clause provides two methods by which officers may be appointed.
First, only the President, with the advice and consent of the Senate, can appoint noninferior
officers—or *principal officers*. *Edmond*, 520 U.S. at 659. Second, Congress may vest the
appointment of *inferior officers* in the President, the Courts of Law, the Heads of Departments. U.S.
CONST. art. II. § 2, cl. 2. Now, the "default manner of appointment" for these inferior officers, as
with all principal officers, is still nomination by the President and confirmation by the Senate.
*Edmond*, 520 U.S. at 660. But "the Framers foresaw that 'when offices became numerous, and
sudden removals necessary, this mode might be inconvenient.'" *Arthrex, Inc.*, 141 S. Ct. at 1979
(citing *Germaine*, 99 U.S. at 510). Consequently, the Appointments Clause "permits Congress to
dispense with joint appointment, but only for inferior officers." *Id.* (citing *Edmond*, 520 U.S. at
660). The question now concerns the nature of the Council Members' responsibilities and what
that reveals about their status as principal or inferior officers.

Inferior officers are "officers whose work is directed and supervised at some level by others
who were appointed by Presidential nomination with the advice and consent of the Senate"—that

---

[10] The Supreme Court was comparing the Commission's administrative law judges to the Tax Court's
special-tax judges in *Freytag*. In its conclusion it held that "[t]hat last-word capacity makes this an *a fortiori* case: If the
Tax Court's [judges] are officers, as *Freytag* held, then the Commission's [judges] must be too." *Lucia*, 138 S. Ct. at
2054.

is, by principal officers.[11] *Edmond*, 520 U.S. at 663. Yet rather than focusing solely on the chain of command, the inferior/principal determination centers on "how much power an officer exercises free from control by a superior." *Arthrex*, 141 S. Ct. at 1982. Generally, only officers "properly appointed to a principal office may issue a final decision binding the Executive Branch[.]" *Id.* at 1985. Whether that officer's decision is final and binding depends on if a different officer can exercise administrative oversight, removal authority, and general review over that officer. *Id.* at 1980-82.

In *Edmond*, the Supreme Court held that the judges of the Coast Guard Court of Criminal Appeals were inferior officers rather than principal officers because of "the supervision over their work exercised by the General Counsel of the Department of Transportation in his capacity as Judge Advocate General and the Court of Appeals for the Armed Forces." 520 U.S. at 664-65. The Judge Advocate General could "'prescribe uniform rules of procedure' for the [Coast Guard] Court" and could "also remove a [Coast Guard] Court . . . judge from his judicial assignment without cause." *Id.* at 664. This, coupled with the ability of the Court of Appeals for the Armed Forces to "reverse decisions of the court," demonstrated the Coast Guard Court's power to bind the Executive Branch was sufficiently cabined "unless permitted . . . by other Executive officers." *Id.* at 664-65.

On the other hand, the Supreme Court found in *Arthrex* that Administrative Patent Judges were wielding authority akin to principal officers because of how unreviewable their decisions

---

[11] "This understanding of the Appointments Clause conforms with the views of the first Congress. On July 27, 1789, Congress established the first Executive department, the Department of Foreign Affairs. In so doing, it expressly designated the Secretary of the Department as a 'principal officer,' and his subordinate, the Chief Clerk of the Department, as an 'inferior officer[.]'" *Edmond*, 520 U.S. at 663.

were. 141 S. Ct. at 1982. There, these judges' decisions on "patentability" were automatically final within the Executive Branch and could be appealed only to the Court of Appeals for the Federal Circuit. *Id.* at 1977, 1980. Combined with their removability only for cause, these structures insulated the judges' "decisions from any executive review" such that they were acting to bind the Executive Branch as principal officers rather than inferior officers. *Id.* at 1982, 1985. The Supreme Court distinguished *Arthrex* from *Edmond*, noting that the officers under review in *Edmond*—judges of the Coast Guard Court of Criminal Appeals—acted as inferior officers because other Executive Branch officials exercised sufficient oversight of them. *Arthrex*, 141 S. Ct. at 1980. Unlike in *Edmond*, the Supreme Court found that the director, who was nominally in charge of the patent judges, "is the boss, except when it comes to the one thing that makes the APJs officers exercising 'significant authority' in the first place—their power to issue decisions on patentability." *Id.* In other words, "no principal officer at any level within the Executive Branch 'direct[s] and supervise[s] the work of APJs in that regard." *Id.*

Here, the process of plan creation reveals the Council Members as inferior officers. First, the Council must transmit its fishery management plan or plan amendment to the Secretary. 16 U.S.C. § 1854(a)(1). Similarly, any proposed regulations developed by the Council must also be transmitted to the Secretary. 16 U.S.C. §§ 1853(c), 1854(b)(1). Once the Secretary receives them, the plans and regulations must be reviewed, 16 U.S.C. §§ 1854(a)(1)(A), (b)(1), and released for public comment. 16 U.S.C. §§ 1854(a)(1)(B), (b)(1)(A). After the public comment period is concluded, the plan or regulation is finalized and published. 16 U.S.C. §§ 1854(a), (b)(3). If after reviewing the plan, however, the Secretary believes that the plan is "inconsistent" with some

"applicable law,"[12] she must disapprove of the plan and provide "recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law." 16 U.S.C. § 1854(a)(3). Once the plan is disapproved of, "the Council may submit a revised plan or amendment" to the Secretary under that subsection. 16 U.S.C. § 1854(a)(4). The review and publish process then begins again. A similar procedure is followed for regulations.[13] Moreover, if the Council does not develop and submit fishery plans timely—or refuse to revise plans after she has disapproved them—the Secretary may then develop her own plan. 16 U.S.C. § 1854(c)(1). That plan must then be submitted to the Council again for notice and comment. 16 U.S.C. § 1854(c)(4).

The Council wields significant authority throughout; it is empowered to develop plans and regulations governing the maritime fisheries in its regions. Though, this authority is not unfettered—while the creation of the plans and regulations generally begin with the Council, the Secretary or her designee acts as a check on the legality and direction (the national standards in 16 U.S.C. Section 1851) of those plans and regulations. This check indicates that the Council acts with inferior, not principal, authority. While the Council *can* issue final plans, it can only do so if the Secretary or her designee decides to do nothing with the plan. Any plan or regulation submitted is, presumably, reviewed by the Secretary and subject to her determination that it accords with the "applicable law" in the area. 16 U.S.C. §§ 1854(a)(3), (b)(1). That is essentially the same role

---

[12] This "applicable law" includes the national standards for fishery conservation and management found in 16 U.S.C. Section 1851. "Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards[.]" *Id.*

[13] If the Secretary of Commerce finds that a proposed regulation is not "consistent with the fishery management plan, plan amendment, this chapter and other applicable law[,]" then she "shall notify the Council in writing of the inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent[.]" 16 U.S.C. § 1854(b)(1)(A). The Council can then "revise the proposed regulations and submit them to the Secretary for reevaluation" again. 16 U.S.C. § 1854(b)(2).

played by the appellate court in *Edmond* and is the sort of oversight specifically identified as lacking in *Arthrex*. Under the statutory scheme, the Secretary retains the ability, should she wish, to review all plans and regulations created by the Council.

Admittedly, the Secretary is restricted from removing Council Members unless certain criteria are met.[14] But the patent judges in *Arthrex* also could not be removed at-will, and the Supreme Court did not find that outcome determinative for whether they exercised inferior or principal authority. 141 S. Ct. at 1987. Instead, the Supreme Court was more concerned with allowing review of the judges' decisions. *Id.* at 1987 (holding that "regardless whether . . . at-will removal by the Secretary would cure the constitutional problem, review by the Director better reflects the structure of supervision within the PTO and the nature of APJs' duties[.]"). Ultimately, because the Council can only render a final decision "on behalf of the United States" if it is "permitted to do so by other Executive officers[,]" its Members are inferior, rather than principal officers. *Id.* at 1980.

### 3.   Who Appointed the Inferior Officers

The final question is who appointed the Council Members as inferior officers and whether such appointments are constitutional. For inferior officer appointments, three options are available: (1) the President personally appointing an official, (2) the Courts of Law doing so, or (3) the Heads of Departments. U.S. CONST. art. II. § 2, cl. 2. Because of the nature of the Council Members' appointments by the Executive Branch, and not by a Court of Law, this analysis will be confined to the "Heads of Departments" language.

---

[14] Those are either a two-thirds vote of the Council to recommend removal, or a violation of the conflict-of-interest provision contained in the statute. 16 U.S.C. § 1852.

The "Heads of Departments" language poses two questions: what is a department and who is the head? "Department" has received two definitions—one restrictive and one expansive. First, in *Freytag*, the Supreme Court restricted the term "department" to executive divisions, like cabinet-level departments, stating that the term "refers only to 'a part or division of the executive government, as the Department of State, or the Treasury[.]'" 501 U.S. at 886 (citing *Germaine*, 99 U.S. at 510-11). Second, in *Free Enterprise Fund*, the Supreme Court provided a more expansive definition: "[b]ecause the Commission is a freestanding component of the Executive Branch, not subordinate to or contained within any other . . . , it constitutes a 'Departmen[t]' . . ."[15] 561 U.S. at 511. There, the Supreme Court also saw "no reason why a multimember body may not be the 'Hea[d]' of a 'Departmen[t]' that it governs." *Id.* at 512-13. So here, "Heads of Departments" means appointment by the head of a free-standing component of the Executive Branch.

As a review, the 17 Council Members are made up of: (1) one regional director of the National Marine Fisheries Service; (2) five state officials who manage marine fisheries, as designated by their state's governor; and (3) 11 appointees recommended by a list of governors, provided they meet certain qualifications. 16 U.S.C. §§ 1852(b)(1), (2)(D)(ii). But where these 17 nominees come from is less important than *who* appoints them. That is the focus of the Appointments Clause as the Supreme Court has interpreted it; "it limits the universe of eligible recipients of the power to appoint." *Freytag*, 501 U.S. at 880.

---

[15] In a footnote immediately following this statement, the Supreme Court notes that the *Freytag* Court utilized the definition of "Department" from the Opinions Clause and the Twenty-Fifth Amendment, suggesting that *Free Enterprise Fund* was not overruling *Freytag* but distinguishing it. *Free Enter. Fund*, 561 U.S. at 511, n. 11 (citing *Freytag*, 501 U.S. at 886–87).

First, the regional director of the National Marine Fisheries Service from bucket (1) does not appear to be appointed by the Secretary. 5 U.S.C. § 3393; [50]-15, p. 32. While some of the Commercial Fishers said that the regional director was validly appointed, [63], p. 31-32, others do not, asserting a violation because the regional director was selected by a "lesser Commerce Department Official" and not directly by the Secretary of Commerce. [71], p. 37. The record reveals that the regional director was appointed as a Senior Executive Service member under 5 U.S.C. Section 3393. [50]-15, p. 32. The regional director's inclusion on the Council is simply owed to the fact that he happens to serve as regional director and the statute mandates his inclusion. 16 U.S.C. § 1852(b)(1)(B).

Among the many functions of the Appointments Clause is to protect the power of the executive by avoiding the diffusion of the appointment power. In other words, "forbid[ding] Congress to grant the appointment power to inappropriate members of the Executive Branch." *Freytag,* 501 U.S. at 880; *see also Weiss v. United States,* 510 U.S. 163, 188 n. 3, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (Souter, J., concurring). So, when Congress creates an "inferior Officer" in the Executive Branch, it can vest the appointment power for that officer no further from the President than the Head of a Department whom the President himself has appointed. *Tucker v. Comm'r of Internal Revenue*, No. 3165-06L, 2010 WL 2901811 *121 (T.C. July 26, 2010), *aff'd sub nom. Tucker v. Comm'r*, 676 F.3d 1129 (D.C. Cir. 2012). "There is, so to speak, only one degree of separation between any duly appointed officer and the President, thus maintaining the locus of executive power in the President himself." *Id.*

Here, the regional director's appointment as a Senior Executive Service member was authorized by Deputy Assistant Administrator Rauch—the Deputy to Assistant Administrator

Janet Coit. [50]-15, p. 25. Coit, in turn, was appointed directly by the Secretary of Commerce. *Id.* at 36. In light of already finding that the Council Members wield the power of inferior officers, this appointment contains, on its face, more than "one degree of separation" between the regional director and the President. Thereby thwarting the Framer's goal of ensuring "that those who wielded [the appointment power] were accountable to political force and the will of the people." *Freytag,* 501 U.S. at 884. The regional director's appointment is unconstitutional.

Next, the five *state* officials who manage statewide marine fisheries from bucket (2) do not appear to be appointed by the Secretary. Indeed, these five are Council Members solely by their office in their State. These five Council Members, then, have not been appointed at all, much less by an individual with authority under the Appointments Clause. The text of the statute specifies that these five Council Members consist of "the principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State, so long as the official continues to hold such position, or the designee of such official." 16 U.S.C. § 1852(b)(1)(A). The plain language of this statute is strong, uncontroverted evidence that these five "principal State official[s] with . . . expertise in each constituent State" are not appointed by the President, a Court of Law, or the Secretary of Commerce. *Id.* Indeed, the Governor of each State is exclusively responsible for their inclusion on the Council. These five Council Members are serving in violation of the Appointments Clause.

Finally, the question now turns to the 11 Council Members in bucket (3). On the surface, all 11 Council Members appear to be properly appointed as inferior officers by the Secretary of Commerce. [50]-16, p. 188-198. After all, the Secretary is the "Head of a Department" under the definition of that term in *Freytag* or *Free Enterprise Fund*. Yet the Commercial Fishers allege that

34

the restrictions placed on the Secretary in selecting the 11 Council Members from state governor-provided lists offends the Appointments Clause. The state governors do initially have some control over the process as they must submit a list of at least three individuals for the Secretary to choose from. 16 U.S.C. § 1852(b)(2)(C). And while the Secretary can reject those candidates if she determines that "any individual is not qualified," the Secretary is not empowered to introduce new candidates into the mix, and instead must await an updated list to be provided. *Id.* Of note though, the Secretary is empowered to decide what "qualified" means. 16 U.S.C. § 1852(b)(2)(A) (stating that "the Secretary shall, by regulation, prescribe criteria for determining whether an individual satisfies the requirements of this subparagraph."). Nevertheless, the Commercial Fishers contend that the Executive Branch ultimately has little say over who these 11 Council Members are. Yet the Commercial Fishers provide no case law directly asserting that this gubernatorial-recommendation process violates the Constitution. What argument they do advance is grounded in the usage of "vest" in the Appointments Clause.

The Commercial Fishers assert that the language providing that "the Congress may by Law vest the Appointment of such inferior officers . . . " requires that Congress vest plenary, unfettered appointment authority in the Head of a Department. U.S. CONST. art. II, § 2, cl. 2. But they provide no case law supporting the contention that Congress may not issue certain statutory qualifications for the appointment of inferior officers. And the text of the Appointments Clause cuts against that contention. The relevant portion of the Clause states:

> . . . but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II. § 2, cl. 2.

The language empowers Congress to "vest" "by law" the appointments of inferior officers. This reading illustrates two points. First, the fact that Congress "by law" may vest appointments indicates the presence of a degree of statutory oversight of these appointments. *See* Hanah Metchis Volokh, *The Two Appointments Clauses: Statutory Qualifications for Federal Officers*, 10 U. PA. J. CONST. L. 745, 759 (2008). This is because the language "by law" invokes the specific method of law creation set forth in Article I, Section 7—which foresees a role for *both* the House of Representatives *and* the Senate before presentment to the President. U.S. CONST. art. I. § 7, cl. 2. (stating that "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States."). This contrasts with the language governing the appointment of principal officers, in which the President can nominate, and then appoint with the advice and consent of the Senate only. *See* Volokh, *supra* at 759-60; U.S. CONST. art. II. § 2, cl. 2.

But the text and punctuation reveal more. With the phrase "as they think proper," the punctuation that is present—two commas—renders at least two interpretations[16]—both of which support Congressionally set qualifications. In the first, the phrase modifies "vest." This reading gives strong discretion to Congress to decide in what manner to vest the appointment.[17] Second, the phrase modifies "such inferior Officers," situating the phrase to mean the officers as Congress thinks is proper. The Appointments Clause appears to allow Congress much more leeway in setting forth who and by what manner inferior officers can be appointed. *Id.* This textual interpretation is

---

[16] *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS p. 161 (2012) (noting that "[p]unctuation in a legal text will rarely change the meaning of a word, but it will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part.").

[17] *See* Volokh, *supra* at 761 (observing that "Congress might think it proper to vest an appointment while constraining the appointer's discretion through statutory qualifications.").

also supported by the structural system of checks and balances, instituted by the Framers, and revealed throughout the Constitution.

To be sure, the delegates to the Constitutional Convention at Philadelphia consciously chose to separate the power to create federal offices from the power to fill them. *Weiss*, 510 U.S. at 184 (Souter, J. concurring) (observing that "the Framers came to appreciate the necessity of separating at least to some degree the power to create federal offices (a power they assumed would belong to Congress) from the power to fill them[.]"). And yet, they decided to ensure that neither actor had unfettered power—to create or to appoint.

In terms of principal officers, the Appointments Clause empowers the President to *nominate* anyone that the President wishes. Yet to *appoint* that individual, the President must seek "the Advice and Consent of the Senate." U.S. CONST. art. II. § 2, cl. 2. This "advice and consent" requirement allows the Senate the ability to check the power of the President on the back end.

In the same way, the appointment of inferior officers has a similar check, though on the front end. After all, the Framers structured the method for inferior officer appointment "to ensure accountability and check governmental power: any decision to dispense with Presidential appointment and Senate confirmation is Congress's to make, not the President's, but Congress's authority is limited to assigning the appointing power to the highly accountable President or the heads of federal departments." *Weiss*, 510 U.S. at 187 (Souter, J. concurring). And, unlike with principal officers, *both chambers* of Congress get a say in inferior officers—even if the say is on the

types of people who can be subject to appointment. Congress dispensing a statutory qualifier[18] in which there is still autonomy to appoint does not violate the above principles.[19]

The Supreme Court has touched on this idea in the context of unconstitutional removal provisions. In *Myers v. United States*, 272 U.S. 52, 47 S. Ct. 21, 71 L. Ed. 160 (1926), the Supreme Court considered a challenge to removal of a first-class postmaster. In his majority opinion holding that the President's ability to remove inferior officers had been unconstitutionally hindered, then-Chief Justice Taft[20] considered the scope and applicability of the Appointments Clause to many situations. Commenting on the removal of inferior officers and the power Department Heads retained, Chief Justice Taft recognized "that Congress, in committing the appointment of such inferior officers to the heads of departments, may prescribe incidental regulations controlling and

---

[18] The governors must submit a list of at least "three individuals" and must provide "a statement . . . explaining how each such individual" is "by reason of their occupational or other experience, scientific expertise, or training, . . . knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the" Gulf of Mexico. 16 U.S.C. §§ 1852(b)(1)(C), (2)(A). "If the Secretary determines that any individual is not qualified, the Secretary shall notify the appropriate Governor . . . . The Governor shall then submit a revised list or resubmit the original list with an additional explanation of the qualifications of the individual in question." 16 U.S.C. § 1852(b)(1)(C). Here, the structural safeguards imposed by Congress for these 11 Council Members aid, not abet, the President in their selection—allowing autonomy in the selection, while providing immediate access to multiple candidates who actually live in these states and have relevant fisheries expertise, rather than spending time scouring these states for qualified individuals. It also removes the likelihood of potentially unqualified candidates from land locked states having input on regional fishery regulations.

[19] Congress issuing statutory measures that limit candidates to certain qualifications or levels of expertise, as with the Council, is not new. *See* 12 U.S.C. §4512 (requiring the director of the Federal Housing Finance Agency be appointed from among candidates who have an "understanding of financial management or oversight, and have a demonstrated understanding of capital markets, including the mortgage securities markets and housing finance" and more specifically, to "have served as an executive officer or director of any regulated entity or entity-affiliated party at any time during the 3-year period preceding the . . . appointment"); 31 U.S.C. §504(b) (mandating that the office of controller at the Office of Federal Financial Management in the Office of Management and Budget be filled "from among individuals who possess—(1) demonstrated ability and practical experience in accounting, financial management, and financial systems; and (2) extensive practical experience in financial management in large governmental or business entities"); and 29 U.S.C. §792(a)(1)(A) (requiring that at least seven of the 25 members of the Architectural and Transportation Barriers Compliance Board be individuals with disabilities."). There are numerous other examples throughout the United States Code.

[20] After previously serving as the 27th President of the United States, Chief Justice Taft obtained a unique perspective on the separation of powers and the Appointments Clause.

restricting the latter in the exercise of the power of removal" so long as Congress "does not exercise that power, the power of removal must remain where the Constitution places it, with the President[.]" *Myers*, 272 U.S. at 161. While in the context of removal provisions in that case, the fact that Congress may regulate, control, and restrict the President is not limited to the removal context. Indeed, it supports the textual reading of the Appointments Clause that Congress has wide latitude to structure how it vests power to appoint inferior officers on the front end—as long as the actual appointment power for inferior officers resides with the Executive Branch or a Court of Law.

While Congress enjoys broad discretion in qualifying appointments, there appears to be consensus that it may not set qualifications that limit the President's selection such that the appointment is a *de facto* legislative designation. *See* Henry B. Hogue, Statutory Qualifications for Executive Branch Positions p. 19 (2015). That is not the case here, where the entire purpose of the recommendation lists are ostensibly to help the Secretary of Commerce make efficient and informed selections from the Gulf States, while vesting in the Secretary the power to request new candidates when the previous do not meet the Secretary-set qualifications. 16 U.S.C. § 1852(b)(2)(C). After all, in appointing the Council Members, the Secretary is empowered to decided what "qualified" means. 16 U.S.C. § 1852(b)(2)(A) ("the Secretary shall, by regulation, prescribe criteria for determining whether an individual satisfies the requirements of this subparagraph.").

The Constitution specifies that the Congress should delegate the appointment power "as they think proper." "It follows, then, that Congress's choice always deserves appreciable deference." *United States v. Hilario*, 218 F.3d 19, 27 (1st Cir. 2000); *Ex parte Siebold*, 100 U.S. 371, 397-98, 25 L. Ed. 717 (1879) (noting that, "as the Constitution stands, the selection of the

appointing power, as between the functionaries named, is a matter resting in the discretion of Congress."). The gubernatorial-recommendation system imposed by statute is not foreclosed by the Appointments Clause. Accordingly, those 11 appointees are validly appointed by the Secretary.

### 4. Causation and Remedy

Six of the 17 Council Members are unconstitutional. The question now turns to whether, because of their inclusion, the past actions of the Council, and specifically Amendment 54 and the promulgation of its Final Rule, are void.

Historically, the Supreme Court has found at least two types of cases in which the appropriate remedy is to invalidate an action taken by an unconstitutional agency or officer. *See Collins v. Mnuchin*, 938 F.3d 553, 593 (5th Cir. 2019), *aff'd* in part, vacated in part, *rev'd* in part *sub nom*; *Collins*, 141 S. Ct. at 1761. For example, the Supreme Court has found actions by actors who were granted power "inconsistent with their role in the constitutional program worthy of invalidation." [21] *Id.* The other example is that the Supreme Court has invalidated actions taken by actors who were not properly appointed under the Constitution. It has thus vacated and remanded

---

[21] For example, in *Bowsher*, Congress delegated executive powers to the Comptroller General of the United States to review certain deficit estimates and budget reduction calculations under the Gramm-Rudman-Hollings Deficit Control Act of 1985. 478 U.S. at 732-36. In noting that "Congress [could not] grant to an officer under its control what it [did] not possess[,]" the Supreme Court found a separation of powers issue and declared unconstitutional the statutory power granting the Comptroller General certain executive authority. *Id.* at 726, 734–36. Given that the Comptroller General never should have had the authority in the first place, the exercise of authority was invalidated. *Id.* The Supreme Court has also invalidated other exercises of authority taken from separate branches. *Mnuchin*, 938 F.3d at 593 (citing *Clinton v. City of New York*, 524 U.S. 417, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998) (concluding a line item veto by President Clinton amounted to amending the law—powers left only to Congress—and was therefore unconstitutional); *INS v. Chadha*, 462 U.S. 919, 103 S. Ct. 2764, 77 L.Ed.2d 317 (1983)) (holding that a part of the Immigration and Nationality Act, which sanctioned either House of Congress to invalidate deportation decisions of the United States Attorney General, violated the doctrines of separation of powers and bicameralism).

adjudications by officers who were not appointed by the appropriate official.[22] But this present situation is unique and vacatur is inappropriate as explained below.

### A. The Council's action lacks proximate causation

It is self-evident that a plaintiff is not entitled to a remedy for a violation unless the violation is the cause of the plaintiff's harm. This is true in tort law. And it is true in constitutional law. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412 (1989) (requiring "a *direct causal link* between a municipal policy or custom and the alleged constitutional deprivation.") (emphasis added); *Utah v. Strieff*, 579 U.S. 232, 239, 136 S. Ct. 2056, 2061–62, 195 L. Ed. 2d 400 (2016) (concluding that a valid warrant constituted "a sufficient intervening event to break the causal chain" of an unconstitutional traffic stop.). To be sure, some of the Commercial Fishers concede that proximate causation is a requirement for a merits finding at this stage.[23] But the Commercial Fishers are on the wrong end of this proximate cause analysis.

The phrase "proximate cause" refers to the concept that: Injuries have countless causes, and not all should give rise to legal liability. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011). It has been an established "principle of law, that in all cases of loss, we are to attribute it to the *proximate cause*, and not to any remote cause." *Waters v. Merchants' Louisville Ins. Co.,* 11 Pet. 213, 223, 9 L.Ed. 691 (1837) (emphasis added). Thus, the

---

[22] An example of this was seen in *Lucia*. 138 S. Ct. at 2055 (ordering a new hearing be held after the Supreme Court found that administrative law judges within the Securities and Exchange Commission were officers and were therefore subject to the Appointments Clause). Another example is *NLRB v. Noel Canning*, 573 U.S. 513, 134 S. Ct. 2550, 189 L.Ed.2d 538 (2014), where the Supreme Court invalidated a ruling after finding that two out of three members of a National Labor Relations Board panel who skipped Senate confirmation through Presidential misuse of the Recess Appointments Clause were unconstitutionally appointed.

[23] At the hearing on some of the Commercial Fishers' Motion for Summary Judgment [6], the Commercial Fishers noted that "the Court has to find that . . . the [C]ouncil is the cause of our harm" and to be entitled to relief, "you have to prove causation on the merits [in addition to standing] as well[.]" [63], p. 26.

"proximate-cause inquiry . . . requires careful consideration of the relation between the injury asserted and the injurious conduct alleged." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462, 126 S. Ct. 1991, 1999, 164 L. Ed. 2d 720 (2006) (internal quotations omitted).

Here, the composition of the Council was not the proximate cause of the Commercial Fishers' injury. The amberjack quota reduction was ultimately signed off on by the Secretary's Designee, Janet Coit—not the Council. As the Assistant Administrator for Fisheries properly appointed by the Secretary, Coit was empowered by the Under Secretary to execute and fulfill duties on the Secretary's behalf.[24] [50]-15, p. 35-36; [14]-12, p. 3-6. While Coit faced a potential closed universe of options once the Council transmitted Amendment 54 to her,[25] as discussed previously, she still decided to approve it after her review.[26] In fact, Coit could have been silent on Amendment 54—either intentionally or through lack of diligence—and after 30 days the Amendment would have taken effect. 16 U.S.C. § 1854(a). But Coit was not silent—she affirmatively approved Amendment 54.[27] [14]-4, p. 2; [14]-10, p. 2. That decision, and Coit's ability

---

[24] DEP'T OF COM., DOO 10-15, UNDER SECRETARY OF COMMERCE FOR OCEANS AND ATMOSPHERE AND ADMINISTRATOR OF THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, § 3.05 (2011). As mentioned above, the parties arguments are solely centered on the Council's alleged unconstitutional structure and removal provisions—not the oversight structure of Coit's authority or her officer status and ability to bind the Executive Branch.

[25] The Secretary could: (1) approve the plan or (2) determine that the plan is not in step with the national standards or the law. 16 U.S.C. §§ 1854(a), (b).

[26] Coit had at her disposal the national standards contained in 16 U.S.C. Section 1851 to aid in her potentially sending Amendment 54 back to the Council. By way of example, these standards gave Coit the option, among others, to: utilize the "best scientific information" available; consider the efficiency of fishery resources; use economic and social data to weigh the "importance of fishery resources to fishing communities;" weigh the equitable fairness and conservation promotion of fishing privileges; and judge whether measures deliver "the optimum yield . . . for the United States fishing industry." 16 U.S.C. § 1851.

[27] Had Coit been silent or sent Amendment 54 back to the Council and a dispute arose that locked the two parties in an extended back and forth, there might be more of a causation throughline to the Council. Moreover, that back and forth between Coit and the Council might still be going on to this day. But that is not what happened.

to have a rigorous and mostly independent review,[28] thereby adopting Amendment 54 as the Secretary's, cuts off proximate causation to the Council.[29]

Now, given the lengthy standing analysis above, it is worth repeating that meeting the requirements for standing to bring claims against the Council, as the Commercial Fishers have done, does not automatically entitle the Commercial Fishers to a favorable causation ruling on the merits against the Council.[30] Unlike in causation analyses, in standing analyses, the merits of an unconstitutional claim are assumed valid at the start. *See Cruz*, 142 S. Ct. at 1647-48. Moreover, "standing in no way depends on the merits of the plaintiff's" claims. *Warth v. Seldin*, 422 U.S. 490, 500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)) (citing *Flast v. Cohen*, 392 U.S. 83, 99, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968)). Standing requires only that the Commercial Fishers' injury is *fairly traceable* to the Council's passage of Amendment 54. *League of United Latin Am. Citizens*, 659 F.3d at 431. And they have met that. But a decision on the merits requires more. And the Commercial Fishers have not shown how the Council's passage of Amendment 54 is not cut off by Coit's largely independent review and decision to adopt Amendment 54 as the Secretary's. Said differently, the

---

[28] The Commercial Fishers suggest that Coit merely rubber stamped any approval in a matter of minutes. But as the Assistant Administrator of the National Fisheries Service, Coit effectively runs its day-to-day operations, and surely knew about the Council's work on Amendment 54, as evidenced in the record and as shown in the months leading up to final approval. *See* [14]-1, 2, 3, and 4.

[29] Several circuits have held that a properly appointed official can ratify an improperly appointed official's action. The D.C. Circuit has "repeatedly held that a properly appointed official's ratification of an allegedly improper official's prior action, rather than mooting a claim, resolves the claim on the merits by 'remedying the defect' (if any) from the initial appointment." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 13 (D.C. Cir. 2019). And the Second, Third, and Ninth Circuits agree. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 160–63 (2d Cir. 2021); *Kajmowicz v. Whitaker*, 42 F.4th 138, 152 (3d Cir. 2022); *CFPB v. Gordon*, 819 F.3d 1179, 1191 (9th Cir. 2016).

[30] As discussed, the burden for sufficiently pleading causation as an element of standing "is relatively modest." *Bennett*, 520 U.S. at 168-71. It is not equivalent to proving proximate cause. *Lexmark Int'l, Inc.*, 572 U.S. at 134 n.6. Nor is it equivalent to proving strict but-for causation. *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004) ("Article III standing demands 'a causal relationship,' but neither the Supreme Court nor our Court has ever held that but-for causation is always needed.").

Commercial Fishers have not shown how the Council's action proximately caused their injuries. Because of this, the Council's Appointments Clause maladies, under these facts, are irrelevant. So there is no basis to void Amendment 54 or its Final Rule on those grounds.

### B. The Council maintained a valid quorum

Next, the proximate cause issue notwithstanding, it is not apparent how a valid exercise of Executive Authority by a majority of the Council is offset by an invalid exercise of authority by a minority of the Council. The Council comprises 17 members, of which 11 members have valid constitutional authority. Despite the six unconstitutionally appointed Council Members, the requirements of the Magnuson-Stevens Act were still met for Amendment 54 because a valid quorum still passed the Amendment. Removing the six unconstitutional Council Members from the equation, the 11 remaining validly appointed Council Members constituted a quorum and passed Amendment 54 by a vote of 10 to 1. GULF OF MEX. FISHERY MGMT. COUNCIL, GULF COUNCIL MOTIONS REPORT OCTOBER 24-27, 2022, p. 5-6 (An Alabama gubernatorial-recommendation appointee was the Council's only "no" vote).

Under the Act, the Council must have a quorum to transact business. 16 U.S.C. § 1852(e). Unsurprisingly, a quorum is "[a] majority of the voting members[.]" *Id.* The statute also dictates that all decisions of any Council shall be by majority vote of the voting members present and voting. *Id.*[31] As a result, the 11 validly appointed voting Council Members constituted a valid quorum (11 of 17). And the 10 validly appointed voting Council Members who voted for Amendment 54 were an adequate majority to adopt it. 16 U.S.C. § 1852(e); *See New Process Steel, L.P. v. N.L.R.B.*, 560

---

[31] Here, some of the Commercial Fishers allude to the potential importance of the quorum in their briefing. [71], p. 41 (stating that "if the Court finds nine or more Council seats were unconstitutionally appointed, the Council lacked a quorum to adopt Amendment 54 or its implementing regulation, § 1852(e)(1), and [the Final Rule] should also be vacated for that reason.").

U.S. 674, 687, 130 S. Ct. 2635, 2644, 177 L. Ed. 2d 162 (2010) (holding that a delegee group of the five-member National Labor Relations Board could not exercise its delegated authority once the group's and the National Labor Relations Board's membership fell to two—below the three out five required at all times for a quorum by statute). In this specific case, the validly appointed quorum that passed Amendment 54 also acts as a cure to any constitutional defect of the six Council Members.

Additionally, recognizing the Council as an entity that often makes policy decisions about fishing limits, and not as judges, makes the Council's passage of Amendment 54 different from other cases. The Council's structure and, in particular, how its Members come together to issue decisions, is distinct from the Appointments Clause cases often reviewed by the Supreme Court. The Council itself includes 17 appointed members who are not judges. And the decisions they render are proposals reviewed by the Secretary's Designee—not judgments. This distinction is important.

In *Ryder*, the Supreme Court found that a new hearing was the proper remedy where two judges on a three-judge panel of the Coast Guard Court of Military Review were unconstitutionally appointed. 515 U.S. at 178. The remedy centered around a tainted adjudication by a panel in which a quorum was impossible because a majority of the panel was unconstitutionally structured.

The Council's situation also differs from *Lucia*. There, in finding the single administrative law judge's appointment was unconstitutional, the Supreme Court concluded, as the *Ryder* Court did, the "appropriate remedy for an *adjudication* tainted with an appointments violation is a new 'hearing before a properly appointed' official." *Lucia*, 138 S. Ct. at 2055 (citing *Ryder*, 515 U.S. at 183, 188) (emphasis added). But Amendment 54 and its passage by the Council is not an

"adjudication." Nor is the Council akin to the single unconstitutionally appointed administrative law judge that rendered that adjudication. *Id.* at 2047. In either case, Amendment 54's passage does not present the same risk of a due process concern or other judicial error present in *Lucia*.[32]

Finally, the Supreme Court has at times declined to void decisions of public officials under the *de facto* officer doctrine. The *de facto* officer doctrine validates acts performed by a person acting under the color of official title even though that person's appointment or election was later found deficient. *Norton v. Shelby County*, 118 U.S. 425, 440, 6 S.Ct. 1121, 1124, 30 L.Ed. 178 (1886). "The de facto doctrine springs from the fear of the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question, and seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office." *Ryder*, 515 U.S. 177, 180-81 (citing 63A Am.Jur.2d, Public Officers and Employees § 578, p. 1080–1081 (1984) (footnote omitted)).

While often used in cases of criminal defendants challenging judicial authority during some part of their trial,[33] the Supreme Court has applied it to civil officers, as well. In *Buckley*, the plaintiffs challenged the appointment of the Federal Election Commission members on separation of powers grounds. *Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 626, 46 L. Ed. 2d 659 (1976). The

---

[32] The Council's disposition as a non-adjudicative body is distinguishable from other Appointments Clause cases, as well. *See Freytag*, 501 U.S. at 891 (noting where special trial judges of the Tax Court were inferior officers, "[t]he Tax Court exercises judicial power . . . It is neither advocate nor rulemaker. As an adjudicative body, it construes statutes passed by Congress and regulations promulgated by the Internal Revenue Service. It does not make political decisions."); and *Arthrex*, 141 S. Ct. at 1972 (observing where administrative patent judges were unconstitutionally appointed and the remedy was voiding their decision, the administrative patent judges "conduct adversarial proceedings for challenging the validity of an existing patent . . . ").

[33] *See Ball v. United States*, 140 U.S. 118, 128-29, 11 S.Ct. 761, 35 L.Ed. 377 (1891) (finding where a defendant was sentenced by a district judge after that district judge was reassigned from Louisiana to Texas as a replacement for a district judge who had fallen ill and died, the assigned district judge "was judge *de facto* if not *de jure*, and his acts as such are not open to collateral attack,"); *McDowell v. United States*, 159 U.S. 596, 601 16 S.Ct. 111, 40 L.Ed. 271 (1895) (holding that where McDowell was sentenced by a district judge, again after a reassignment, the assigned district judge, was a "judge *de facto*," and that "his actions as such, so far as they affect third persons, are not open to question.").

46

Supreme Court agreed, finding an Appointments Clause violation because four members of the Commission were appointed by Congress, rather than the President. Yet the Supreme Court also noted that the "past acts of the Commission are therefore accorded de facto validity." *Id.* at 142 (citing *Connor v. Williams*, 404 U.S. 549, 550–551, 92 S. Ct. 656, 657–658, 30 L.Ed.2d 704 (1972) (recognizing that legislative acts performed by legislators held to have been elected in accordance with an unconstitutional apportionment plan were not found void)).

It is true that *Ryder* refused to apply the *de facto* officer doctrine to its specific case and did not extend the *Buckley* decision beyond its facts, but the doctrine in the context of civil officers was not overruled. *Ryder*, 515 U.S. at 183-84. Moreover, in finding a new hearing was the proper remedy, *Ryder* did not look to the "original public meaning" of a constitutional provision to adopt this remedy and reject the *de facto* officer doctrine. *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv.,* 140 S. Ct. 1649, 1659, 207 L.Ed.2d 18 (2020). The Supreme Court instead anchored the reasoning in litigation incentives for future challenges: "Any other rule would create a disincentive to raise Appointments Clause challenges with respect to questionable judicial appointments." *Ryder*, 515 U.S. at 183. Here, those incentives do not support voiding the Council's passage of Amendment 54 and the Final Rule—as upholding a fishery regulation is not akin to the "questionable judicial appointment" present in *Ryder*.[34] *Id. Ryder* appears to address

---

[34] *Ryder* noted that when the Supreme Court had applied the *de facto* officer doctrine, the case did not involve "basic constitutional protections designed in part for the benefit of litigants." *Ryder*, 515 U.S. at 182 (citing *Glidden Co. v. Zdanok*, 370 U.S. 530 536, 82 S.Ct. 1459 1465, 8 L.Ed.2d 671 (1962)). While *Ryder*, *Ball*, and *McDowell* all involved judicial proceedings, the distinction between them was that petitioner in *Ryder* "raised his objection to the judges' titles before those very judges and prior to their action on his case. And his claim is based on the Appointments Clause of Article II of the Constitution—a claim that there *has* been a "trespass upon the executive power of appointment," *McDowell,* 159 U.S. at 598, rather than a misapplication of a statute providing for the assignment of already appointed judges to serve in other districts." *Id.* Here, the facts are unlike any of the above cases. No litigants implicate the trespass of due process rights—it is instead a challenge to fishery regulations passed by a valid quorum of a Council.

47

only judicial proceedings, where one who challenges "the constitutional validity of the appointment of an officer who *adjudicates* his case is entitled to a decision on the merits . . . and whatever relief may be appropriate if a violation indeed occurred." *Id.* at 182-183 (emphasis added).

The Commercial Fishers have presented a handful of cases for their proposition that "one unconstitutional decisionmaker is one too many." [7], p. 25 n.4.; [71] p. 40. But they are all either inapplicable or distinguishable.

First, *Free Enterprise Fund* has little to say on this specific issue.[35] Instead, the referenced portion dives into arguments about whether an individual, or a commission, is the Head of a Department under the Appointments Clause. [7], p. 25, n. 4 and [71] p. 40; *Free Enter. Fund*, 561 U.S. at 511-12 & n. 12. What little the referenced footnote does discuss concerns what assumptions may be made regarding party *standing*—not remedies for constitutional violations. *Id.* (holding that the Supreme Court "cannot assume . . . that the Chairman would have made the same appointments acting alone; and petitioners' standing does not require precise proof of what the Board's policies might have been[.]"). This argument is better conveyed in the Commercial Fishers' second case, *Fed. Elections Comm'n v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993), but it is still distinguishable.

There, the D.C. Circuit considered a challenge to the composition of the Federal Elections Commission—specifically to the presence of two Congressional officers on the Commission as

---

[35] In *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1725, 201 L. Ed. 2d 35 (2018), much like *Free Enterprise Fund*, the portion cited by the Commercial Fishers has nothing to say on this matter, instead exploring the history of the Colorado Anti-Discrimination Act. *Masterpiece Cakeshop*, 138 S. Ct. at 1725.

non-voting members. *NRA Political Victory Fund*, 6 F.3d at 826. The D.C. Circuit determined that Congress had placed its "agents 'beyond the legislative sphere' by naming them to membership on an entity with executive powers." *Id.* at 827. After considering the ways that Congress's agents might have impermissibly exerted authority over the Commission's proceedings, the D.C. Circuit vacated the Commission's underlying enforcement decision even though six of the eight members were not challenged. *Id.* at 827-28. This "enforcement" was at the heart of the issue—it is Congress' job to *create* the laws, and the Executive Branch's job to *enforce* them. Ultimately, even though the two Congressional officers were non-voting members, the separation of powers breach was too egregious not to vacate. Here, there is no separation of powers issue. And moreover, the Commercial Fishers make no factual allegations that the Council Members somehow exerted influence and control over the decisions of the others in their "on the record" meetings. Nor is *NRA Political Victory Fund* binding here.

*Nguyen v. United States*, 539 U.S. 69, 82, 123 S. Ct. 2130, 156 L. Ed. 2d 64 (2003) is similarly distinguishable. There, the Supreme Court vacated an opinion of the Ninth Circuit because the panel that issued it was improperly constituted. *Id.* But that holding depended on the dictates of the statute which authorizes the Circuit Courts of Appeals to sit in panels. *Id.* (citing 28 U.S.C. § 46(b)). In short, the Supreme Court vacated the opinion because, while a *quorum* of the panel was properly appointed, the statute required the *entire* panel to be properly appointed. *Id.* at 82-83. This was because Congress enacted Section 46(b) at least in part "to curtail the prior practice under which some circuits were routinely assigning some cases to two-judge panels." *Id.* at 83. That is not the case here, where the statute simply requires that all decisions of the Council be by majority vote of the voting members present and voting. 16 U.S.C. § 1852(e).

Next, in *Williams v. Pennsylvania*, 579 U.S. 1, 12-14, 136 S. Ct. 1899, 195 L. Ed. 2d 132 (2016), the Supreme Court held that a refusal of the Chief Justice of the Pennsylvania Supreme Court to recuse himself from a death penalty appeal—a case in which he had served as the district attorney who authorized the death penalty request to begin with—violated the defendant's due process and required vacating the judgment. The Supreme Court's rationale—despite five other properly serving state court justices—was the confidential deliberations of the panel: because the Supreme Court could not determine "whether the jurist in question might have influenced the views of his or her colleagues during the decisionmaking process[,]" the judgment should be vacated. *Id.* at 15. Here, the same due process risks or "unacceptable risk of bias" are not present. *Id.* at 14 (finding the Chief Justice's "significant, personal involvement in a critical decision in Williams's case gave rise to an unacceptable risk of actual bias."). Indeed, the Commercial Fishers have not alleged that the validly appointed Members of a Council, whose meetings are all public, were influenced at all by the improperly appointed Council Members.

Ultimately, the Council still maintained a quorum to conduct business. And that quorum, under this set of facts, cures any constitutional defect of the six unconstitutional Council Members insofar as Amendment 54 is concerned. Accordingly, absent a lack of quorum of validly appointed Council Members, there is alternatively no basis to declare Amendment 54 invalid and the Commercial Fishers are not entitled to have the Final Rule enjoined.

Because the Council's passage of Amendment 54 was not the proximate cause of the Commercial Fishers' injuries, there is no reason to void Amendment 54 or its Final Rule. Thus a severability analysis is not required. Alternatively, the Council maintained a valid quorum to conduct business while passing Amendment 54. Given that the constitutional defect—the six

invalid appointments—did not defeat the quorum vote on Amendment 54, and are therefore harmless under these facts, it is not necessary to correct any constitutional defect.[36] That correction is for Congress to make.[37] *See Blount v. Rizzi*, 400 U.S. 410, 419, 91 S. Ct. 423, 27 L.Ed.2d 498 (1971) (declaring that "it is for Congress, not this Court, to rewrite the statute.").

---

[36] Yet, if the Court is wrong on the proximate cause and quorum issues, the appropriate district court remedy may not be to automatically bar enforcement of Amendment 54, or set aside the Amendment 54 Final Rule, but instead to issue a stay in the proceedings, allowing for a fix through ratification or otherwise.

[37] However, the Court will provide a brief recourse to avoid any unnecessary remand if it were required to perform a severability analysis. These analyses generally involve examining the unconstitutional statutes and determining whether the offensive provisions are severable. *See Selia Law*, 140 S. Ct. at 2209 (holding that "[e]ven in the absence of a severability clause, the 'traditional' rule is that 'the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.'"). "[W]hen confronting a constitutional flaw in a statue, [courts ought] to limit the solution to the problem[.]" *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 508). Here, the statutory portion investing these six as Council Members must be severed while the remaining constitutional provisions be given "full effect." *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2350, 207 L. Ed. 2d 784 (2020).

For the five state officials, the governing provision states that "[t]he principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State, so long as the official continues to hold such position, or the designee of such official[,]" will be a Council Member. 16 U.S.C. § 1852(b)(1)(A). By slightly changing this so that the Secretary appoints one individual from each state, "with marine fishery management responsibility [or] expertise," Congress's stated purpose of local input and control over the regulation of fisheries would be preserved while freeing the Executive Branch to appoint these seats on the Council. *See Free Enter. Fund*, 561 U.S. at 509-10 (modifying an unconstitutional statute and noting that courts "might blue-pencil" many portions of a statute, but that "such editorial freedom . . . belongs to the Legislature, not the Judiciary."); 16 U.S.C. § 1801(b)(5) (stating that a purpose was enabling "the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of" fishery plans).

The question now turns to whether, with these changes, Congress would have still passed this statute. The answer is likely yes. Little of substance has changed—the procedure for drafting and promulgating plans, the provisions of the plans, and the methodologies that must be applied to them are the same. Congress also took pains to memorialize why it was passing this statute in Section 1801. There, it laid out its concerns with the state of the nation's fisheries. 16 U.S.C. § 1801(a)(2). Congress declared that it sought to assure the program uses: "the best scientific information available; involves . . . interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities . . . ; considers the effects of fishing on immature fish and encourages development of practical measures . . . ; and is workable and effective[.]" 16 U.S.C. § 1801(c)(3). The proposed severance from the statute has little to no impact on these purposes and goals. Thus, even with these modifications, Congress would likely have still passed this statute.

For the regional director, the governing provision states that "[t]he regional director of the National Marine Fisheries Service for the geographic area concerned" shall be a Council Member. 16 U.S.C. § 1852(b)(1)(B). By adding the brief phrase ", as appointed by the Secretary," to the provision so that it reads "[t]he regional director of the National Marine Fisheries Service for the geographic area concerned, as appointed by the Secretary," shall be a Council member cures the violation. This slight change maintains Congress's stated purpose of including the regional director on the Council, while maintaining the appointment framework for Senior Executive Service members, set up under 5 U.S.C. Section 3393. It simply requires the Secretary to sign off on this particular Senior Executive Service

**IV.     The Removal Provisions**

The Commercial Fishers also challenge the lack of removal provisions for the Council Members: the five state officials, and the 11 gubernatorial-recommended Council Members, and the regional director. The "[g]eneral rule" is "that the President possesses 'the authority to remove those who assist him in carrying out his duties.'" *Selia Law*, 140 S. Ct. at 2198. Consequently, Congress cannot insulate inferior officers from removal if those inferior officers "assist" the President in carrying out his duties—i.e, the officers handle certain regulation decisions or exercise administrative authority. Here, the Council Members exercise administrative authority to draft regulations on fishing limits.[38] As a result, they help the President carry out his duties, and any removal insulation is unconstitutional.

**A.  The Provisions**

First, the state officials serving on the Council appear completely insulated from the Secretary. This is because they serve on the Council "so long as the official continues to hold such position," as appointed by the Governor of their State. 16 U.S.C. § 1852(b)(1)(A). This provides no avenue for the Secretary to remove a Council Member at all. Accordingly, they are unconstitutional.

---

appointment, given the role it plays as an inferior officer. Consequently, Congress would likely have still passed the statute, too.

[38] Returning to the structure of the Magnuson-Stevens Act, the Council creates the fishery regulation plans. 16 U.S.C. § 1854(a). Assistant Administrator Janet Coit's review, as the Secretary's Designee, is most important for compliance with standards and with the law. *Id.* But even if Coit does return a plan to the Council on compliance grounds, the Council must still be the entity to produce that new policy. *Id.* Only if they refuse, may Coit take things into her own hands. 16 U.S.C. § 1854(c). But the structure of the act runs all plan production through the Councils. With this authority, the Council determines how, and why, to regulate the fisheries of the Gulf of Mexico, ultimately assisting the Secretary—and by association, the President—with that task.

Second, the removal provision in 16 U.S.C. Section 1852(b)(6) for the 11 gubernatorial-recommended Council Members is also unconstitutional. That provision provides two avenues for the Secretary to remove those Council Members: (1) if the Council itself recommends removal by a two-thirds majority of voting members, or (2) if the Council Member violates the conflicts-of-interest policy. 16 U.S.C. § 1852(b)(6). Thus, the removal restrictions, which completely prevent the President from any say in removing them, are unconstitutional. *Seila Law*, 140 S. Ct. at 2198.

Finally, some of the Commercial Fishers contend that the regional director, as a Senior Executive Service appointee and subject to the removal restrictions[39] under 5 U.S.C. Section 7543, serves in violation of the Appointments Clause. [71], p. 35, [50]-15, p. 28. While Senior Executive Service appointees are indeed subject to removal restrictions, the Supreme Court has not elaborated on the extent to which Appointments Clause removal cases effect members of the civil service system, including Senior Executive Service members. *See Free Enter. Fund*, 561 U.S. at 507 (holding that, regarding removal restrictions, "nothing in our opinion, therefore, should be read to cast doubt on the use of what is colloquially known as the civil service system within independent agencies.").[40] Consequently, absent clear direction that Senior Executive Service members are subject to the same Appointment's Clause removal limitations as other types of inferior officers, the Court hesitates to draw that conclusion. As a result, the regional director's removal restrictions

---

[39] "Under regulations prescribed . . . an agency may take an action covered by this subchapter against an employee only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." 5 U.S.C. § 7543(a).

[40] Nor is the regional director similarly situated to the other Secretary-appointed Council Members when it comes to Presidential oversight. "[M]embers of the Senior Executive Service may be reassigned or reviewed by agency heads (and entire agencies may be excluded from that Service by the President), see, *e.g.*, [5 U.S.C.] §§ 3132(c), 3395(a), 4312(d), 4314(b)(3), (c)(3); cf. § 2302(a)(2)(B)(ii)." *Id.* at 506-507. And while the full extent of that Presidential power "is not before [the Supreme Court], any such authority is . . . wholly absent with respect to the [Secretary-appointed Council Members]," who are not Senior Executive Service members. *Id.* at 507.

do not appear to be unconstitutional, and the remedy will be limited to the 16 Council Members subject to unconstitutional removal restrictions.[41]

## B.  The Remedy

Lastly, are the Commercial Fishers entitled to any injunctive relief? While the Supreme Court has yet to provide a remedial framework for instances of unconstitutional removal restrictions, the Fifth Circuit has. Drawing on the Supreme Court's *Collins* decision, the Fifth Circuit has stated that for a plaintiff to prove it was harmed by an unconstitutional removal restriction, and thus entitled to relief, the plaintiff must prove three elements: (1) "a substantiated desire by the President to remove the unconstitutionally insulated actor," (2) "a perceived inability to remove the actor due to the infirm provision," and (3) "a nexus between the desire to remove and the challenged actions taken by the insulated actor." *Community Financial Services Association of America, Limited*, 51 F.4th at 632.

The Commercial Fishers cannot meet any of these elements. They have provided no argument that the President, or the Secretary, had any desire to remove these Council Members or had any issues with Amendment 54. Indeed, given the approval of Amendment 54 and its aftermath, one could assume the opposite. Without these elements, the Commercial Fishers cannot demonstrate they were harmed by the removal provisions and cannot demonstrate an entitlement to any relief.

---

[41] Because unconstitutional removal restrictions do not automatically render decisions taken by those affected officers void, it is unnecessary to provide a severability analysis. *See Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th at 631; *Collins*, 141 S. Ct. at 1788 & n. 23 (holding that unlike cases "involv[ing] a Government actor's exercise of power that the actor did not lawfully possess," a properly appointed officer's insulation from removal "does not strip the [officer] of the power to undertake the other responsibilities of his office.").

## CONCLUSION

The appointment of the five state officials and the regional director as Council Members is unconstitutional, but that violation does not void the passage of Amendment 54. Moreover, the inability of the Secretary to remove 16 of the Council Members at will is also unconstitutional, but the Commercial Fishers are not entitled to any relief.

IT IS THEREFORE ORDERED that the Commercial Fishers' Motion for Preliminary Injunction *or alternatively* for Summary Judgment [6] is DENIED.

IT IS FURTHER ORDERED that the Government's Cross Motion for Summary Judgment [65] is GRANTED.

IT IS FURTHER ORDERED that the Defendant's Motion for Summary Judgment [70] is DENIED.

IT IS FURTHER ORDERED that the Government's Cross Motion for Summary Judgment [77] is GRANTED.

IT IS FURTHER ORDERED that the Intervenor Defendants' [84] Motion for Review of Magistrate Judge Order [79] is DENIED.[42]

THIS, the 31st day of January 2024.

TAYLOR B. McNEEL
UNITED STATES DISTRICT JUDGE

---

[42] The Magistrate Judge was correct to deny intervention by the other interested fishing stakeholders for all of his reasons stated, including that the timeliness of the expedited case weighed against intervention, the proposed intervenor defendants had a chance to file an amicus brief, and the proposed intervenor defendants did not show how "their interests may be inadequately represented by [the Government] Defendants." [79], p. 5-6. Moreover, even though the amicus brief was never officially filed, the proposed brief was still reviewed and the arguments presented do not change any opinions expressed by the Court. Because of this, coupled with the fact that the Motion is now moot, the Intervenor Defendants' [84] Motion for Review of Magistrate Judge Order [79] denying Intervenor Defendants' [53] Motion to Intervene is denied.